# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

TEVA PHARMACEUTICALS
INTERNATIONAL GMBH and
TEVA PHARMACEUTICALS
USA, INC.,

        Plaintiffs,

   v.

ELI LILLY AND COMPANY,

        Defendant.

Civil Action No.
1:18-cv-12029-ADB

## PLAINTIFFS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

**I.    LILLY MISAPPLIES THE LAW OF INDEFINITENESS** ...................................... 2

   A.   The Court Should Not Consider Lilly's Indefiniteness Defenses At This Stage ................ 3

   B.   Lilly Misstates and Misapplies the Law of Indefiniteness .................................. 4

**II.   DISPUTED TERMS** ......................................................................................... 6

   A.   Anti-CGRP Antagonist ...................................................................................... 6

      1.   A POSA Would Understand The Scope of "Anti-CGRP Antagonist Antibodies" With Reasonable Certainty. ..................................................................................... 6

      2.   The Court Should Adopt the Agreed Construction of "Anti-CGRP Antagonist Antibody" and, If Necessary, Separately Construe "CGRP." ........................... 10

   B.   "Humanized . . . Antibody" ............................................................................. 10

      1.   The Express Definition of "Humanized Antibody" Is Entirely Consistent With the Well-Known Meaning of the Term in the Field. ................................................ 10

      2.   The Court Should Adopt Teva's Proposed Construction For Humanized Antibodies. 13

   C.   "Wherein the CDRs impart to the antibody specific binding to a CGRP consisting of amino acid residues 1 to 37 of SEQ ID No:15 or SEQ ID No:43" ........................... 14

      1.   "Specific Binding" Is Expressly Defined and Definite. ................................... 14

      2.   The Court Should Find That "Specific Binding" Is Not Limited to Exclusive Binding and Permits Binding to Multiple Isoforms of CGRP. ........................... 16

   D.   Human IgG Heavy Chain ................................................................................. 18

   E.   "Treating" ....................................................................................................... 20

**CONCLUSION** .............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A*,
    657 F.3d 1264 (Fed. Cir. 2011)...................................................................18

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
    786 F.3d 983 (Fed. Cir. 2015)........................................................................5

*BASF Corp. v. Johnson Matthey Inc.*,
    875 F.3d 1360 (Fed. Cir. 2017)...................................................................3, 5

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018)................................................................11, 12

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
    783 F.3d 1374 (Fed. Cir. 2015)..................................................................4, 10

*BJ Servs. Co. v. Haliburton Energy Servs., Inc.*,
    338 F.3d 1368 (Fed. Cir. 2003)......................................................................3

*Cipher Pharm. Inc. v. Actavis Labs. FL, Inc.*,
    99 F. Supp. 3d 508 (D.N.J. 2015) ..................................................................3

*CSB-System Int'l Inc. v. SAP Am., Inc.*,
    2011 WL 3240838 (E.D. Pa. July 28, 2011)....................................................2

*Dow Chem. Co. v. Nova Chems. Corp. (Can.)*,
    803 F.3d 620 (Fed. Cir. 2015)........................................................................7

*Ecolabs, Inc. v. FMC Corp.*,
    569 F.3d 1335 (Fed. Cir. 2009).....................................................................18

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
    796 F.3d 1312 (Fed. Cir. 2015)..................................................................5, 15

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Products Grp., LLC*,
    879 F.3d 1332 (Fed. Cir. 2018).....................................................................10

*Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*,
    936 F.3d 1353 (Fed. Cir. 2019)...............................................................4, 8, 15

*KCJ Corp. v. Kinetic Concepts, Inc.*,
    223 F.3d 1351 (Fed. Cir. 2000).....................................................................17

*Nevro Corp. v. Boston Scientific Corp.*,
  955 F.3d 35 (Fed. Cir. 2020)....................................................................3, 6

*One-E-Way, Inc. v. Int'l Trade Comm'n*,
  859 F.3d 1059 (Fed. Cir. 2017)...................................................................4

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
  520 F.3d 1358 (Fed. Cir. 2008).................................................................19

*In re Packard*,
  751 F.3d 1307 (Fed. Cir. 2014)...................................................................2

*Presidio Components, Inc. v. Am. Technical Ceramics Corp.*,
  875 F.3d 1369 (Fed. Cir. 2015).................................................................15

*Skyline Software Sys., Inc. v Keyhole, Inc.*,
  421 F. Supp. 2d 371 (D. Mass 2006) ........................................................14

*Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017).................................................................11

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
  789 F.3d 1335 (Fed. Cir. 2015)...................................................................7

*Wright Med. Tech., Inc. v. Osteonics Corp.*,
  122 F.3d 1440 (Fed. Cir. 1997).................................................................19

**Statutes**

35 U.S.C. § 112........................................................................................2, 5

# INTRODUCTION

The inventors of the asserted patents were the first people to discover that therapeutic antibodies engineered to target the neuropeptide CGRP could be useful in the treatment of migraine. The general techniques of antibody engineering and evaluating antibody properties were known by 2005. But there was considerable uncertainty among scientists regarding the pathology of migraine. Scientists were skeptical, to say the least, that the full-length therapeutic antibodies that the inventors were researching could even reach the brain, let alone treat migraine. Targeting CGRP itself (rather than its receptors) was also risky, given the role of CGRP in regulating multiple aspects of the cardio- and cerebrovascular systems. An extensive record on these issues was developed in Lilly's nine IPRs. Suffice to say, the inventors proved the skeptics wrong, made breakthrough discoveries, and invented an entire new class of migraine drugs. This case involves the foundational patents that describe that work and protect Teva's innovative migraine drug.

