UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TEVA PHARMACEUTICALS INTERNATIONAL GMBH and TEVA PHARMACEUTICALS USA, INC., | * * * * | |
| Plaintiffs and Defendants-in-Counterclaim, | * * | |
| v. | * * | Civil Action No. 18-cv-12029-ADB |
| ELI LILLY AND COMPANY, | * * * | |
| Defendant and Plaintiff-in-Counterclaim. | * * * | |

## MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION

BURROUGHS, D.J.

In this patent infringement suit, Teva Pharmaceuticals International GmbH and Teva Pharmaceuticals USA, Inc. (collectively, "Teva") allege that Eli Lilly and Company ("Lilly") has infringed claims in nine patents owned by Teva related to a product marketed under the brand name Ajovy, which contains the active ingredient fremanezumab and is used to treat migraines. [ECF No. 1].  Lilly has brought counterclaims against Teva, seeking declaratory judgments that its product marketed under the brand name Emgality, which contains the active ingredient galcanezumab and is also used to treat migraines, does not infringe Teva's patents and that Teva's patents are invalid.  [ECF No. 17].  The parties briefed claim construction for six disputed terms, [ECF Nos. 65, 66, 77, 79, 89, 90], and the Court conducted a hearing on December 15, 2020, at which the parties presented their proposed constructions, [ECF No. 88].  The Court construes the terms as set forth below.

I.      **LEGAL STANDARD**

A.      **Claim Construction**

Claim construction is the first stage of a patent infringement analysis and requires the Court to determine "the scope and meaning of the patent claims asserted." Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc., 206 F.3d 1440, 1444 (Fed. Cir. 2000). Claim construction is a question of law for the Court, Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996), to be resolved with an eye toward the fact that the Court's adopted construction "becomes the basis of the jury instructions, should the case go to trial" on the issue of infringement, AFG Indus., Inc. v. Cardinal IG Co., 239 F.3d 1239, 1247 (Fed. Cir. 2001).

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation and internal quotation marks omitted). "[T]he words of a claim are generally given their ordinary and customary meaning," which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Id. at 1312–13 (internal quotation marks omitted). Certain terms "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314.

"There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." Thorner v. Sony Comput. Ent. Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012). "To act as [his] own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning." Id. (citation and internal quotation marks omitted). Similarly, to disavow the scope

of a claim term, "[t]he patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." Id. at 1366 (citation and internal quotation marks omitted).

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996); see also Allergan Sales, LLC v. Sandoz, Inc., 935 F.3d 1370, 1373 (Fed. Cir. 2019). "First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." Vitronics, 90 F.3d at 1582. "[S]econd, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." Id. "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." Id. For this reason, the specification "is always highly relevant to the claim construction analysis," and "[u]sually, it is dispositive; it is the single best guide to the meaning of a disputed term." Id. "Third, the court may also consider the prosecution history of the patent, if in evidence." Id. The prosecution history is relevant because

> [it] was created by the patentee in attempting to explain and obtain the patent. . . . [T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.

Phillips, 415 F.3d at 1317.

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." Vitronics, 90 F.3d at 1583. However, "[w]hen the intrinsic evidence is silent as to the plain

meaning of a term, it is entirely appropriate for the district court to look to dictionaries or other

extrinsic sources for context—to aid in arriving at the plain meaning of a claim term."

Helmsderfer v. Bobrick Washroom Equip., Inc., 527 F.3d 1379, 1382 (Fed. Cir. 2008).

"[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable

interpretation of patent claim scope unless considered in the context of the intrinsic evidence."

Phillips, 415 F.3d at 1319.

### B.    Indefiniteness

Patent law speaks to indefiniteness by requiring that "[t]he specification . . . conclude

with one or more claims particularly pointing out and distinctly claiming the subject matter

which the applicant regards as his invention."  35 U.S.C. § 112.  The Supreme Court has held

that "a patent is invalid for indefiniteness if its claims, read in light of the specification

delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those

skilled in the art about the scope of the invention."  Nautilus, Inc. v. Biosig Instruments, Inc., 572

U.S. 898, 901 (2014).  The requirement is aimed at providing the public with clear notice about

what is being claimed.  Id. at 911.

"Indefiniteness is a matter of claim construction, and the same principles that generally

govern claim construction are applicable to determining whether allegedly indefinite claim

language is subject to construction."  Praxair, Inc. v. ATMI, Inc., 543 F.3d 1306, 1319 (Fed. Cir.

2008).  "Of course, claims are not indefinite merely because they present a difficult task of claim

construction."  Halliburton Energy Servs. v. M-I LLC, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

"Instead, '[i]f the meaning of the claim is discernible, even though the task may be formidable

and the conclusion may be one over which reasonable persons will disagree, we have held the

claim sufficiently clear to avoid invalidity on indefiniteness grounds.'"  Id. (alteration in

original) (quoting <u>Exxon Research & Eng'g Co. v. United States</u>, 265 F.3d 1371, 1375 (Fed. Cir. 2001)).  On the other hand, "[i]t cannot be sufficient that a court can ascribe *some* meaning to a patent's claims; the definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application, not that of a court viewing matters post hoc."  <u>Nautilus</u>, 572 U.S. at 911.  "[A]n accused infringer [must] show[] by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area."  <u>Halliburton</u>, 514 F.3d at 1249–50.

## II.   DISCUSSION

The terms submitted for claim construction are found across nine patents: U.S. Patent Nos. 8,586,045 ("the '045 patent"); 8,597,649 ("the '649 patent"); 9,266,951 ("the '951 patent"); 9,340,614 ("the '614 patent"); 9,346,881 ("the '881 patent"); 9,884,907 ("the '907 patent"); 9,884,908 ("the '908 patent"); 9,890,210 ("the '210 patent"); and 9,890,211 ("the '211 patent"). [ECF No. 65 at 7, 8 n.3; ECF No. 66 at 6].  Six of the patents claim as inventive anti-Calcitonin Gene-Related Peptide ("CGRP") antibodies (composition patents), while three patents claim methods of treating migraines by using the anti-CGRP antibodies (method of treatment patents). [ECF No. 65 at 8].[1]  Since all of the patents share a common specification, for the purposes of claim construction the parties primarily focus on the '045 patent.  [ECF No. 59-1 at 2 nn.1–2].

The parties present six disputed claim terms for construction: (1) "anti-CGRP antagonist antibody" or "anti-Calcitonin Gene-Related Peptide (CGRP) antagonist antibody";

---

[1] Through the *inter partes* review process, the Patent Trial and Appeals Board found that all challenged claims in the composition patents were invalid as obvious, but upheld the validity of the challenged claims in the method of treatment patents.  [ECF No. 65 at 13].  Both parties are appealing the decisions to the Federal Circuit.  [<u>Id.</u>; ECF No. 66 at 6 n.3].

(2) "humanized . . . antibody"; (3) "specific binding" or "preferentially binds"; (4) "human IgG heavy chain"; (5) "or" (as used in a specific phrase); and (6) "treating."  [ECF No. 59-1 at 2–6].[2] In addition, the parties present an agreed-upon construction for two claim terms: "antibody" and "effective amount."  [Id. at 6].