Before the Court reaches those aspects of the case, though, it must construe six disputed terms. For the most part, the terms are directed toward basic concepts of antibody engineering, well known to persons of ordinary skill in the art ("POSAs"), such as "antibody antagonists," "humanized antibodies," and "specific binding." Lilly claims these terms are indefinite because they are too broad and the specification does not provide "precise" or "specific" or numerical "thresholds." As detailed in Section I below, the level of precision Lilly demands is not what the law requires. Lilly's characterization of the specification and the conclusions that a POSA would draw from that specification also fail as a factual matter, which Teva addresses in Section II.

Lilly's remaining arguments fare no better. Lilly takes a different approach for the term "human IgG heavy chain," arguing that the term is so narrow as to be robbed of all meaning. But even Lilly's expert admitted that antibody heavy chains are classified only by their *constant* regions, not their variable regions. Lilly also seeks a narrow construction of "or" in isolation,

without acknowledging that its proposed construction is foreclosed by the express definition of "specific binding," which appears in the same phrase.  Finally, Lilly continues to refuse to take a position on whether the preamble in the method of treatment claims is a claim limitation.  The parties need to know whether the preamble must be addressed in infringement and invalidity proofs.  By proposing a construction, Lilly seems to concede that the preamble matters.  Lilly's refusal to commit at this stage is an improper attempt to keep its options open in the event that Lilly wants to change its mind later in the case.  The Court should find the preamble is limiting and construe it as the parties agreed.

## ARGUMENT

## I.    LILLY MISAPPLIES THE LAW OF INDEFINITENESS

Lilly asks the Court to invalidate all asserted claims arguing that they are indefinite.  Lilly's indefiniteness defenses run into two insurmountable legal obstacles.  First, Lilly's indefiniteness arguments are premature.  Courts consistently defer consideration of indefiniteness arguments like the ones advanced by Lilly here because they are fact intensive.  *See, e.g.*, *CSB-System Int'l Inc. v. SAP Am., Inc.*, 2011 WL 3240838, at *17 (E.D. Pa. July 28, 2011) ("Several well-settled principles . . . tend to discourage rulings on indefiniteness at the *Markman* stage.").  Second, Lilly's arguments are all premised on the flawed theory that a patent must provide "precise" or "specific" thresholds and identify one—and only one—testing method to measure those thresholds.  The Federal Circuit, however, has instructed that 35 U.S.C. § 112 "is not a demand for unreasonable precision.  The requirement, applied to the real world of modern technology, does not contemplate in every case a verbal precision of the kind found in mathematics." *In re Packard*, 751 F.3d 1307, 1313 (Fed. Cir. 2014).

**A.      The Court Should Not Consider Lilly's Indefiniteness Defenses At This Stage**

The Court should not consider Lilly's indefiniteness defenses now because this is not a case where the Court is unable to ascribe meaning to the disputed terms.  *See Cipher Pharm. Inc. v. Actavis Labs. FL, Inc.* 99 F. Supp. 3d 508, 514 (D.N.J. 2015) (deferring consideration of indefiniteness arguments that "ventures far beyond the inherent meaning of the words . . . ").  As Lilly admits, the terms are all expressly defined in the specification, and the Court should adopt those express definitions as the constructions.

Lilly takes issue with the express definitions because they include functional language and terms of degree.  At the outset, there is nothing legally or inherently wrong with functional language or terms of degree in patent claims.  *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1366 (Fed. Cir. 2017).  The Federal Circuit has recognized that "[c]laim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention."  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014).  Similarly, "functional language can 'promote[] definiteness because it helps bound the scope of the claims by specifying the operations that the [claimed invention] must undertake.'"  *Nevro Corp. v. Boston Scientific Corp.*, 955 F.3d 35, 39–40 (Fed. Cir. 2020) (citations omitted).  In cases like this one, the definiteness inquiry is fact intensive and "highly dependent on context (e.g., the disclosure in the specification and the knowledge of a person of ordinary skill in the relevant art area)."  *See id.* (citations omitted).  To carry its burden, Lilly must prove those facts by clear and convincing evidence.  *See BASF Corp.*, 875 F.3d at 1365.  And, taking into account Lilly's evidentiary burden, if there are disputes of material fact on these specific, fact-intensive issues, Lilly's indefiniteness defenses should be tried to and resolved by the jury.  *See BJ Servs. Co. v. Haliburton Energy Servs., Inc.*, 338 F.3d 1368, 1372 (Fed. Cir. 2003) ("[D]efiniteness . . . is amenable to resolution by the jury where the issues are factual in nature.").

In its brief, Lilly does not acknowledge, let alone carry, its evidentiary and procedural burdens. For that reason alone, the Court should defer ruling on Lilly's indefiniteness defenses at this stage of the case.

### B.    Lilly Misstates and Misapplies the Law of Indefiniteness

The Court should reject Lilly's indefiniteness defenses for the additional, independent reason that Lilly misapprehends the requirement for definiteness. Lilly's indefiniteness arguments hinge on its assertions that the specification fails to provide a "specific criteria" (ECF No. 66 ("Lilly Br.") at 7), "precise boundaries" (*id.* at 13), or specific numeric "threshold[s]" or "proportion[s]" (*id.* at 13, 19). In the same vein, Lilly asserts that the specification must identify one—and only one—method (or assay) to evaluate certain functional requirements. *See id.* at 8 (arguing that the specification does not "identify a particular test or assay").