### A.     "Anti-CGRP antagonist antibody" or "anti-Calcitonin Gene-Related Peptide (CGRP) antagonist antibody"

| Patent (Claims) | Teva's Proposed Construction | Lilly's Proposed Construction |
|---|---|---|
| All patents-in-suit (all asserted claims) | No construction needed in light of the specification.<br><br>To the extent construction is needed, Teva proposes construing the terms as: "An antibody that is able to bind to CGRP and inhibit CGRP biological activity and/or downstream pathway(s) mediated by CGRP signaling" | Indefinite.<br><br>In the alternative, Lilly proposes construing the terms as: "An antibody that is able to bind to any form of calcitonin gene-related peptide (CGRP) (including variants thereof that retain at least partial activity) from any mammalian species and inhibit CGRP biological activity and/or downstream pathway(s) mediated by CGRP signaling" |

This term is used in all asserted claims of each of the nine patents in dispute.  [ECF No. 59-1 at 2].  Lilly primarily argues that the term is indefinite.  [ECF No. 66 at 13].  Lilly asserts in the alternative that the term requires construction because the definition provided in the specification contains terms that should be further defined.  [Id. at 12].  Teva counters that the term is not indefinite and that Lilly's experts testified during the *inter partes* review process that the term would have been "well known" to a person of ordinary skill in the art ("POSITA"). [ECF No. 65 at 15].  In addition, Teva argues that this term is clearly defined in the specification

---

[2] Terms are presented in the order in which they appear in a chart attached to the parties' joint claim construction statement.  [ECF No. 59-1 at 2–6].

and that Lilly is impermissibly adding language from more general descriptions of CGRP—
rather than anti-CGRP antagonist antibodies—in its proposed claim construction.  [Id. at 17].

       1.      Indefiniteness Challenge

The Court begins with Lilly's indefiniteness challenge.  See Enzo Biochem, Inc. v.
Applera Corp., 599 F.3d 1325, 1332 (Fed. Cir. 2010) ("If a claim is indefinite, the claim, by
definition, cannot be construed.").

The term "anti-CGRP antagonist antibody" is used in all claims of the patents, for
example, in Claim 1 of the '045 patent: "A method for reducing incidence of or treating at least
one vasomotor symptom in an individual, comprising administering to the individual an effective
amount of an anti-CGRP antagonist antibody, wherein said anti-CGRP antagonist antibody is a
human monoclonal antibody or a humanized monoclonal antibody."  [ECF No. 67-1 at 70
(99:1–7)].  The term is defined in the specification as

> an antibody that is able to bind to CGRP and inhibit CGRP biological activity
> and/or downstream pathway(s) mediated by CGRP signaling.  An anti-CGRP
> antagonist antibody encompasses antibodies that block, antagonize, suppress or
> reduce (including significantly) CGRP biological activity, including downstream
> pathways mediated by CGRP signaling, such as receptor binding and/or elicitation
> of a cellular response to CGRP.

[Id. at 27 (13:63–14:4)].  Lilly claims that the term is indefinite because the specification does
not identify a single test or associated test results to identify which antibodies meet the term's
definition and properties, specifically the inhibition of CGRP biological activity and/or
downstream pathways.  [ECF No. 66 at 12; ECF No. 68 ¶¶ 34–59 (Garcia declaration)].  Teva
argues compellingly that the specification provides sufficient information to allow a POSITA to

understand how to identify and assess an anti-CGRP antagonist antibody's activity.  [ECF No. 65 at 18–19; ECF No. 70 ¶¶ 25–33 (Ravetch declaration)].

Although claim terms must provide a POSITA with reasonable certainty about the scope of an invention, that certainty "does not require 'absolute or mathematical precision.'"  BASF Corp. v. Johnson Matthey Inc., 875 F.3d 1360, 1365 (Fed. Cir. 2017) (quoting Biosig Instruments, Inc. v. Nautilus, Inc., 783 F.3d 1374, 1381 (Fed. Cir. 2015)).  "A term is not indefinite . . . merely because of the possibility of variations in experimental conditions."  Oxford Immunotec Ltd. v. Qiagen, Inc., 255 F. Supp. 3d 263, 272 (D. Mass. 2017) (citing Enzo Biochem, 599 F.3d at 1335–36).

In one case cited by Lilly, Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc., the Federal Circuit found a claim reciting "molecular weight" indefinite where the claim and specification did not define the term and there were three different types of molecular weight (Mp, Mw, and Mn) as well as different ways to measure each type, which could produce different results.  789 F.3d 1335, 1341 (Fed. Cir. 2015).  In contrast, in a second case cited by Lilly, not providing *any* information about methods to measure or test a property or characteristic disclosed in a patent rendered a claim indefinite.  Dow Chem. Co. v. Nova Chems. Corp. (Can.), 803 F.3d 620, 634 (Fed. Cir. 2015) ("Neither the patent claims nor the specification here discusses the four methods or provides any guidance as to which method should be used or even whether the possible universe of methods is limited to these four methods.").  Neither of these extremes is evident in the patents at issue in this case.

Here, although the claim itself does not reference inhibition, the specification's definition of an anti-CGRP antagonist antibody describes inhibition as the ability to "block, antagonize, suppress or reduce (including significantly)."  [ECF No. 67-1 at 27 (13:66–14:1)].  The

specification suggests six different tests, or assays, for measuring this ability, as well as an antibody's binding affinity.  [ECF No. 65 at 19 (citing specification references to tests)]; see, e.g., [ECF No. 67-1 at 34 (27:3–19) (discussing assay and method to test binding affinity of antibodies); id. at 47 (53:36–54:64) (discussing test to measure downstream activity and test results)].  In addition, the specification provides results for the assays.  See, e.g., [id. at 47 (53:36–54:64); id. at 48 (55:26–57:12)].  Both parties agree that a POSITA would understand that these different tests are measuring different aspects of those binding and inhibition properties under different conditions.  [ECF No. 79 at 11–12; ECF No. 70 ¶ 33 (noting that a POSITA would understand that in vitro assay results would differ from in vivo assay results); ECF No. 68 ¶ 36 (acknowledging that a POSITA would understand that different types of tests will produce different results)].  As a result, the Court does not credit Lilly's contention that a POSITA would be confused by these varying results.  Where one of the disclosed assays demonstrates an antibody's binding and inhibition of specified activities and/or downstream pathways, that antibody meets the definition of an anti-CGRP antagonist antibody.

The Court is also not persuaded by Lilly's arguments that the patent must disclose precise parameters or amounts for these activities.  The specification provides a range of possible levels of binding affinity and inhibition relative to the assays necessary for an antibody to qualify as an anti-CGRP antagonist antibody.  See, e.g., [ECF No. 67-1 at 46 (51:1–52:26) (listing results related to binding and antagonist activity from two different assays)]; see also [ECF No. 70 ¶¶ 29–31 (discussing specification's description of ranges produced by different assays)].  This provides sufficient notice of the scope of the claimed invention, even if the exact extent of an antibody's binding and inhibition properties is not provided to a mathematical certainty.  See

BASF, 875 F.3d at 1365.  Accordingly, Lilly has failed to demonstrate by clear and convincing evidence that the term is indefinite.  See Halliburton, 514 F.3d at 1249–50.

>    2.    Claim Construction

Teva's proposed construction mirrors a definition for the claim term that is set out in the specification.  Compare [ECF No. 59-1 at 2], with [ECF No. 67-1 at 27 (13:62–14:4)].  In contrast, Lilly's proposed construction deviates from the specification's definition for the term and the claims' use of the term by adding definitions of other terms from the specification.  See [ECF No. 59-1 at 2].