Even a cursory review of recent Federal Circuit caselaw demonstrates that Lilly demands too much from Teva's patents. The Court has repeatedly rejected assertions of indefiniteness similar in nature to those made by Lilly. For example, in *Biosig Instruments, Inc. v. Nautilus, Inc.*, the Federal Circuit found the term "spaced relationship" definite even though the specification in that case "d[id] not specifically define 'spaced relationship' with actual parameters, e.g., that the space between the live and common electrodes is one inch." 783 F.3d 1374, 1382–83 (Fed. Cir. 2015). In *Guangdong*, the Court rejected an argument that the term "lofty . . . batting" was indefinite because the patent "fails to disclose precisely how much resilience is enough to satisfy the claim." *Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1362 (Fed. Cir. 2019). Similarly, in *One-E-Way,* the Federal Circuit reversed a finding by the International Trade Commission that the term "virtually free from interference" was indefinite. *See One-E-Way, Inc. v. Int'l Trade Comm'n*, 859 F.3d 1059, 1064–65 (Fed. Cir. 2017). In reaching its conclusion, the Federal Circuit rejected respondents' argument that the specification "does not

'inform one of ordinary skill in the art as to any particular level of interference or as to how much interference is permitted.'"  *See id.* at 1066 (citation omitted).[1]

There is also no requirement that a patent identify "a particular test or assay that should be used" to assess functional limits in claims.  *See* Lilly Br. at 8, 19.  The Federal Circuit's decision in *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1316 (Fed. Cir. 2015), is instructive.  *Ethicon* involved claims covering surgical shears that required "clamping pressure" and "clamping force."  Initially, the district court found the claims indefinite because "nothing in the specification or understanding in the art specified 'a method of measurement, the location of measurement, and the type of and amount of tissue used for the measurement of clamping force[s] and clamping pressure[s]' recited by the claims."  *Id.* at 1316–17.  The Federal Circuit reversed, finding that the district court went astray by "believ[ing] that in order for the claims of the '501 patent to satisfy the definiteness requirement of 35 U.S.C. § 112 ¶ 2, the intrinsic evidence needed to identify *a specific method* one of ordinary skill in the art would use to measure the recited clamping/coaptation pressures."  *Id.* at 1319 (emphasis added).  The Federal Circuit rejected that reasoning:

> But in the context of the dispute here, the definiteness requirement of 35 U.S.C. § 112 mandates only that one skilled in the art must be able to understand *which* pressures are relevant to the claims and *how* those pressures can be measured, so to discern the scope of the claimed average pressure range with reasonable certainty. . . .  If such an understanding of how to measure the claimed average pressures was within the scope of knowledge possessed by one of ordinary skill in the art, there is no requirement for the specification to identify a particular measurement technique.

[1] *See also BASF Corp.*, 875 F.3d at 1366 ("The mere observation of information not 'recited' does not answer the question whether a person of ordinary skill in the art would *need* to be given the level and measurement information to understand, with reasonable certainty, whether a composition is 'effective to catalyze' . . . ."); *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 786 F.3d 983, 1002 (Fed. Cir. 2015) (finding the term "substantially centered" to be definite, notwithstanding that the patent provides "no objective standard to measure the scope of the term 'substantially centered'").

*Id.* (emphasis in original).   The court more recently explained:   "the ambiguity inherent in functional terms may be resolved where the patent 'provides a general guideline and examples sufficient to enable a person of ordinary skill in the art to determine the scope of the claims.'" *Nevro Corp.*, 955 F.3d at 39 (quoting *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1335 (Fed. Cir. 2010)).   For the reasons set forth below, Teva's patents easily meet that standard.

## II.   DISPUTED TERMS

### A.   Anti-CGRP Antagonist

1.   A POSA Would Understand The Scope of
"Anti-CGRP Antagonist Antibodies" With Reasonable Certainty.

Lilly cannot credibly argue that a POSA—who, under Lilly's construct, possesses a Ph.D. in immunology, molecular biology, or pharmacology with several years of post-doctoral research focused on antibody engineering and/or antibody pharmacology—would be unable to discern with reasonable certainty the meaning of the term "anti-CGRP antagonist antibody."   Lilly and its expert concede that an "anti-CGRP antagonist antibody" must possess two characteristics:   the antibody must "(1) 'bind to CGRP' and (2) 'inhibit CGRP biological activity and/or downstream pathway(s) mediated by CGRP signaling.'"   Lilly Br. at 7; *see* Garcia Decl. ¶ 35.   There is no argument that a POSA would not understand, with reasonable certainty, what it means for an antibody to "bind" or "inhibit" biological activity and/or downstream pathway(s) mediated by CGRP signaling.[2] Indeed, the specification's definition of "antagonist" is essentially the same as the basic, textbook

---

[2] Lilly's expert explained at his deposition that "the way . . . that a hormone like CGRP acts is it doesn't go into the cell.   It binds and activates the receptor which is sitting on that [cell] wall and essentially acting like a door.   And then once the ligand knocks on the door, it activates signaling pathways downstream."   Garcia Tr. (Ex. V) at 107:7–108:18.   That cellular signaling can produce biological and physiological outcomes, such as vasodilation.   *See* '045 patent (Ex. A), 1:35–37; *see also* Garcia Tr. at 111:6–14.

definition of the term in molecular biology:  i.e., "[a] molecule, such as a drug, enzyme inhibitor, or hormone, that diminishes or prevents the action of another molecule."  Blais Ex. U[3] at 5.