"When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls."  Martek Biosciences Corp. v. Nutrinova, Inc., 579 F.3d 1363, 1380 (Fed. Cir. 2009); see Vitronics, 90 F.3d at 1582 ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication."). This is true even when the patentee's definition is different than the term's ordinary meaning. Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp., 493 F.3d 1358, 1361 (Fed. Cir. 2007). As a result, the Federal Circuit will affirm a construction that "is consistent with the definition provided by the patentee in the patents' specifications."  Mexichem Amanco Holding S.A. de C.V. v. Honeywell Int'l Inc., 702 F. App'x 993, 994 (Fed. Cir. 2017).

As noted above, Teva expressly defined the term at issue in the specification.  In addition, the specification consistently uses the term as it is defined:

> The methods of the invention use an anti-CGRP antagonist antibody, which refers to any antibody molecule that blocks, suppresses or reduces (including significantly) CGRP biological activity, including downstream pathways mediated by CGRP signaling, such as receptor binding and/or elicitation of a cellular response to CGRP.

[ECF No. 67-1 at 33 (25:45–50)]; see also [id. at 36 (31:31–41); id. at 37 (34:21–30)].

Lilly argues that adding a reference to CGRP "from any mammalian species" to the construction of "anti-CGRP antagonist antibody" is consistent with the specification's definition of "CGRP."  [ECF No. 66 at 17].  The specification does define CGRP to "include[] all mammalian species of native sequence CGRP, e.g., human, canine, feline, equine, and bovine." [ECF No. 67-1 at 27 (13:59–61)].  Read with the claims from the nine patents, however, anti-CGRP antagonist antibodies are consistently narrowed by referencing "human" or "humanized."  See, e.g., [id. at 70 (99:2–7 ('045 patent, Claim 1, describing a method to treat headaches and referring to an anti-CGRP antagonist antibody that "is a human monoclonal antibody or a humanized monoclonal antibody"); ECF No. 67-2 at 71 (101:38–41) ('649 patent, Claim 1, describing "[a]n isolated human or humanized anti-CGRP antagonist antibody"); ECF No. 67-3 at 73 (99:21–23) ('951 patent, Claim 1, describing "[a] human or humanized monoclonal anti-CGRP antagonist antibody")].  Lilly's proposed construction is, therefore, not supported by the claims.

Because the specification sets out an express definition and Teva's proposed construction mirrors that definition, the Court adopts Teva's proposed construction for "anti-CGRP antagonist antibody" or "anti-Calcitonin Gene-Related Peptide (CGRP) antagonist antibody" and construes the term as "**an antibody that is able to bind to CGRP and inhibit CGRP biological activity and/or downstream pathway(s) mediated by CGRP signaling**."  See Martek, 579 F.3d at 1380.

B.    "Humanized . . . antibody"

| Patent (Claims) | Teva's Proposed Construction | Lilly's Proposed Construction |
|---|---|---|
| All patents-in-suit (all asserted claims) | No construction needed in light of the specification.<br><br>To the extent construction is needed, Teva proposes construing the term as: "A form of a non-human antibody that is a specific chimeric immunoglobulin, an immunoglobulin chain, or a fragment thereof (such as Fv, Fab, Fab', $F(ab')_2$ or other antigen-binding subsequences of antibodies) that contains minimal sequence derived from a non-human immunoglobulin; humanized antibodies are for the most part human immunoglobulins in which residues from a complementarily determining region (CDR) of the recipient are replaced by residues from a CDR of a non-human species such as mouse, rat, or rabbit having the desired specificity, affinity, and biological activity" | Indefinite.<br><br>In the alternative, Lilly proposes construing the term as: "A form of a non-human antibody that is a specific chimeric immunoglobulin, an immunoglobulin chain, or a fragment thereof (such as Fv, Fab, Fab', $F(ab')_2$ or other antigen-binding subsequences of antibodies) that contains minimal sequence derived from a non-human immunoglobulin" |

This term is used in all asserted claims of all nine patents in dispute. [ECF No. 59-1 at 2]. Teva states that Lilly's proposed construction omits a sentence from the specification so as to make the term appear indefinite. [ECF No. 65 at 21]. Lilly claims that its proposed construction eliminates superfluous language, [ECF No. 66 at 21], but primarily focuses on its indefiniteness argument, contending that the term's discussion of containing a "minimal sequence" does not provide a POSITA with enough information to understand the term, [id. at 18].

1.    Indefiniteness Challenge

The term is used in all claims of the patents, for example in Claim 1 of the '045 patent: "wherein said anti-CGRP antagonist antibody is a human monoclonal antibody or a humanized

monoclonal antibody."  [ECF No. 67-1 at 70 (99:5–7)].  The specification defines "humanized

antibody" as follows:

> [a]s used herein, "humanized" antibodies refer to forms of non-human (e.g. murine)
> antibodies that are specific chimeric immunoglobulins, immunoglobulin chains, or
> fragments thereof (such as Fv, Fab, Fab', F(ab')$_2$ or other antigen-binding
> subsequences of antibodies) that contain *minimal sequence* derived from non-
> human immunoglobulin.

[Id. at 26 (12:61–66) (emphasis added)].  The specification then goes on to give examples of

different ways that an antibody may be humanized.  [Id. at 26–27 (12:66–13:25) ("For the most

part, humanized antibodies are human immunoglobulins (recipient antibody) in which residues

from a complementarity determining region (CDR) of the recipient are replaced by residues from

a CDR of a non-human species . . . .  In some instances . . . .")].

    Claims "must provide objective boundaries" when measurements are involved—

including less precise terms of degree, like "minimal."  Dow Chem., 803 F.3d at 630 (quoting

Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1371 (Fed. Cir. 2014)); see Berkheimer v.

HP Inc., 881 F.3d 1360, 1364 (Fed. Cir. 2018) (applying objective boundaries requirement to

terms of degree).  "Because language is limited," however, the Federal Circuit "ha[s] rejected the

proposition that claims involving terms of degree are inherently indefinite.  Thus, 'a patentee

need not define his invention with mathematical precision in order to comply with the

definiteness requirement.'"  Sonix Tech. Co. v. Publ'ns Int'l, Ltd., 844 F.3d 1370, 1377 (Fed.

Cir. 2017) (quoting Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1384 (Fed. Cir.

2005)).  "Indeed, '[c]laim language employing terms of degree has long been found definite

where it provided enough certainty to one of skill in the art when read in the context of the

invention.'"  Id. (quoting Interval Licensing, 766 F.3d at 1370); see Enzo Biochem, 599 F.3d at

1335 ("Because the intrinsic evidence here provides 'a general guideline and examples sufficient

to enable a person of ordinary skill in the art to determine [the scope of the claims],' the claims

are not indefinite even though the construction of the term 'not interfering substantially' defines the term without reference to a precise numerical measurement."  (citation omitted) (quoting In re Marosi, 710 F.2d 799, 803 (Fed. Cir. 1983))); One-E-Way, Inc. v. ITC, 859 F.3d 1059, 1067 (Fed. Cir. 2017) ("While we note that 'virtually' is a term of degree, one that slightly expands the scope of the term 'free from interference,' the inclusion of 'virtually' in these claims does not render them indefinite.").