Lilly's argument hinges on its attempt to shoehorn this case and Teva's patents into a narrow line of cases in which the Federal Circuit has found claims indefinite because the scope of the claim *depended* on the test method and the specification provided no (or conflicting) guidance on which test to use.  *See* Lilly Br. at 3 (citing *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620, 634–35 (Fed. Cir. 2015) and *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341–45 (Fed. Cir. 2015)).  However, the terms at issue in those cases are much different from the term before the Court now.  In both *Dow* and *Teva*, the claims were directed toward a ***specific property*** that needed to fall within a specific numeric range.  *See Dow*, 803 F.3d at 624–25 (requiring a "slope of strain hardening coefficient greater than or equal to 1.3"); *Teva*, 789 F.3d at 1338 (requiring a "molecular weight of about 5 to 9 kilodaltons").[4]  In contrast, the term anti-CGRP antagonist antibody is defined inclusively to cover antibodies that exhibit any one of multiple potential properties.  After binding, the antibody must "inhibit CGRP biological activity and/or downstream pathway(s) mediated by CGRP signaling."  '045 patent (Ex. A), 13:64–66.  Put another way, either inhibition of CGRP biological activity or inhibition of downstream pathway(s) mediated by CGRP signaling is sufficient for an antibody to fall within the express definition.  The term also is not limited to the inhibition of a *single* biological activity or downstream pathway mediated by CGRP signaling.  The anti-CGRP antagonist antibodies covered by Teva's patents

---

[3] Exhibits A–U were attached to the Declaration of Elaine Herrmann Blais in Support of Plaintiffs' Opening Claim Construction Brief (ECF No. 69).  The deposition testimony of Dr. Garcia and Dr. Ravetch are attached as Ex. V and Ex. W, respectively, to the Declaration of Elaine Herrmann Blais in Support of Plaintiffs' Responsive Claim Construction Brief.

[4] In both *Teva* and *Dow*, the Court took up the indefiniteness defense *after trial*.  *See Teva*, 789 F.3d at 1338–39 (discussing district courts credibility determinations); *Dow*, 803 F.3d at 625 (appeal after jury trial).

may, for example, inhibit the production of cyclic AMP in cells (human or rat),[5] inhibit skin vasodilation, lower blood pressure, or, eventually, treat migraines. *See id.* at 25:56–58, 31:61–66.

With that background, Lilly's repeated assertions that assay results in Teva's patents are "contradictory" fall apart.  Simply put, Teva's patents disclose the results of *different* assays designed to evaluate *different* biological properties.  The unremarkable fact that different assays used to evaluate different characteristics of complex biological systems in different species produce different results does not make the term indefinite.  *See Guangdong*, 936 F.3d at 1363 ("Because 'lofty . . . batting' is expressly defined . . . based on two properties, bulk and resilience, we find it unremarkable that the specification discloses two methods of measuring loftiness.").  An assay that shows that an antibody inhibits cellular signaling in human cells is not "contradicted" by a different assay that fails to show antagonism in live rats.  The definition of "anti-CGRP antagonist antibody" does not require an antibody to exhibit antagonistic behavior in *all* species and *all* assays that evaluate *all* CGRP biological activity.  All that is required is evidence that the antibody (1) binds to CGRP and (2) inhibits biological activity.  Lilly Br. at 7; Garcia Tr. (Ex. V) at 121:16–25.  It is sufficient for purposes of the definition of "anti-CGRP antagonist antibody" for the antibody to inhibit any one of the many biological responses elicited by CGRP.[6]

Lilly's discussion of the assays performed on Antibody 6H2 makes Teva's point.  *See* Lilly Br. at 8–10.  To begin, Lilly does not argue that the assays themselves would be unknown to a

---

[5] Lilly's expert explained in his deposition that when CGRP binds to receptors on the surface of a cell, it causes the cell to produce cAMP.  Garcia Tr. at 108:19–109:8.  cAMP is a "secondary messenger" which acts "like a courier inside the cell."  *Id.*

[6] The fact that the term is inclusive does not make it indefinite.  Even Lilly's expert understands the scope of the term.  For example, Dr. Garcia acknowledged that the specification permits evaluation of "any characteristic" or "any function" of antagonism.  *See* Garcia Decl. ¶ 40.  Dr. Garcia further conceded that the specification permits "*any* meaningful degree of change" in those characteristics.  *See id.* ¶ 51.

POSA or that a POSA would not know how to interpret their results.  Rather, the assays were commercially available, performed "following manufacturer's instructions," and, as Dr. Garcia testified, "quite straightforward to learn."  '045 patent, 53:58–62:1; Garcia Tr. at 154:12–156:8. In one assay that measured cellular signaling impacts in human cells (referred to as SK-N-MC cells), a POSA would understand that Antibody 6H2 "inhibited biological activity using SK-N-MC cells."  Lilly Br. at 9.  Antibody 6H2 was also evaluated in rat cells (referred to as L6) and live rats, and did not exhibit antagonistic activity in those systems.  *See* '045 patent, Table 3.  There is no contradiction in the results; each assay evaluates different ways an antibody may "inhibit biological activity."  As long as one assay demonstrates inhibition of a biological activity or downstream CGRP signaling, the antibody is an "antagonist" and falls within the definition of "anti-CGRP antagonist antibody."

Finally, Lilly's complaint about the breadth of the definition in the specification is largely academic.  The terms in dispute do not exist in isolation, but rather they are part of the patent claims, and thus the issue before the Court (or what should be left for a jury to determine) should be whether the *asserted claims* are indefinite.  The other limitations in the claims operate to narrow the scope of the "anti-CGRP antagonist antibodies" claimed.  For example, the asserted claims are principally directed toward *therapeutic* antibodies that are administered to *humans*.  The asserted method of treatment claims require the administration of an "effective amount" of an anti-CGRP antagonist antibody for "treating" headache ('907 and '908 patents) or vasomotor symptoms ('045 patent).  *See* ECF No. 59 at A-5 to -5 (setting out agreed constructions for "treating" and "effective amount").  The antibodies that are covered by those claims are not the corner cases on which Lilly's indefiniteness case is based—i.e., antibodies that show only antagonistic activity *in vitro* but no activity *in vivo*.  Likewise, other asserted claims, such as claims 1, 17, and 18 of the '951

patent and claims 1, 17, and 18 of the '881 patent, *do specify* particular assays to evaluate antagonistic activity.  Thus, to the extent the Court is inclined to take up Lilly's indefiniteness defense (and it should not), it must do so on a claim-by-claim basis.