Lilly cites Berkheimer v. HP Inc., 881 F.3d at 1363–64, for the proposition that a specification's reference to a "minimal" condition is indefinite, however in Berkheimer, the specification used "minimal," "reducing," and "eliminating" to refer to "redundancy."  The court found that, because there were various levels of redundancy described and no mention of a "point of comparison" to understand "minimal" in comparison to "reduced" or "eliminated" redundancies, the term was indefinite.  Id.  In contrast, in Sonix Technology Co. v. Publications International, Ltd., the Federal Circuit found that the specification's use of examples to describe the term "visually negligible" did not render the term indefinite but instead provided guidance to enable a POSITA "to underst[and] the term with reasonable certainty."  844 F.3d at 1379.

Here, the specification provides examples of various ways to make humanized antibodies with minimal sequences from non-human sources.  See, e.g., [ECF No. 67-1 at 34–35 (29:65– 30:3) (describing antibodies with rodent variable regions and complementarity determining regions ("CDRs") fused to human constant domains)); id. at 35 (29:7–10) (describing antibodies with "rodent CDRs grafted into a human supporting framework region (FR) prior to fusion with an appropriate human antibody constant domain")].  Teva notes that the specification's definition of a "human antibody" would guide a POSITA to find the line between human and humanized antibodies because the specification states that human antibodies must contain "at least one

human heavy chain polypeptide or at least one human light chain polypeptide."  [ECF No. 79 at

16 (citing ECF No. 67-1 at 27 (13:30–34)].  In contrast, as Teva's expert explained,

> a [POSITA] would read the specification as restricting the non-human portion of a
> humanized antibody to the variable regions of the heavy and light chains, more
> specifically the CDRs and (sometimes) portions of the framework regions.  A
> [POSITA] would know that these non-human sequences would necessarily
> represent only a small fraction of the antibody's overall sequence and would thus
> immediately identify these portions as the "minimal sequence" described in the
> first sentence of the specification's definition.

[ECF No. 70 ¶ 37].

   In addition, the "minimal sequence" reference is a matter of objective degree and the

patent provides examples to guide a POSITA in determining what "minimal" means.  See

One-E-Way, 859 F.3d at 1067 ("While we note that 'virtually' is a term of degree, one that

slightly expands the scope of the term 'free from interference,' the inclusion of 'virtually' in

these claims does not render them indefinite.").  With the information provided and in the

context of the patent, therefore, a POSITA would be able to understand the term "humanized

antibody" with "enough certainty."  Sonix, 844 F.3d at 1377.  Thus, the Court finds that Lilly has

failed to demonstrate by clear and convincing evidence that the term is indefinite.  See

Halliburton, 514 F.3d at 1249–50.

### 2.  Claim Construction

   Lilly argues that Teva's proposed construction impermissibly adds limiting language

from a sentence providing an example of a humanized antibody, which Lilly describes as an

embodiment.  [ECF No. 66 at 21].  Teva correctly notes, however, that examples of terms being

defined in the "definitions" section of the specification are not the invention itself (and therefore

not an embodiment of the invention).  [ECF No. 79 at 17–18].  In other words, Teva is not

claiming humanized antibodies broadly in these patents, but is instead claiming humanized

antibodies that possess the characteristics set forth in the patents' claims.  The definitions section

of the specification merely provides examples of defined terms, not embodiments of the invention disclosed in the claims.  See Durel Corp. v. Osram Sylvania, Inc., 256 F.3d 1298, 1304 (Fed. Cir. 2001) (looking to examples that immediately followed definition in specification to construe claim term).

As discussed supra, Section II.A.2, "[w]hen a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls."  Martek, 579 F.3d at 1380.  Because "humanized antibody" is defined in the specification, that definition controls.  See id.  Teva has stated that it would not object to the Court adopting the full paragraph from the specification that defines "humanized antibody" and provides examples, rather than the one sentence Lilly proposes or the two sentences Teva initially proposed.  [ECF No. 79 at 17 n.9].  The Court will adopt Lilly's construction, which is the specification's most precise definition of "humanized antibody," with the caveat that Teva will be allowed to reference the examples of humanized antibodies provided in the specification to further explain the term to the jury.  The Court therefore construes "humanized antibody" to mean "**a form of non-human (e.g. murine) antibodies that are specific chimeric immunoglobulins, immunoglobulin chains, or fragments thereof (such as Fv, Fab, Fab', F(ab')$_2$ or other antigen-binding subsequences of antibodies) that contain minimal sequence derived from non-human immunoglobulin**."

### C.    "specific binding" or "preferentially binds"

| Patent (Claims) | Teva's Proposed Construction | Lilly's Proposed Construction |
|---|---|---|
| '614 patent (all asserted claims) '907 patent (all asserted claims) '908 patent (all asserted claims) '210 patent (all asserted claims) '211 patent | No construction needed in light of the specification. To the extent construction is needed, Teva proposes construing the terms as: "Binding/binds more frequently, more rapidly, more readily, and/or with greater affinity, avidity, and/or duration | Indefinite. In the alternative, Lilly proposes construing the terms as "Binding/binds more frequently, more rapidly, more readily, and/or with greater affinity, avidity, and/or duration with a particular cell or substance than it does with alternative |

| (all asserted claims) | with a particular cell or substance than it does with alternative cells or substances; this includes antibodies that may bind to more than one isoform of CGRP, e.g., the α and β isoforms of human and/or rat CGRP, and does not preclude binding to another peptide, such as amylin; nor does it require any special degree of binding to one CGRP isoform compared to another" | cells or substances" |
|---|---|---|

This term is used in all asserted claims of the '210, '211, '614, '907, and '908 patents. [ECF No. 59-1 at 4]. The parties agree that "specific binding" and "preferentially binds" should be construed to have the same meaning. [Id.; ECF No. 65 at 24 n.12]; see [ECF No. 66 at 22]. Teva advocates for construing the term in line with the full definition provided in the specification, [ECF No. 65 at 25], while Lilly proposes construing the term using a shorter version of the definition, [ECF No. 59-1 at 4]. Lilly also challenges the term as being indefinite. [ECF No. 66 at 22].

1.    Indefiniteness Challenge

The term is used in all asserted claims of multiple patents, for example, in Claim 1 of the '614 patent, [ECF No. 67-4 at 74 (101:32–34) ("A human or humanized monoclonal anti-CGRP antagonist antibody that preferentially binds to human α-CGRP as compared to amylin.")], and Claim 1 of the '907 patent, [ECF No. 67-6 at 78 (103:33–35) (reciting a method for treating headache in which "the CDRs impart to the antibody specific binding to a CGRP consisting of amino acid residues 1 to 37 of SEQ ID NO:15 or SEQ ID NO:43")]. The term is defined in the patents as follows:

> A molecule is said to exhibit "specific binding" or "preferential binding" if it reacts or associates more frequently, more rapidly, with greater duration and/or with greater affinity with a particular cell or substance than it does with alternative cells

> or substances.  An antibody "specifically binds" or "preferentially binds" to a target
> if it binds with greater affinity, avidity, more readily, and/or with greater duration
> than it binds to other substances.  For example, an antibody that specifically or
> preferentially binds to a CGRP epitope is an antibody that binds this epitope with
> greater affinity, avidity, more readily, and/or with greater duration than it binds to
> other CGRP epitopes or non-CGRP epitopes.  It is also understood by reading this
> definition that, for example, an antibody (or moiety or epitope) that specifically or
> preferentially binds to a first target may or may not specifically or preferentially
> bind to a second target.  As such, "specific binding" or "preferential binding" does
> not necessarily require (although it can include) exclusive binding.  Generally, but
> not necessarily, reference to binding means preferential binding.