      2.    The Court Should Adopt the Agreed Construction of "Anti-CGRP Antagonist Antibody" and, If Necessary, Separately Construe "CGRP."

Lilly concedes that it has altered the express definition of "anti-CGRP antagonist antibody" to "account for the specification's definition of 'CGRP.'"  Lilly Br. at 12.  For the reasons provided in Teva's Opening Brief, it is improper to alter the express definition of one term to "account for" the definition of a separate term.  Although Teva does not believe a construction is necessary (as there is no dispute on what the specification says), if the Court disagrees, the Court should separately construe CGRP and adopt the express definition from the specification.

**B.**    **"Humanized . . . Antibody"**

      1.    The Express Definition of "Humanized Antibody" Is Entirely Consistent With the Well-Known Meaning of the Term in the Field.

Lilly argues that the well-known term "humanized antibody" renders all asserted claims invalid.  Focusing on the term of degree, "minimal sequence," Lilly argues that the specification does not provide "precise boundaries," or "a minimal threshold," or a "*maximum* number or proportion" of non-human antibodies.  *Id.* at 13.  As explained in Section I, Lilly overstates the amount of precision required for a claim to be found definite.  *See also Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Products Grp., LLC*, 879 F.3d 1332, 1345–47 (Fed. Cir. 2018) (rejecting arguments that "numerical precision is required" where "there is 'some standard for measuring the term of degree'"); *Biosig Instruments*, 783 F.3d at 1382 ("[T]he degree of precision necessary for adequate claims is a function of the nature of the subject matter.") (citation omitted).

There is considerable guidance in the specification from which a POSA would understand the scope of the claimed "humanized antibodies."  Even Lilly's expert conceded that a POSA would understand "[h]umanized antibody refers to an antibody that has gone through the process of humanization which encompasses a myriad of possible combinations and strategies."  Garcia Tr. at 69:19–70:3.[7]  Dr. Garcia further admitted that these known techniques for humanizing antibodies could be "pick[ed] . . . up fairly readily by reading experiments and protocols."  *Id.* at 40:13–21.  Thus, at a minimum, a POSA would understand a "humanized antibody" refers to an antibody that has undergone one of the known processes of humanization—exactly as the specification discloses.  *See* '045 patent, 28:65–29:28.

The specification provides several, objectively-defined examples of "humanized" and "human" antibodies, making clear that the distinction turns on the presence of non-human amino acid sequences in the variable region.  Lilly argues there is a problem using "exemplary language that *does not limit* the scope" of a claim term.  Lilly Br. at 14.  The Federal Circuit, however, has found terms of degree to be definite when examples provide "guidance and points of comparison for skilled artisans."  *See Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1378 (Fed. Cir. 2017) (reversing district court determination that the phrase "visually negligible" was indefinite where the specification included a "general exemplary design" and "two specific examples of visually-negligible indicators").[8]  The figure from Lilly's brief illustrates how the

---

[7] Several of those strategies are discussed in the specification, such as fusing a non-human variable region to a human constant region, CDR grafting, and veneering.  *See* '045 patent, 28:65–29:15.

[8] Indeed, even the cases relied on by Lilly make this point.  For example, in *Berkheimer*, the Federal Circuit reviewed the definiteness of the term "minimal redundancy."  *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1363 (Fed. Cir. 2018).  Unlike here, the Federal Circuit found (1) "[t]he specification uses inconsistent terminology to describe the level of redundancy that the system archives," (2) "[t]he only example included in the specification is an archive that exhibits no redundancy," and (3) "[t]he specification ***contains no point of comparison*** for skilled artisans to determine an objective boundary of 'minimal' when archives include *some* redundancies."  *Id.* at

examples in Teva's specification provide guidance and points of comparison that allow a POSA to understand the scope of humanized antibodies.



At the far left of the spectrum, there is no dispute that Antibody A illustrates a "human antibody." *See* Garcia Tr. at 73:6–15; *see also* '045 patent, 13:26–30. On the other end of the spectrum, Antibody I illustrates an antibody with entirely non-human variable regions. The specification tells a POSA these so-called "chimeric antibodies" fall within the definition of "humanized antibodies." *See* '045 patent, 28:65–29:3. Antibody F illustrates an antibody with CDRs from non-human sources, which the specification also labels as humanized. *See* '045 patent, 12:66–13:5, 29:7–10; *see also* Garcia Tr. at 76:22–77:2, 177:25–178:4. Similarly, Antibodies G and H illustrate antibodies where at least one variable region contains non-human CDRs, which are identified as examples of "humanized antibodies." *See* '045 patent, 13:11–17.

That leaves Antibodies B – E in Lilly's figure. As Dr. Garcia conceded, each of those antibodies contain at least one fully-human heavy chain or at least one fully-human light chain. *See* Garcia Tr. at 77:3–7. The express definition of "human antibodies" in the specification, which neither Lilly nor Dr. Garcia address, provides the answer: "This definition of a human antibody includes antibodies comprising at least one human heavy chain polypeptide or at least one light chain polypeptide." '045 patent, 13:30–34. Accordingly, as defined in Teva's specification,

1363–64 (emphasis added). *Berkheimer* is also distinguishable from this case because the patent owner did not provide the court with expert testimony of its own. *See id.*

Antibodies A – E are "human antibodies," and Antibodies F – I are "humanized antibodies." Through the several, objectively defined examples, a POSA of ordinary skill in the art would know how to distinguish between a "human antibody" and the claimed "humanized antibodies."

> 2.   The Court Should Adopt Teva's
>       Proposed Construction For Humanized Antibodies.