[ECF No. 67-1 at 28 (15:56–16:8)].

        a.       No Single Metric

Lilly first argues that the patent does not provide a single metric for specific binding, but instead presents several: frequency, rapidity, affinity, avidity, and/or duration.  [ECF No. 66 at 23].  Referencing results from an assay presented in the specification's Table 5, Lilly notes that embodiment G1 (which represents Teva's Ajovy) showed binding for a longer duration over other substances, but that it showed less rapidity and affinity for binding over those same substances.  [Id.]; see [ECF No. 67-1 at 50 (60:25–47)].  The specification clearly states, however, that specific binding may be demonstrated through a single characteristic, [id. at 28 (15:56–16:8 (using "and/or")], and the results in Table 5 inform a POSITA that, for G1, that characteristic is duration.  Lilly has not provided clear and convincing evidence to demonstrate that a POSITA would not understand with reasonable certainty that the scope of the claims covers an antibody candidate that might specifically bind by possessing one or more of several possible characteristics for binding.  Nautilus, 572 U.S. at 901.

        b.       No Single Test to Measure Various Metrics

Lilly next states, as it did with the term "anti-CGRP antagonist antibody," that the patents disclose multiple tests related to the term "specific binding" without selecting or identifying one preferred test.  [ECF No. 66 at 24].  As discussed supra, Section II.A.1, a POSITA would

understand that the different tests identified in the patents measure different characteristics (e.g., affinity, rapidity) and would therefore have different outcomes.  See BASF, 875 F.3d at 1365 (stating that reasonable certainty "does not require absolute or mathematical precision" (internal quotation marks and citation omitted)).  Given that the specification discloses various characteristics that meet the definition of specific binding, the Court finds that a POSITA would not be confused by the fact that multiple tests might be required to identify the various characteristics described.  See Nautilus, 572 U.S. at 911 ("[T]he definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application . . . .").

c.        No Threshold Values for Various Metrics

Lilly also claims that the patents do not identify a "threshold differential" to determine how much more of a given characteristic must be demonstrated (e.g., how much more readily, how much more rapidly).  [ECF No. 66 at 24].  As discussed supra, Section II.B.1, however, terms of degree are not *per se* indefinite.  See Sonix, 844 F.3d at 1377 ("Because language is limited, we have rejected the proposition that claims involving terms of degree are inherently indefinite.  Thus, a patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." (internal quotation marks and citation omitted)).

As Teva notes, the specification makes clear that a better result for a candidate antibody under any of the tests described meets the definition of specific binding.  [ECF No. 79 at 19]. The specification also provides a measurement range for at least one of these binding metrics, affinity, which is "about 0.02 to about 200 nM."  [ECF No. 67-1 at 23 (5:35–46)].  In addition, the specification provides results regarding the affinity, rapidity, and duration of binding to multiple substances for one embodiment, G1, demonstrating the rapidity threshold for specific binding of that antibody.  [ECF No. 67-1 at 50 (60:25–47)].

    d.  No Identified Comparator

  Lilly's final contention is that the definition of specific binding suggests that a comparison is required: for example, an antibody might bind "more rapidly" to a target than to another substance.  [ECF No. 66 at 25].  Lilly argues that the claims do not recite a specific comparator for use in determining whether a candidate antibody specifically binds as compared to that comparator.  [Id.].

  The Court first notes that Claim 1 of the '614 patent does identify a comparator: amylin.  [ECF No. 67-4 at 74 (101:32–34)].  As for the other patents, the challenged claims recite specific binding to human α-CGRP or human β-CGRP without identifying a comparator substance.  See, e.g., [ECF No. 67-6 at 78 (103:33–35)].  Lilly suggests that a POSITA would be left to randomly guess at various comparator antibodies to test against a candidate antibody, [ECF No. 66 at 24–25], while Teva claims that the specification discloses a "competitive binding assay."  [ECF No. 79 at 20].  With the competitive binding assay, "the ability of a candidate antibody to compete with a known anti-CGRP antagonist for CGRP binding is evaluated.  The assay may be performed in various formats, including the ELISA format."  [ECF No. 67-1 at 36 (31:47–52)].  The results of a competitive binding assay are provided in Figure 6, [id. at 12], which is described as "show[ing] epitope mapping of antibody G1 by peptide competition using Biacore," [id. at 25 (10:10–11)].[3]  The results provided in Figure 6 list the various comparator proteins used to compare the binding of G1 against other antibodies and substances, including amylin, which is disclosed in Claim 1 of the '614 patent.  [Id. at 12].

---

[3] Teva's expert, Dr. Ravetch, describes Biacore as "an industry standard . . . [surface plasmon resonance] assay."  [ECF No. 70 ¶ 41]; see [ECF No. 68 ¶ 83 ("Biacore . . . is a measurement technique based on surface plasmon resonance.")].

During the <u>Markman</u> hearing, Teva argued that several of the comparators listed in Figure 6 are from a group of peptides that are closely related to CGRP—including amylin, calcitonin, and adrenomedullin—so that a POSITA would understand the relevance of comparing the binding of a potential anti-CGRP antagonist antibody against peptides that are closely related to CGRP.  [ECF No. 91 (12/15 Tr. at 109:5–23)]; <u>see</u> [ECF No. 70 ¶ 45 ("A [POSITA] would expect a humanized anti-CGRP antagonist antibody to bind both human α- and β-CGRP with specificity as compared to other human proteins (e.g., amylin).")].  As Lilly noted at the hearing, however, there is no expert testimony to support Teva's assertions, and Figure 6 discloses at least eighteen different peptides for comparison.  [ECF No. 91 (12/15 Tr. at 114:20–115:7)].

Although Lilly has not produced clear and convincing evidence on indefiniteness, it has raised a substantial question that the Court is not able to resolve on the evidence presented.  <u>See Ethicon Endo-Surgery, Inc. v. Covidien LP</u>, No. 16-cv-12556, 2018 U.S. Dist. LEXIS 103702, at *19 (D. Mass. June 21, 2018) ("[Plaintiff] raises substantial questions of indefiniteness.  Given the burden on [Plaintiff] to establish indefiniteness by clear and convincing evidence, as well as the potentially dispositive and patent-invalidating effect of an indefiniteness finding, it is appropriate to defer resolution of this question until the close of all discovery, when a fuller record is available.").  Accordingly, the Court will delay a finding on indefiniteness and claim construction on this term until summary judgment.  <u>See Enzo</u>, 599 F.3d at 1332 (noting that indefinite claims cannot be construed); <u>Amax, Inc. v. ACCO Brands Corp.</u>, 282 F. Supp. 3d 432, 442 (D. Mass. 2017) ("Because the determination is likely to be determinative, many courts have declined to address indefiniteness arguments at the claim construction stage."); <u>Sunrise Techs.,</u>

Inc. v. Cimcon Lighting, 280 F. Supp. 3d 238, 247 (D. Mass. 2017) (delaying finding on indefiniteness to later stage of litigation and declining to construe challenged claim).