Lilly is incorrect when it argues that its proposed alternative construction "matches the asserted patents' governing definition of 'humanized' antibodies," and its construction should be rejected for that reason alone. Lilly Br. at 16. Instead, Lilly's proposed construction matches *only* the topic sentence of a paragraph that then goes on to provide the governing definition of "humanized antibodies." As relevant here, one question that the fact-finder will need to resolve is whether Lilly's antibody product Emgality®—an antibody that contains non-human CDRs—is a humanized antibody. Teva's construction, which is based on the specification, makes clear for the jury that antibodies with non-human CDRs are humanized antibodies. Accordingly, Lilly cannot reasonably argue the language is "superfluous." It directly informs both questions of infringement and (as explained above) indefiniteness.[9]

Lilly's argument that Teva's construction improperly imports limitations from "embodiments" into the specification makes no sense. There is simply no way to reconcile Lilly's indefiniteness argument that the "exemplary language . . . *does not limit*" the definition of humanized antibody (*id.* at 14), with its claim construction argument that "Teva's construction 'threatens to improperly limit the term beyond its express definition' and should be rejected" (*id.* at 17). In any event, the language from the *definition* section of the specification is not merely an

---

[9] Teva's construction abridges the full definition of "humanized antibodies" for the sake of simplifying issues and technical concepts presented to the jury. Teva would not object if the Court elects to adopt the full paragraph (col. 12, ll. 61–col. 13, ll. 25) as its construction.

"embodiment." The law Lilly cites refers to attempts by parties to limit claims to "specific embodiments of the *invention*." *See Skyline Software Sys., Inc. v Keyhole, Inc.*, 421 F. Supp. 2d 371, 376 (D. Mass 2006) (emphasis added). Teva's construction does not limit the claims to a particular "embodiment"—for example antibody G1. Instead, Teva's construction tracks the patent's definition that "humanized antibodies" includes antibodies that have non-human CDRs.

**C.** **"Wherein the CDRs impart to the antibody specific binding to a CGRP consisting of amino acid residues 1 to 37 of SEQ ID No:15 or SEQ ID No:43"**

       1.   <u>"Specific Binding" Is Expressly Defined and Definite.</u>

Lilly's argument that the express definition of "specific binding" is indefinite is difficult to understand. The term is expressly defined using straightforward, non-technical language that can be easily understood by a lay person, never mind a Ph.D. with several years of relevant experience: "binding/binds more frequently, more rapidly, more readily, and/or with greater affinity, avidity, and/or duration with a particular cell or substance than it does with alternative cells or substances." In other words, an antibody exhibits specific binding if it binds "more frequently" or "more rapidly" or "more readily" or "with greater affinity" or "with greater avidity," or "with greater duration" to one substance as compared against another substance. Lilly effectively concedes the point when it argues "a POSA would understand from the specification that 'specific' or 'preferential' binding may be assessed using *any* parameter reflecting one of the disclosed binding characteristics (e.g., *greater* frequency, rapidity, duration, affinity, avidity, or readiness)." Lilly Br. at 18. Lilly further acknowledges that the specification provides guidance on metrics for measuring rapidity (referred to as $k_{on}$), duration (referred to as $k_{off}$), and affinity of binding (referred to as $K_D$). *See id.*; *see also* '045 patent, 19:40–47 (defining $k_{on}$, $k_{off}$, and $K_D$).[10]

---

[10] Dr. Ravetch explained that "more readily refers to more rapidly, and that's another measure of the association kinetic quantity of the interaction." Ravetch Tr. at 245:14–22.

In Lilly's view, the specification must identify one metric, measured by one test, that can be compared to a numerical standard before a claim is definite. *See* Lilly Br. at 18–19 (claiming Teva's patent fails to "identify a single metric" and a "particular test/assay for assessing 'specific' . . . binding" and a numeric "threshold differential for a given metric."). As already discussed, that is not the law. Lilly's view also cannot be squared with the plain, inclusive language used in the express definition. A positive result under any of the metrics—frequency, rapidity, readiness, affinity, avidity, or duration—is sufficient to meet the definition of "specific binding."

Lilly's arguments are also factually incorrect. For example, Lilly suggests that the patent does not identify a particular assay for assessing specific binding or thresholds for evaluating those measurements. To the contrary, the specification repeatedly directs the POSA to commercially available, surface plasmon resonance assays manufactured by Biacore. *See, e.g.*, '045 patent, 27:3–13, 50:6–12, 58:53–57. Dr. Garcia agreed that a POSA would be qualified to operate the Biacore assay and would have received training on its operation. *See* Garcia Tr. at 125:6–24. Similarly, Lilly's IPR expert testified that SPR was a "preferred choice" for measuring the affinity of antibodies and was both "routine" and "readily accessible in the field of antibody engineering" as of 2005. Blais Ex. C, ¶¶ 66–67; *see Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 875 F.3d 1369, 1376 (Fed. Cir. 2015) ("Under our post-*Nautilus* cases, a claim is not indefinite if a person of skill in the art would know how to utilize a standard measurement method, such as insertion loss, to make the necessary measurement."). Not only does the specification identify the applicable methods of measurement, it "demonstrates their application via examples." *See Guangdong,* 936 F.3d at 1362–63; *Endo-Surgery,* 796 F.3d at 1316–17.[11]

---

[11] The specification also provides explicit numerical thresholds for measuring binding affinity, such as "about 0.02 to about 200 nM." *See* '045 patent, 5:35–46. In addition, according to the specification, the Biacore assay can "detect[] differences in binding affinity of about 2-fold or

The specification also directs the POSA to "a competitive binding assay, where the ability of a candidate antibody to compete with a known anti-CGRP antagonist for CGRP binding is evaluated." '045 patent, 31:47–50. Figure 6 demonstrates the application of such a competitive binding assay, again using the commercially-available Biacore system. *See id.* 10:10–18. The assay evaluated "competitive binding" between Antibody G1 and various antibody fragments and biological substances, such as amylin, calcitonin, and adrenomedullin. These three substances are closely-related peptides in the body that perform different functions. *See* '045 patent, 1:25–27. Tellingly, neither Lilly nor Dr. Garcia even mention the competitive binding assay or offer any interpretation of its results.