### D.    "Human IgG Heavy Chain"

| Patent (Claims) | Teva's Proposed Construction | Lilly's Proposed Construction |
|---|---|---|
| '907 patent (all asserted claims) '908 patent (all asserted claims) '210 patent (all asserted claims) '211 patent (all asserted claims) | "IgG heavy chain with human constant regions" | "An IgG heavy chain polypeptide having an amino acid sequence corresponding to that of an IgG heavy chain produced by a human or having been made using a technique for making an antibody having an amino acid sequence corresponding to that of an antibody produced by a human" |

This term appears in all asserted claims of the '210, '211, '907, and '908 patents. The parties' differing proposed constructions reflect Teva's view that this term references a heavy chain with a human constant region and Lilly's view that the term describes a heavy chain that must contain human constant and variable regions. [ECF No. 65 at 29; ECF No. 66 at 27].

The term "human IgG heavy chain" appears in Claim 1 of each of the four patents, which recite a humanized monoclonal anti-CGRP antagonist antibody that comprises "two human IgG heavy chains, each heavy chain comprising three complementarity determining regions (CDRs) and four framework regions [(FRs)]." [ECF No. 67-6 at 78 (103:26–28); ECF No. 67-7 at 76 (99:57–62); ECF No. 67-8 at 78 (103:35–39); ECF No. 67-9 at 78 (103:33–37)]. There are five different classes of antibodies, with IgG being the most common class. [ECF No. 70 ¶¶ 13, 16; ECF No. 68 ¶ 26]. The different classes of antibodies are defined by the constant (as opposed to variable) regions of an antibody's heavy chains. [ECF No. 70 ¶¶ 13, 16; ECF No. 68 ¶ 26; ECF No. 67-1 at 26 (12:27–29)]. IgG antibodies contain two light chains and two heavy chains, and each type of chain contains both variable and constant regions. [ECF No. 68 ¶¶ 23, 27; ECF No. 70 ¶¶ 15, 16]. The FRs and CDRs referenced in Claim 1 of the patents are located on the heavy

and light chains' variable regions.  [ECF No. 68 ¶¶ 27–28; ECF No. 70 ¶ 17]; see, e.g., [ECF No. 67-8 at 78 (103:35–43)].

Claim 1 of each of the four patents recites "two human IgG heavy chains" before referencing "two light chains."  See, e.g., [ECF No. 67-6 at 78 (103:26–30)].  "IgG heavy chains" is modified by "human," while "light chains" is not modified by human, non-human, or humanized.  [Id.].  Lilly focuses on sentence structure in arguing that "human" modifies "IgG heavy chain" so that the entire heavy chain—including variable and constant regions—must be understood to be human.  [ECF No. 66 at 27].  Teva argues that a POSITA would know that the words "human" and "IgG" in the term are references to the antibody's heavy chain constant region only, and not to both the constant and variable regions, because scientists distinguish antibodies based on constant regions, rather than variable regions.  [ECF No. 65 at 29 (citing ECF No. 70 ¶ 16)]; see also [ECF No. 70 ¶¶ 46–53].  Lilly's expert, Dr. Garcia, acknowledged this when he agreed during his deposition that a reference to "IgG" denotes characteristics about the constant region of the heavy chain.  [ECF No. 80-1 at 12–13 (Garcia deposition transcript, 88:18–22, 91:13–17)].  Teva also notes that the entire claim is focused on a humanized anti-CGRP antagonist antibody, so that a POSITA would understand that the antibodies being described are humanized, rather than containing an entirely human heavy chain.  [ECF No. 65 at 30–31; ECF No. 67-6 at 78 (103:24–25) (reciting a "humanized monoclonal anti-[CGRP] antagonist antibody")].[4]

---

[4] Lilly notes that during the prosecution of a related patent that is not in dispute, Teva removed "human" from the phrase "human IgG heavy chain," and argues that this edit would have been unnecessary if Teva's proposed construction is accurate.  [ECF No. 66 at 29].  As Teva notes, however, Lilly has not provided evidence to explain why the word "human" was removed from that claim or how that and several other edits (e.g., adding reference to a specific amino acid sequence and removing reference to CDRs and FRs) might have reflected awareness of an issue

As discussed <u>supra</u>, Section II.B.1, the specification provides examples of humanized antibodies, describing them as, "[f]or the most part, . . . human immunoglobulins . . . in which residues from a complementarity determining region (CDR) of the recipient are replaced by residues from a CDR of a non-human species."  [ECF No. 67-1 at 26–27 (12:66–13:25)].  These changes are therefore taking place on the variable region of an antibody.  <u>See</u> [ECF No. 68 ¶ 28; ECF No. 70 ¶ 17].  In addition, the specification's definition of humanized antibodies states that,

> [i]n general, the humanized antibody will comprise substantially all of at least one, and typically two, variable domains, in which all or substantially all of the CDR regions correspond to those of a non-human immunoglobulin and all or substantially all of the FR regions are those of a human immunoglobulin consensus sequence.

[ECF No. 67-1 at 27 (13:11–17)].

Meanwhile, human antibodies are defined as "includ[ing] antibodies comprising at least one human heavy chain polypeptide or at least one human light chain polypeptide."  [ECF No. 67-1 at 27 (13:30–33)].  Under Lilly's construction, then, the humanized anti-CGRP antagonist antibody described in Claim 1 would in fact be a human antibody because it would have one human heavy chain.  Lilly's reading might be possible, but given the context of the claim (reciting a humanized antibody) and the specification (defining humanized and human antibodies by their heavy chains), it would be inconsistent with the patent as a whole and with a POSITA's

---

with the use of the word "human" as relevant to Lilly's proposed construction.  <u>See</u> [ECF No. 79 at 24].  The prosecution document Lilly provided, [ECF No. 67-13], indicates that the language was changed in response to a rejection and "solely for the purpose of expediting prosecution." [<u>Id.</u> at 8].  Unlike the court in the case Lilly cited, <u>Ajinomoto Co. v. ITC</u>, 932 F.3d 1342, 1349 (Fed. Cir. 2019), this Court was not provided with the examiner's comments or reasons for rejection.  For example, as Teva notes, there is no record of a discussion between the examiner and patent applicant about the use of the word "human" and whether it should be read to apply to the entire IgG heavy chain or just the constant region.  <u>See</u> [ECF No. 79 at 24].  In any case, as noted, the patent applicant conditioned revision of the claim on an understanding that the change was being made "solely for the purpose of expediting prosecution," which does not provide insight into the reasons for the revision.  <u>See</u> [ECF No. 67-13 at 8].

understanding of the claim terms.  See Phillips, 415 F.3d at 1312–13 (interpreting claim terms with reference to "the meaning that the term would have to a [POSITA] in question at the time of the invention").  The Court "may construe claims to sustain their validity when the claims are amenable to more than one reasonable construction . . . ."  Lucent Techs., Inc. v. Gateway, Inc., 525 F.3d 1200, 1215 (Fed. Cir. 2008).  Because the claims are amenable to both constructions, one of which will sustain their validity, the Court agrees that Teva's proposed construction should be adopted.