> 2.    The Court Should Find That "Specific Binding" Is Not Limited to <u>Exclusive Binding and Permits Binding to Multiple Isoforms of CGRP.</u>

The Court should reject Lilly's attempt to construe the phrase "wherein the CDRs impart to the antibody specific binding to a CGRP consisting of amino acid residues 1 to 37 of SEQ ID NO:15 or SEQ ID NO:43" to require ***exclusive*** binding to either α-CGRP or β-CGRP but not both. As reflected below, Teva has adopted the word-for-word construction Lilly obtained in the IPRs. Teva's construction is not "surplusage"; it directly addresses the fundamental dispute.

| Lilly's IPR Construction | Teva's Proposed Construction |
|---|---|
| "As used in the '908 patent, the term 'specific binding' includes antibodies that may bind to more than one isoform of CGRP, e.g., the α and β isoforms of human and/or rat CGRP, and does not preclude binding to another peptide, such as amylin. Nor does it require any special degree of binding to one CGRP isoform compared to another." (Blais Ex. B at 24.) | "…[t]his includes antibodies that may bind to more than one isoform of CGRP, e.g., the α and β isoforms of human and/or rat CGRP, and does not preclude binding to another peptide, such as amylin; nor does it require any special degree of binding to one CGRP isoform compared to another." |

---

greater" ('045 patent, 41:23–25), which is consistent with thresholds generally known in the field. *See* Ravetch Tr. at 209:14–210:13. Lilly points to Example 4, which reports binding affinities ($K_D$) for Antibody G1 to human and rat β-CGRP of 0.155 nM and 0.152 nM, respectively. These $K_D$ are indistinguishable as they fall within the 2-fold sensitivity of the Biacore system.

In a complete reversal from its IPR position, Lilly now argues that the language of the claims "is clear:  the claimed antibody exhibits 'specific binding' to either human α-CGRP or β-CGRP but not both."  Lilly Br. at 27.  Lilly even goes so far as to argue that there is "no indication" in the intrinsic record that "or" should be construed inclusively.  *Id.* at 26. Lilly is wrong.  As Lilly argued in the IPRs, the intrinsic record contains an express definition of "specific binding" that unequivocally states that "antibodies may bind to more than one isoform of CGRP, e.g., the α and β isoforms of human and/or rat CGRP."  Blais Ex. B at 24 (citing '045 patent, 16:1–4).  Moreover, the intrinsic record expressly distinguishes between "specific binding" and "exclusive binding." '045 patent, 16:4–6.  The specification instructs that α-CGRP and β-CGRP differ in only three of thirty-seven amino acids.  *Id.*, 1:29–30.  Given the small variation, a POSA would expect antibodies to bind to both α- and β-CGRP.  Ravetch Decl. ¶ 45.  The specification also indicates that the preferred antibody, G1, binds to both α-CGRP and β-CGRP.  *See id.* (citing '045 patent, 49:10–50:5).  Finally, the claims require specific binding to "a CGRP," which means "one or more" CGRP.  *See KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000).

Against the weight of the clear direction in the patent that the inventors did not intend to exclude anti-CGRP antibodies that bind to both closely related isoforms of CGRP, Lilly points to the unremarkable fact that the patentees sometimes used "and," sometimes used "or," and sometimes used "and/or."  But Lilly goes too far when it argues that the "specification employs the term 'or' in a limited fashion, referring to exclusive alternatives."  Lilly Br. at 26.  For example, the specification states that the invention is directed toward "antibodies for treating *or* preventing . . . migraines."  *See, e.g.*, '045 patent, Abstract; 3:37–54; 5:61–67; 8:65–9:5; 11:36–41; 19:62–67; 48:49–52.  No one would understand the inventors to be referring only to antibodies that either treated migraine or prevented migraine but not antibodies that both treated and

prevented migraines.  Similarly, the specification states that the inventive anti-CGRP antagonist antibodies can "block *or* decrease CGRP receptor activation," "inhibit CGRP biological activity *or* downstream pathways mediated by CGRP signaling function,"[12] and "prevent, ameliorate, *or* treat any aspect of headache."  *See id.*, 31:31–41 (emphasis added).  And the inventors used "or" in its inclusive sense when listing symptoms of migraines.  *See id.*, 2:41–47; *see also id.*, 1:52–59 (listing symptoms of hot flushes as "nervousness, fatigue, irritability, insomnia, depression, memory loss, headache, anxiety, nervousness *or* inability to concentrate" (emphasis added)).  The specification contains many other examples of the inventors using "or" in its inclusive sense.[13]

### D.    Human IgG Heavy Chain

Lilly asks the Court to construe the phrase "human IgG heavy chain" in a manner that would make the claims in which the phrase appears inoperable.  *See AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1277–78 (Fed. Cir. 2011) (rejecting claim construction that required a material that was "physically impossible to produce."); *Ecolabs, Inc. v. FMC Corp.*, 569 F.3d 1335, 1345 (Fed. Cir. 2009) (holding inoperable construction was wrong where the claim language permits an operable interpretation).  Lilly ignores that the asserted claims are directed toward *humanized* antibodies, which requires that the variable region contains non-human amino acid sequences.  In contrast, an antibody with an entirely human heavy chain is defined as a "human antibody."  *See* '045 patent, 13:30–34 ("This definition of human antibody includes antibodies comprising at least one human heavy chain polypeptide or at least one human light chain

---

[12] This phrase in particular demonstrates that the inventors, on occasion, used "or" and "and/or" interchangeably.  *See* '045 Patent, 13:62–66 ("[A]n 'anti-CGRP antagonist antibody' . . . refers to an antibody that is able to . . . inhibit CGRP biological activity ***and/or*** downstream pathway(s) mediated by CGRP signaling." (emphasis added)).