As a final point, Teva states that Lilly's proposed construction would exclude Teva's preferred embodiment (Ajovy, or G1) from the claim because the preferred embodiment's heavy chain does not have a human constant region.  [ECF No. 65 at 31–32].  Teva argues that adopting Lilly's proposed construction would exclude a preferred embodiment.  "[A] claim construction that excludes the preferred embodiment is highly disfavored."  Duncan Parking Techs., Inc. v. IPS Grp., Inc., 914 F.3d 1347, 1364 (Fed. Cir. 2019); see Vitronics, 90 F.3d at 1583 (stating that a claim construction that excludes a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support").  Lilly has failed to provide the required support for its proposed construction.

Accordingly, "human IgG heavy chain" is construed to mean "**an IgG heavy chain with human constant regions**."

E.    **"Or" as used in the phrase "[wherein the CDRs impart to the antibody specific binding to a CGRP consisting of amino acid residues 1 to 37 of SEQ ID NO:15] or [SEQ ID NO:43]"**

| Patent (Claims) | Teva's Proposed Construction | Lilly's Proposed Construction |
|---|---|---|
| '907 patent (all asserted claims) '908 patent (all asserted claims) '210 patent | No construction needed in light of the specification.<br><br>To the extent construction is needed, Teva proposes construing the phrase | "[wherein the CDRs impart to the antibody specific binding to a CGRP consisting of amino acid residues 1 to 37 of] either [SEQ ID NO:15] or [SEQ ID NO:43] (i.e., not both)" |

| | | |
|---|---|---|
| (all asserted claims) '211 patent (all asserted claims) | as: "Wherein the CDRs impart to the antibody specific binding to a CGRP consisting of amino acid residues 1 to 37 of [SEQ ID NO:15] or [SEQ ID NO:43] (i.e., one or both)" | |

This term appears in all asserted claims of the '210, '211, '907, and '908 patents. Teva claims that Lilly's proposed construction attempts to limit the claim to an exclusive binding concept, which is narrower than the specification's discussion of specific/preferential binding. [ECF No. 65 at 26]. Further, Teva notes that Lilly's proposed construction would exclude from the scope of the patents' claims the preferred embodiment, Teva's product Ajovy (G1), which does not bind exclusively to one sequence but instead binds to both sequences (SEQ ID NO:15 and SEQ ID NO:43). [Id. at 25–26]. Lilly argues that, in context, "or" should be interpreted to mean one or another sequence, but not both. [ECF No. 66 at 30].

The word "or" appears between two named sequences in all asserted claims of several patents, for example, Claim 1 of the '907 patent: "wherein the CDRs impart to the antibody specific binding to a CGRP consisting of amino acid residues 1 to 37 of SEQ ID NO:15 **or** SEQ ID NO:43." [ECF No. 67-6 at 78 (103:33–35) (emphasis added)]. The term "SEQ ID NO:15" refers to the sequence of human α-CGRP, while "SEQ ID NO:43" refers to the sequence of human β-CGRP. [ECF No. 65 at 16 n.7; ECF No. 66 at 31; ECF No. 68 ¶ 91].

There is no bright-line rule that requires courts to interpret "or" as either all-inclusive or exclusive. Teva's proposed claim construction finds support from at least one case in which the Federal Circuit affirmed a construction that similarly interpreted "or" in a non-exclusive manner (e.g., one or multiple items from a list). Brown v. 3M, 265 F.3d 1349, 1352 (Fed. Cir. 2001). Lilly cites a case in which the Federal Circuit found that "or" indicated alternatives rather than one or both, reasoning that because one alternative involved a two-dimensional process and the

other involved a three-dimensional process, the object being described could not be both two-

and three-dimensional.  See SkinMedica, Inc. v. Histogen Inc., 727 F.3d 1187, 1200 (Fed. Cir.

2013) ("The patentees' distinction between bead and three-dimensional cultures is that clear.

They not only repeated such a disjunctive listing of culturing methods elsewhere in the

specification, but also expressly chose to define beads as culturing in 'two-dimensions'—a

definition that places beads in stark contrast to another method immediately following it in the

list, 'three-dimensions.'").  In another case, the Federal Circuit similarly looked to how the

patentee used the word "or" to determine how to understand the term.  Kustom Signals, Inc. v.

Applied Concepts, Inc., 264 F.3d 1326, 1331 (Fed. Cir. 2001) ("The district court construed 'or'

and 'either' in their common usage as designating alternatives.  We agree with this construction,

for there is no indication that Kustom used these words with a different meaning.  Particularly,

there is no basis whatsoever for believing that Kustom intended its usage of 'or' somehow to

embrace 'and.'").  Lilly concedes that, in accordance with these cases, determining how to

interpret "or" is a context-specific exercise that requires courts to look to how the word is used in

the claim and specification.  [ECF No. 77 at 24].[5]

Teva's position that "or" should be interpreted as meaning "one or both" is consistent

with the specification's definition of specific/preferential binding: "[a]s such, 'specific binding'

---

[5] In a supplemental brief filed after the Markman hearing, Lilly argued that the claims recite a
"Markush group" that requires an either/or interpretation.  [ECF No. 89 at 5–6].  "A *Markush*
group is commonly used in certain areas of patent practice to indicate with definiteness that a
claim limitation is 'selected from the group consisting of . . . ,' meaning only those recited
members of the group."  Lexington Luminance LLC v. Amazon.com Inc., 601 F. App'x 963, 968
(Fed. Cir. 2015); see Abbott Labs. v. Baxter Pharm. Prods., 334 F.3d 1274, 1280 (Fed. Cir.
2003) ("A Markush group is a listing of specified alternatives of a group in a patent claim,
typically expressed in the form: a member selected from the group consisting of A, B, and C.").
As Teva notes, however, the claims here do not include this "selected from a group consisting
of" language and so do not recite a Markush group.  See [ECF No. 90 at 5; ECF No. 67-6 at 78

or 'preferential binding' does not necessarily require (although it can include) exclusive binding." [ECF No. 67-1 at 28 (15:56–16:8)]. Interpreting the word "or" as Lilly suggests would therefore impose an exclusive binding requirement that would be in conflict with this definition. Teva also references other parts of the specification that support its position that "or" should be read to mean "one or both," including a list of migraine symptoms that would not be read to be mutually exclusive, the fact that its preferred embodiment binds to both sequences, and the fact that the two sequences differ in only three out of thirty-seven amino acids, so that a POSITA would understand that the antibodies could bind to either or both types of sequences. [ECF No. 79 at 21–22 (citing to patent); ECF No. 70 ¶ 45 ("A [POSITA] would further expect that many antibodies that have affinity for human α-CGRP will also have affinity for human β-CGRP and vice versa because the amino acid sequences of human α-CGRP and human β-CGRP differ by only 3 out of 37 amino acids . . . ."); ECF No. 67-1 at 21 (2:41–44) (listing possible migraine symptoms by using "or")]. As noted supra, Section II.D, a claim construction that excludes a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support." Vitronics, 90 F.3d at 1583. As demonstrated here, Lilly has failed to provide the requisite support for its proposed construction.

The Court therefore construes "or" with reference to the context of these patents and claims by adopting Teva's proposed construction: "**wherein the CDRs impart to the antibody specific binding to a CGRP consisting of amino acid residues 1 to 37 of [SEQ ID NO:15] or [SEQ ID NO:43] (i.e., one or both)**."