[13] *See, e.g., id.*, claim 1 ("A method for reducing incidence of or treating . . . ."); *see also id.* at 2:53, 3:43–44, 3:55–57, 3:61–63, 5:42, 6:45, 8:11, 8:40, 9:1, 11:39, 17:38, 19:64, 20:8–9, 20:30, 20:55, 26:66.

polypeptide.").  This is also reflected in the dependent claims that require the CDRs in the variable region to be "derived from mouse, rat, or rabbit CDRs."  *See, e.g.*, '907 patent, claim 14, 17; *see also Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1362 (Fed. Cir. 2008) (rejecting construction that would "render several dependent claims meaningless"); *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed. Cir. 1997) (same).[14]

Ignoring the actual language of the claims, Lilly argues that "human" modifies "IgG heavy chain," and therefore the entire amino acid sequence for the entire chain must be human.  Lilly Br. at 22.  Lilly's argument is a *non sequitur*.  Human can still modify "heavy chain" without requiring any particular amino acids in the variable region.  The best example of this is the other modifier in the phrase, "IgG."  There is no dispute that IgG describes the constant region, not the variable region, of the heavy chain.  *See* '045 patent, 12:27–29, 12:33–35; *see also* Garcia Tr. at 91:13–17. By November 2005, a POSA would be aware that IgG referred to a known sequence in the constant region of the heavy chain that could be looked up in a database.  *See* Garcia Tr. at 87:23–88:2, 88:13–17.  Dr. Garcia admitted, however, that the label "IgG" says nothing about the amino acids in the variable region of the heavy chain.  *See id.*, 88:18–22 ("Does the characterization of an antibody as IgG give a person of ordinary skill in the art any information about the sequence of the variable region of the heavy chain?  A.  Not really.  No.  Very little.").

The same logic applies to the modifier "human," which further instructs that the constant region corresponds to a "human IgG" antibody as opposed to an IgG antibody from another animal. Most mammals, including humans, rats, rabbits, cows, etc., have IgG antibodies.  *See id.*, 89:8– 16.  The general structure of the IgG antibodies are the same across species—i.e., two heavy chains

---

[14] Lilly's construction also excludes the preferred G1 antibody in the patent.  *See* Garcia Tr. at 104:9–16.

and two light chains, with variable regions that have three CDRs and four framework regions. *See id.*, 100:15–101:14, 102:5–8. The amino acid sequence of the constant regions, however, differs across species. *See id.*, 90:1–17. For example, the constant region of the heavy chain of a human IgG antibody has a different amino acid sequence than the constant region of the heavy chain of a rat IgG antibody. *Id.*; *see id.* at 98:24–99:12 (testifying that a POSA was "one . . . click away" from IgG sequences for different species). Accordingly, the "human" modifier simply refers to an IgG heavy chain that has the constant region sequence that corresponds to humans IgG antibodies as compared to rat or mouse or cow IgG antibodies.

Lilly's remaining arguments fail. Lilly suggests that the prosecution of different claims with different terms in different patents somehow bears on the meaning of "human IgG heavy chain" in claims directed toward "humanized antibodies." *See* Lilly Br. at 23–24 (relying on claims in and the prosecution of the '614 and the '343 patents). But nowhere in those other claims or their prosecution do either Teva or the Examiner provide any interpretation of the term "human," as it modifies "IgG heavy chain." There is certainly no discussion about whether the term "human" was understood to modify the entire heavy chain or just its constant region. There is simply no evidence concerning why those different claims used different language.

**E.     "Treating"**

The Court should hold the preamble is limiting and not let Lilly eventually disclose its actual theory regarding the preamble on Teva later in the case. Lilly concedes that the term "treating," which appears in the preamble must be construed. It only makes sense to offer a construction of the preamble, if it is limiting. The Court should find the preamble is limiting.

**CONCLUSION**

For the foregoing reasons, the Court should reject or, at least, defer consideration of Lilly's indefiniteness defenses and adopt all of Teva's proposed constructions.

Dated: October 23, 2020

Respectfully Submitted,

/s/ Elaine Herrmann Blais
Douglas J. Kline (BBO# 556680)
Elaine Herrmann Blais (BBO# 656142)
Robert Frederickson III (BBO# 670111)
Joshua S. Weinger (BBO# 690814)
Alexandra Lu (BBO# 691114)
Eric T. Romeo (BBO# 691591)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: (617) 570-1000
Fax: (617) 523-1231
dkline@goodwinlaw.com
eblais@goodwinlaw.com
rfrederickson@goodwinlaw.com
jweinger@goodwinlaw.com
alu@goodwinlaw.com
eromeo@goodwinlaw.com

I. Neel Chatterjee (*pro hac vice*)
GOODWIN PROCTER LLP
601 Marshall St.
Redwood City, CA 94063
Tel.: (650) 752-3100
Fax: (650) 853-1038
nchatterjee@goodwinlaw.com

Natasha Daughtrey (*pro hac vice*)
GOODWIN PROCTER LLP
601 S. Figueroa St.
Los Angeles, CA 90017
Tel.: (213) 426-2500
Fax: (213) 623-1673
ndaughtrey@goodwinlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Elaine Herrmann Blais, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on all counsel of record who are not served through the CM/ECF system on October 23, 2020.

*/s/* Elaine Herrmann Blais
Elaine Herrmann Blais (BBO# 656142)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
eblais@goodwinlaw.com