---

(103:21–35) ("A method for treating headache in an individual . . . wherein the CDRs impart to the antibody specific binding to a CGRP consisting of amino acid residues 1 to 37 of SEQ ID NO:15 or SEQ ID NO:43.")].

### F.    "Treating"

| Patent (Claims) | Teva's Proposed Construction | Lilly's Proposed Construction |
|---|---|---|
| '045 patent (all asserted claims) '907 patent (all asserted claims) '908 patent (all asserted claims) | Teva asserts that this preamble term is limiting.<br><br>"Utilizing an approach for obtaining beneficial or desired clinical results, including but not limited to an approach that achieves such beneficial or desired clinical results" | "Utilizing an approach for obtaining beneficial or desired clinical results, including but not limited to an approach that achieves such beneficial or desired clinical results" |

This claim term appears in all asserted claims of the '045, '907, and '908 patents.  The parties agree on a proposed construction, but disagree as to whether the term is limiting: Teva's position is that it is limiting, while Lilly's position is that it is not.  [ECF No. 65 at 32; ECF No. 66 at 32].

The language appears, for example, in Claim 17 of the '045 patent:

> **A method for reducing incidence of or treating headache in a human**, comprising administering to the human an effective amount of an anti-CGRP antagonist antibody, wherein said anti-CGRP antagonist antibody is a human monoclonal antibody or a humanized monoclonal antibody.

[ECF No. 67-1 at 70 (100:3–7) (emphasis added)].  The language in bold, appearing before the word "comprising," is the preamble.

"No litmus test can be given with respect to when the introductory words of a claim, the preamble, constitute a statement of purpose for a device or are, in themselves, additional structural limitations of a claim."  Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251, 1257 (Fed. Cir. 1989).  "Whether a preamble is limiting is 'determined on the facts of each case in light of the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history.'"  Bio-Rad Labs., Inc. v. 10X Genomics Inc., 967 F.3d 1353, 1369 (Fed. Cir. 2020) (quoting Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc., 98 F.3d 1563, 1572–73 (Fed. Cir. 1996)).  "A preamble

limits the claimed invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." Id. (quoting Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999)).  "If the claim uses the preamble only to state a purpose or intended use for the invention, then the preamble is not limiting." Id. "And, a preamble is generally not limiting unless there is 'clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art.'" Id. (quoting Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002)).

Here, the preamble references treating a human for a headache, while the claim explains administering an effective dose to that human.  The preamble therefore gives life and vitality to the claim by explaining what the "dose" referenced in the claim is meant to accomplish. See Jansen v. Rexall Sundown, Inc., 342 F.3d 1329, 1333 (Fed. Cir. 2003) ("In both cases, the claims' recitation of a patient or a human 'in need' gives life and meaning to the preambles' statement of purpose."); Pitney Bowes, 182 F.3d at 1306 ("That the claim term 'spots' refers to the components that together make up the images of generated shapes on the photoreceptor is only discernible from the claim preamble.  In such a case, it is essential that the court charged with claim construction construe the preamble and the remainder of the claim, as we have done here, as one unified and internally consistent recitation of the claimed invention.").  Rather than merely state an intended use for the claim, the preamble works with the claim to provide an essential understanding of the claim. See id.

The Court therefore construes "treating" as a limiting term meaning "**utilizing an approach for obtaining beneficial or desired clinical results, including but not limited to an approach that achieves such beneficial or desired clinical results**."

### G.    "Antibody" and "Effective Amount"

| Patent (Claims) | Agreed-Upon Construction |
| --- | --- |
| All patents-in-suit (all asserted claims) | **Antibody**: "An immunoglobulin molecule capable of specific binding to a target through at least one antigen recognition site located in the variable region of the immunoglobulin molecule, in the form of an intact polyclonal or monoclonal antibody, a fragment thereof, a single chain (ScFv), a mutant thereof, a fusion protein comprising an antibody portion, or any other modified configuration that comprises an antigen recognition site" |
| '045 patent (all asserted claims) '907 patent (all asserted claims) '908 patent (all asserted claims) | **Effective Amount**: "An amount sufficient to effect beneficial or desired results, including but not limited to clinical results" |

The parties agree that "antibody," contained in all claims in all patents, should be construed to mean "[a]n immunoglobulin molecule capable of specific binding to a target through at least one antigen recognition site located in the variable region of the immunoglobulin molecule, in the form of an intact polyclonal or monoclonal antibody, a fragment thereof, a single chain (ScFv), a mutant thereof, a fusion protein comprising an antibody portion, or any other modified configuration that comprises an antigen recognition site."  [ECF No. 59-1 at 6]. In addition, they agree that "effective amount," contained in all asserted claims in the '045, '907, and '908 patents, should be construed to mean "[a]n amount sufficient to effect beneficial or desired results, including but not limited to clinical results."  [Id.].  Courts are obligated to construe terms only when the parties present a dispute.  See U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy."); see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999) (stating that "only those terms need be construed that are in controversy,

and only to the extent necessary to resolve the controversy"); <u>Amgen, Inc. v. F. Hoffmann-La Roche Ltd.</u>, 494 F.Supp.2d 54, 70 n.1 (D. Mass. 2007) ("Where the parties agree upon claim construction, that construction properly governs the course of subsequent proceedings just as would a stipulation of fact.").  The Court therefore adopts the parties' agreed-upon constructions for these two terms.

## III.      CONCLUSION

Accordingly, the claim terms at issue will be construed for the jury and for all other purposes in this litigation in a manner consistent with the above rulings of the Court.  For ease of reference, the Court's constructions are reproduced below in Appendix A.

**SO ORDERED.**

February 24, 2021                                        /s/ Allison D. Burroughs
                                                        ALLISON D. BURROUGHS
                                                        U.S. DISTRICT JUDGE

**Appendix A**

| Disputed Claim Term | Court's Adopted Construction |
|---|---|
| "Anti-CGRP antagonist antibody" or "anti-Calcitonin Gene-Related Peptide (CGRP) antagonist antibody" | "An antibody that is able to bind to CGRP and inhibit CGRP biological activity and/or downstream pathway(s) mediated by CGRP signaling" |
| "Humanized…antibody" | "A form of non-human (e.g. murine) antibodies that are specific chimeric immunoglobulins, immunoglobulin chains, or fragments thereof (such as Fv, Fab, Fab', F(ab')₂ or other antigen-binding subsequences of antibodies) that contain minimal sequence derived from non-human immunoglobulin" |
| "Human IgG Heavy Chain" | "An IgG heavy chain with human constant regions" |
| "Or" | "Wherein the CDRs impart to the antibody specific binding to a CGRP consisting of amino acid residues 1 to 37 of [SEQ ID NO:15] or [SEQ ID NO:43] (i.e., one or both)" |
| "Treating" | "Utilizing an approach for obtaining beneficial or desired clinical results, including but not limited to an approach that achieves such beneficial or desired clinical results" (claim limitation) |
| "Antibody" | "An immunoglobulin molecule capable of specific binding to a target through at least one antigen recognition site located in the variable region of the immunoglobulin molecule, in the form of an intact polyclonal or monoclonal antibody, a fragment thereof, a single chain (ScFv), a mutant thereof, a fusion protein comprising an antibody portion, or any other modified configuration that comprises an antigen recognition site" |
| "Effective Amount" | "An amount sufficient to effect beneficial or desired results, including but not limited to clinical results" |