**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| TEVA PHARMACEUTICALS INTERNATIONAL GMBH and TEVA PHARMACEUTICALS USA, INC., | ) ) ) ) | Case No. 1:18-cv-12029-ADB |
| Plaintiffs, | ) ) | ████████████████████ |
| v. | ) ) | Leave to File Granted on Feb. 22, 2022 (ECF No. 272) |
| ELI LILLY AND COMPANY, | ) ) | Leave to File Under Seal Granted on |
| Defendant. | ) ) | Mar. 28, 2022 (ECF No 285) |

**ELI LILLY AND COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY FOR LACK OF ENABLEMENT**

## TABLE OF CONTENTS

I.     Introduction ..................................................................................................... 1

II.    Statement of Facts ............................................................................................ 3

       A.     Over 200 Different Headache Disorders Were Known, Only Few Linked
              to CGRP ................................................................................................ 3

       B.     Developing Therapeutic Antibodies Was Unpredictable, Costly, Time-
              Consuming, and Labor-Intensive .......................................................... 3

              1.     The Tremendous Diversity of Antibodies .................................. 3

              2.     The Trial-and-Error Complexity of Making a Therapeutic
                     Antibody ..................................................................................... 4

       C.     Teva's Asserted Patents Are Limited in Disclosure but Claim Broadly ............... 6

              1.     The Limited Disclosure of Teva's Asserted Patents ................... 6

              2.     The Broad Claims of Teva's Asserted Patents ........................... 7

       D.     ████████████████████████████████████ ................... 9

       E.     Extensive Work Was Required to Develop Lilly's Galcanezumab ................... 10

       F.     The Parties' Prior IPR Proceedings and Appeals ........................... 10

III.   Legal Standards .............................................................................................. 11

IV.    Teva's Asserted Claims Are Invalid for Lack of Enablement ........................... 13

       A.     The Asserted Claims Are Functionally Defined and Vast in Scope (*Wands*
              Factors 1 and 3) .................................................................................. 13

              1.     The Asserted Claims Broadly Encompass Use of *Any* Human
                     and/or Humanized Anti-CGRP Antagonist Antibody ............... 13

              2.     The Asserted Claims Broadly Encompass Treatment of Any and
                     All Headache Disorders, by Any Effective Amount ................ 15

       B.     A POSA Had No Prior Experience with the Claimed Antibodies in This
              New Field and the Art Was Unpredictable (*Wands* Factors 2, 4, and 5) ............. 16

       C.     The Specification Amounts to an Invitation for Further Research and
              Contains Insufficient Working Examples (*Wands* Factors 6 and 7) .................... 18

D.    An Excessive Quantity of Experimentation Was Needed to Make and Use the Full Scope of the Claimed Methods (*Wands* Factor 8) ................................... 21

E.    Undue Experimentation Would Have Been Required to Practice the Full Scope of the Claimed Methods ................................................................. 24

F.    None of Teva's Asserted Claims Are Enabled ..................................... 27

V.    Lilly Is Also Entitled to Summary Judgment as a Matter of Law Because Teva's Experts Applied the Wrong Legal Standard ..................................................... 28

VI.    Conclusion ..................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amgen Inc. v. Sanofi*,
   987 F.3d 1080 (Fed. Cir. 2021).................................................................... *passim*

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..........................................................................................13

*Baxalta Inc. v. Genentech, Inc.*,
   No. 17-509-TBD, 2022 WL 420479 (D. Del. Jan. 13, 2022) ...................2, 13, 21, 26

*Charleston Medical Therapeutics, Inc. v. AstraZeneca Pharms. LP*,
   No. 2:13-cv-2078-RMG, 2016 WL 7030743 (D.S.C. Feb. 19, 2016)....................15

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
   8 F.4th 1331 (Fed. Cir. 2021) ...........................................................................11

*Genentech, Inc. v. Novo Nordisk, A/S*,
   108 F.3d 1361 (Fed. Cir. 1997)........................................................................1, 12

*Idenix Pharms. LLC v. Gilead Scis. Inc.*,
   941 F.3d 1149 (Fed. Cir. 2019).................................................................... *passim*

*MorphoSys AG v. Janssen Biotech, Inc.*,
   358 F. Supp. 3d 354 (D. Del. 2019)............................................................ *passim*

*Rasmusson v. SmithKline Beecham Corp.*,
   413 F.3d 1318 (Fed. Cir. 2005)..................................................................2, 3, 21

*Straumann Co. v. Lifecore Biomedical Inc.*,
   278 F. Supp. 2d 130 (D. Mass. 2003) ..............................................................28, 30

*Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*,
   8 F.4th 1349 (Fed. Cir. 2021) ........................................................................ *passim*

*Univ. of Rochester v. G.D. Searle & Co.*,
   358 F.3d 916 (Fed. Cir. 2004)............................................................................30

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988)..........................................................................1, 12

*Wyeth & Cordis Corp. v. Abbott Lab'ys*,
   720 F.3d 1380 (Fed. Cir. 2003)..................................................................... *passim*

**Statutes**

35 U.S.C. § 112.............................................................................................................................1, 11

**Rules**

Fed. R. Civ. P. 56(a) .....................................................................................................................13

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| '045 patent | U.S. Patent No. 8,586,045 |
| '907 patent | U.S. Patent No. 9,884,907 |
| '908 patent | U.S. Patent No. 9,884,908 |
| ***Bold and italicized*** | emphasis added unless indicated otherwise |
| CGRP | calcitonin gene-related peptide |
| FDA | Food and Drug Administration |
| IPR | *inter partes* review |
| Lilly | Eli Lilly and Company |
| patents-in-suit | U.S. Patent Nos. 8,586,045; 9,884,907; and 9,884,908 |
| POSA | person of ordinary skill in the art |
| PTAB | Patent Trial and Appeal Board |
| SOF | Citation to paragraph number(s) of the Local Rule 56.1 Statement of Material Facts in Support of Defendant Eli Lilly and Company's Motion for Summary Judgement of Invalidity for Lack of Enablement |
| Teva | Teva Pharmaceuticals International GmbH and Teva Pharmaceuticals USA, Inc. |

## I.    Introduction

With this motion, Lilly seeks summary judgment on a case-dispositive issue. Lilly is entitled to summary judgment—the undisputed material facts establish that Teva's asserted claims are not enabled under 35 U.S.C. § 112 because, at the filing date of the patent, a POSA could not practice their ***full scope*** without undue experimentation.

The named inventors of the patents-in-suit had an idea: that human and humanized antibodies that bound to and inhibited a protein called CGRP could be used as a migraine therapy. But "[t]ossing out the mere germ of an idea does not constitute enabling disclosure." *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997). Teva's patents disclose ***no*** human antibody and just ***one*** humanized antibody. They disclose ***no*** human testing, let alone treatment of migraine or any other headache disorder. But Teva nevertheless obtained exceedingly broad claims that cover using ***any*** human and humanized anti-CGRP antagonist antibody, regardless of amino acid sequence, to treat everything from ***any*** type of migraine to ***any*** and all headache disorders, administered at ***any*** effective dose, by ***any*** route of administration, using ***any*** formulation. The Federal Circuit has already recognized this key defect in Teva's claims. *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1362-63 (Fed. Cir. 2021) (explaining that Teva's antibodies are claimed "not in terms of their structure, but rather in terms of their function—in particular, their ability to bind to the CGRP ligand," resulting in claims of "extremely broad scope").

Enablement is a question of law based on underlying facts, all intended to answer the basic question of whether undue experimentation would be required to practice the invention as broadly as it has been claimed. *See In re Wands*, 858 F.2d 731, 735, 737 (Fed. Cir. 1988). Here, the question is answered in the affirmative beyond genuine dispute by the facts that (1) ████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████ and (2) the parties' experts

agree that, to practice the claimed invention, a POSA would have needed to undertake iterative, trial-and-error experimentation lasting years and costing many millions of dollars for just a ***single*** antibody and ***single*** headache disorder (if it could be done at all).

Courts have repeatedly held that making and testing of far fewer candidate compounds, such as antibodies, requires undue experimentation as a matter of law, when similar trial-and-error experimentation was needed. *Idenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1157, 1165 (Fed. Cir. 2019) (affirming judgment as a matter of law when "the starting point is 'billions and billions'" (citation omitted)); *Wyeth & Cordis Corp. v. Abbott Lab'ys*, 720 F.3d 1380, 1385-86 (Fed. Cir. 2003) (affirming summary judgment when "tens of thousands of candidates" needed to be made and screened); *Baxalta Inc. v. Genentech, Inc.*, No. 17-509-TBD, 2022 WL 420479, at *1-2 (D. Del. Jan. 13, 2022) (Dyk, J., sitting by designation) (granting summary judgment because "millions of candidate antibodies" needed to be made and screened); *MorphoSys AG v. Janssen Biotech, Inc.*, 358 F. Supp. 3d 354, 369, 376 (D. Del. 2019) (Stark, J.) (granting summary judgment because "millions or billions" of candidate antibodies needed to be made and screened (citation omitted)). While Teva's experts argue that the claims are enabled because any experimentation needed to practice the claims with a single antibody would purportedly be "routine," this cannot defeat summary judgment because it disregards the requirement to enable the ***full scope*** of the claims. *See*, *e.g.*, *MorphoSys*, 358 F. Supp. 3d at 372; *Idenix*, 941 F.3d at 1162.

Teva has claimed use of any and all human and/or humanized anti-CGRP antagonist antibodies with "little more than respectable guesses" that ***some*** of them might plausibly treat ***some*** headache disorder at ***some*** future point. *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1325 (Fed. Cir. 2005). But it was Lilly, ███████████████████ who first demonstrated that a humanized anti-CGRP antagonist antibody could treat migraine in humans. It was Lilly, █

███████████████████████ who succeeded in treating episodic cluster headache with an anti-CGRP antagonist antibody. With their functional, overbroad claims, Teva seeks to reap the fruits of Lilly's labor, but that is "not consistent with the statutory requirement that the inventor enable an invention." *Id.* Accordingly, Lilly respectfully requests that the Court grant this case-dispositive motion and enter judgment in Lilly's favor.

## II.     Statement of Facts

### A.     Over 200 Different Headache Disorders Were Known, Only Few Linked to CGRP

As of 2005-2006 when the patents-in-suit were filed, the most up-to-date classifications identified over 200 different headache disorders. SOF 24-26 (Teva IPR expert testifying that there are 250 forms of headache). Known headache disorders included, for example, various subtypes of migraine, cluster headache, and post-traumatic headache, all of which had differing treatment strategies and unique pathologies. SOF 21-23, 27, 30 ███████████████████████ ███████████████████████, 37-39.

The root causes of most headache types were unknown as of 2005-2006. But one protein, called CGRP (calcitonin gene-related peptide), was linked to some forms of migraine and cluster headache. SOF 28-39. CGRP is 37 amino acids long and was understood to have four functionally distinct regions: (1) an N-terminal end (amino acids 1-7); (2) a mid-region (amino acids 8-18); (3) a hinge-like region (amino acids 19-27); and (4) a C-terminal end (amino acids 28-37). SOF 28.

### B.     Developing Therapeutic Antibodies Was Unpredictable, Costly, Time-Consuming, and Labor-Intensive

#### 1.     The Tremendous Diversity of Antibodies

An antibody, also called an immunoglobulin (Ig), is a specialized protein molecule that recognizes and binds to a target molecule ("antigen"). SOF 42, 64. The portion of the antigen to which an antibody binds is called an epitope. SOF 43-44.

Typical full-length antibodies have four amino acid chains: two heavy chains and two light chains. SOF 45-46. Each full-length antibody contains constant and variable regions. SOF 47. The amino acid sequences of the variable region differ for each antibody and play a critical role in binding to a target. SOF 50-58, 63. The variable region is made of two heavy chain variable domains and two light chain variable domains. SOF 48. Discrete regions called complementarity determining regions (CDRs) or "hypervariable regions" that form contacts with the antigen are contained in each variable domain. SOF 49. The amino acids in the CDRs of different antibodies are remarkably diverse. SOF 59-62. ████████████████████████

████████████████████████████████████████████████████

██████ █████████████████████████████████████████ SOF 75, 77.

An antibody's constant region mediates a variety of "effector" functions such as cell killing and pathogen removal. SOF 65-66. Antibodies are categorized into five classes, called IgA, IgD, IgE, IgG, and IgM, determined based on the constant region's structure. SOF 67-68. The IgG class, like other classes, includes subclasses, each having different functional properties. SOF 69. Antibodies can be engineered into smaller pieces (e.g., fragments) such as Fab, Fab', F(ab')$_2$, Fv, and ScFv. SOF 70-73.

## 2. The Trial-and-Error Complexity of Making a Therapeutic Antibody

Antibodies serve as attractive potential therapeutics because of their nearly limitless structural and functional diversity. But as of 2005-2006, and still today, predicting an antibody's function from its amino acid sequence was impossible. SOF 83-88, 101-102. Two antibodies with nearly identical amino acid sequences may bind entirely different antigens or exhibit different activities on the same antigen (e.g., inhibiting (antagonizing) or enhancing its biological effects). SOF 74, 91, 101. Conversely, antibodies with very different sequences might bind the same

antigen. SOF 89-90, 92, 101. Due to this unpredictability, identifying antibodies with desirable properties required empirically making and testing large numbers of antibodies in suitable assays. SOF 88, 93, 98-100. Anti-CGRP antagonist antibodies are no exception. SOF 94-97.

As of 2005-2006, to generate "murine" antibodies, researchers would inject mice or rats with an antigen of interest, which would induce the maturation of antibody-forming cells. SOF 103. Those cells could then be isolated and used to form a hybridoma from which antibodies having an identical amino acid sequence (i.e., monoclonal antibodies) are produced. SOF 104.

Murine antibodies were generally not used therapeutically, however, because a patient's immune system would attack those antibodies as foreign, causing side effects and reducing effectiveness. SOF 108. One could attempt to "humanize" a murine monoclonal, making it more suitable for human administration, by using genetic engineering to replace portions of the genes encoding the murine antibody with portions encoding a human antibody. SOF 109. As of 2005-2006, and still today, humanization did not work for all antibodies and "require[d] case-by-case design and engineering for each individual antibody." SOF 110-117, 125. One could also attempt to make fully "human" antibodies by, for example, using transgenic mice. SOF 135. But making "human" antibodies was relatively new as of 2005-2006— ████████████████████████████████████ ████████████████████████████████ SOF 136-137.

Making even a single humanized or human antibody for therapeutic use required a substantial investment in time and money. SOF 121-126, 138-141, 118-120 ████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████) As of 2005-2006, humanizing a single antibody for therapeutic use could "take 4-6 months involving 2-3 full time employees at a total cost of around half a million." SOF 121-122 (Dr. Hale:

██████████████████████████████████████████████████████████

█████████████████████████████████.) These are conservative estimates, as real-world

examples demonstrate that it often requires more researchers, time, and money. SOF 123-126. As

Dr. Hale explained, ████████████████████████████████████████████

███████████████████████████████████████████ SOF 123.

As of 2005-2006, no antibody had been developed or used to treat any headache disorder.

SOF 6-7, 11, 40-41. No anti-CGRP antagonist antibody, regardless of type, had been administered

to any human. SOF 324-327. No human or humanized anti-CGRP antagonist antibody was known

or used for any therapeutic purpose. SOF 319-327.

### C.   Teva's Asserted Patents Are Limited in Disclosure but Claim Broadly

#### 1.   The Limited Disclosure of Teva's Asserted Patents

Teva's patents-in-suit are generally directed to methods of treating headache using

humanized and/or human anti-CGRP antagonist antibodies. SOF 144. Their shared specification

identifies a single humanized antagonist antibody, Antibody G1 (later re-named fremanezumab).

SOF 142-143, 145-146, 154, 157-158. The specification does not disclose how Antibody G1 was

made. SOF 147. Nor does it disclose galcanezumab. SOF 167-168, 294-309, 314.

The specification lists 84 closely related variants of Antibody G1, which share 95% or

higher sequence identity in their variable regions (i.e., they vary by 10 or fewer amino acids). SOF

154-156. None of these variants were tested to determine whether they antagonize CGRP. SOF

157-158. The specification discloses no human anti-CGRP antibody. SOF 169-170.

The specification reports twelve murine anti-CGRP antibodies but fails to disclose their

amino acid sequences or any structural features correlated with the ability to bind CGRP. SOF

153. Like Antibody G1, these antibodies bind to CGRP's C-terminal end. SOF 159-163. None

bind to CGRP's middle-region or N-terminal end. SOF 164-166.

To make anti-CGRP antibodies, the specification refers to generalized, prior art hybridoma techniques for iteratively making murine monoclonal antibodies from scratch. SOF 171. It also refers a POSA to prior art techniques for humanizing such murine antibodies. SOF 172. These methods are not specific for making humanized anti-CGRP antagonist antibodies, but are instead generic methods for making any humanized antibody. SOF 173. The specification acknowledges that newly made antibodies must be "screened." SOF 174-175.

The specification provides laundry lists of a "wide variety" of headache disorders, the vast majority of which had no known connection to CGRP. SOF 185-187, 29-39. It lists disparate formulations and routes of administration, many of which were untested for therapeutic antibodies as of 2005-2006. SOF 176-184. It states that "dosages for an anti-CGRP antagonist antibody may be determined empirically," and emphasizes that these doses will vary for each individual antibody, headache type, and even patient tested. SOF 336, 188-195.

Antibody G1 was tested in two assays in rats, the rat saphenous nerve assay and the closed cranial window assay. SOF 149. The specification discloses no experiment conducted in non-human primates. SOF 196. Nor does it disclose any experiment conducted in humans. SOF 197.

## 2.   The Broad Claims of Teva's Asserted Patents

In contrast to the specification's limited disclosure, Teva's asserted claims (*see* App'x A) encompass using ***any*** humanized and/or human anti-CGRP antagonist antibody for treating ***any*** headache disorder in a human at ***any*** dosage that works ("effective amount"). SOF 225-232.

Claim 17 of the '045 patent is generally representative (SOF 198):

> 17.  A method for reducing incidence of or treating headache in a human, comprising administering to the human an effective amount of an anti-CGRP antagonist antibody, wherein said anti-CGRP antagonist antibody is a human monoclonal antibody or a humanized monoclonal antibody.

Claim 17 defines the claimed antibodies by their desired functions—binding to and antagonizing CGRP's biological activity—rather than identifying *which* antibodies possess those properties (e.g., by amino acid sequence). SOF 225. Claim 17 encompasses use of antibodies binding to *any* CGRP epitope, for treatment of *any* headache disorder, using *any* dosing regimen that works, *any* formulation, and *any* route of administration. SOF 226-231.

Each of the '045 patent's dependent claims are similarly broad, limiting just one aspect of claim 17. For example, these claims recite certain types of headache disorders (claims 19 and 24), partial amino acid sequences for the claimed antibodies, corresponding to portions of Antibody G1 (claims 18 and 21), a binding affinity to CGRP of 50 nM or less (claim 20), using certain administration routes including systemic and transdermal (claim 27), and using a humanized antibody (claim 30).[1] SOF 199-208.

Claim 1 of each of the '907 and '908 patents is identical except for an affinity limitation, and similarly recites administering *any* humanized anti-CGRP antibody having generic IgG antibody features (e.g., heavy chains, light chains, and CDRs) to treat *any* headache disorder in an individual at *any* effective amount that works. SOF 209, 216, 225-231. The '907 and '908 patents' dependent claims are similarly broad, reciting certain routes of administration (claim 4 of each patent), certain types of headache disorders, including any form of migraine (claims 5 and 6 of each patent), $IgG_4$ constant regions (claim 15 of each patent), and CDRs derived from mouse, rat, or rabbit CDRs (claim 17 of each patent). SOF 210-215, 217-222.

---

[1] Lilly has concurrently moved for partial summary judgment of no infringement of claims 18 and 21 of the '045 patent under the doctrine of equivalents. These claims are not enabled for the reasons set forth herein, particularly as Teva asserts that these claims, which recite specific amino acid sequences not present in galcanezumab, should nevertheless be read to encompass galcanezumab.

None of the asserted claims meaningfully narrows the vast scope of the treatment methods and the antibodies necessary for practicing those methods. SOF 233-235, 398-411. Claim 6 of the '907 and '908 patents, for example, recites treatment of any type of migraine rather than any type of headache but still encompasses use of any humanized anti-CGRP antagonist IgG antibody with generic structural features, regardless of amino acid sequence, administered at any effective amount. SOF 233. Similarly, while claims 18 and 21 of the '045 patent recite some structural information regarding the claimed antibodies (unlike Teva's other asserted claims), they still cover treatment of over 200+ headache disorders, using any effective dose later determined to work, by any route of administration. SOF 234.

**D.** ██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████

██████████████████  ██████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████

### E.    Extensive Work Was Required to Develop Lilly's Galcanezumab

Extensive work was required to develop Lilly's galcanezumab antibody, ███████████ ████ SOF 275-281. ███████████████████████

███████████████████████████████

████████████████████ SOF 282-283. ████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████████████ SOF 286-287.

Even after that, Lilly undertook significant research efforts to bring galcanezumab to market, █████████████████████ and separate clinical studies in human subjects, in patients with migraine, and in patients with cluster headache. SOF 288-292. In 2013, Lilly's galcanezumab antibody became the first anti-CGRP antagonist antibody proven in the clinic to treat migraine. SOF 293, 310. To date, galcanezumab remains the only FDA-approved biologic for treating episodic cluster headache. SOF 311-318.

### F.    The Parties' Prior IPR Proceedings and Appeals

Lilly filed IPR petitions against Teva's six previously asserted, related patents claiming human or humanized anti-CGRP antagonist antibodies. SOF 1, 2, 4. In these "antibody" cases,

Lilly asserted, and the PTAB agreed, that it would have been obvious to make a humanized anti-CGRP antagonist antibody within the scope of the claims. SOF 4, 13-15.

The PTAB did not find, and no party argued, that any human or humanized anti-CGRP antagonist antibody was known in the art. Indeed, Teva represented that its patents were "***the first time*** that anyone, anywhere in the world developed a humanized anti-CGRP antibody…." SOF 7.

The Federal Circuit affirmed the PTAB's holding. SOF 16-20. It explained that Teva's antibodies are claimed "not in terms of their structure, but rather in terms of their function." *Teva*, 8 F.4th at 1362. The court emphasized the "extremely broad scope of the functionally claimed antibodies." *Id.* at 1363. Citing enablement case law, the court concluded that Ajovy® (fremanezumab) was not representative of Teva's functionally defined claims, which encompassed a wide range of antibody sequences, binding affinities, and antibody classes and antibody fragments different from Ajovy®. *Id.* at 1362-63 (a broad "claim to 'anything that works' hardly has a nexus to any particular [antibody] product" (citing *Amgen Inc. v. Sanofi*, 987 F.3d 1080, 1087 (Fed. Cir. 2021)).

Lilly also filed IPR petitions against the three remaining patents-in-suit, which claim methods of using the same functionally defined antibodies to treat headache, including migraine. SOF 3, 17-20; *supra* § II.C.2. Teva in response asserted that a POSA would not have had a reasonable expectation of success that an anti-CGRP antagonist antibody could be used to treat migraine. SOF 5. Teva's method claims were held to be not unpatentable as obvious in view of the novelty and unpredictability of treating migraine with an antibody. *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1348-49 (Fed. Cir. 2021); SOF 6, 8-12.

## III.   Legal Standards

35 U.S.C. § 112 codifies the bargain between inventors and the public that underlies the U.S. patent system. In exchange for the right to exclude others from practicing the claimed

invention, § 112 mandates that the patent provide an enabling disclosure to teach a POSA how to make and use the claimed invention. *Idenix*, 941 F.3d at 1154. "Tossing out the mere germ of an ideal does not constitute enabling disclosure." *Genentech*, 108 F.3d at 1366. Instead, such disclosure must be commensurate with the ***full scope*** of the claims. *Idenix*, 941 F.3d at 1154.

Enablement is a legal determination based on underlying facts. *Id.* Patent claims are not enabled when, as of the patent's filing date, a POSA could not practice their full scope without undue experimentation. *Id.* When analyzing whether the experimentation required to practice the full claim scope is undue, courts often consider the *Wands* factors: the (1) breadth of the claims; (2) relative skill of those in the art; (3) nature of the claimed invention; (4) state of the prior art; (5) predictability or unpredictability of the art; (6) amount of direction or guidance presented; (7) presence or absence of working examples; and (8) quantity of experimentation necessary. *Wands*, 858 F.2d at 737.

Courts impose "high hurdles in fulfilling the enablement requirement" for functional claim limitations. *Amgen*, 987 F.3d at 1087; *Teva*, 8 F.4th at 1362 (explaining that "functional claim language can lead to broad claims, especially when there are no structural limitations to clearly define the scope" (citing *Amgen*, 987 F.3d at 1087)). The Federal Circuit has also placed limits on the amount of experimentation that the law will tolerate, even when synthesis and testing of compounds is routine. *Wyeth*, 720 F.3d at 1384-86. When practicing the full scope of functionally defined claims requires using routine techniques to make and test "tens of thousands of candidates," such experimentation is undue, and the claims lack enablement as a matter of law. *Id.*; *Idenix*, 941 F.3d at 1163.

Summary judgment is appropriate where a patent challenger has satisfied its burden of establishing lack of enablement by clear and convincing evidence. *E.g.*, *Wyeth*, 720 F.3d at 1385-

86; *Baxalta*, 2022 WL 420479 at \*2-3; *MorphoSys*, 358 F. Supp. 3d at 375. Summary judgment should be granted if, upon drawing all reasonable inferences in the non-moving party's favor, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Where the only way for a POSA to practice the full scope of broad, functionally defined claims would have been to embark on years upon years of trial-and-error testing to make and use new antibodies, such experimentation is undue, and the claims are not enabled as a matter of law. *Amgen*, 987 F.3d at 1088; *Idenix*, 941 F.3d at 1162-63.

## IV.   Teva's Asserted Claims Are Invalid for Lack of Enablement

As the undisputed material facts demonstrate, the *Wands* factors point to undue experimentation (*infra* Sections IV.A-D, IV.F), thus requiring a conclusion of non-enablement in view of controlling law (*infra* Section IV.E).

### A.   The Asserted Claims Are Functionally Defined and Vast in Scope (*Wands* Factors 1 and 3)

#### 1.   The Asserted Claims Broadly Encompass Use of *Any* Human and/or Humanized Anti-CGRP Antagonist Antibody

The asserted broad claims define the recited antibodies by their desired functions—binding to CGRP, inhibiting CGRP biological activity, and treating migraine or other headache disorders—rather than identifying which antibodies possess those properties by amino acid sequence.[2] Dkt. 101 at 11; SOF 225-231; *supra* § II.C.2. As the Federal Circuit explained in the context of Teva's related patents, which use nearly identical claim language, Teva's antibodies are claimed "not in

---

[2] Claims 18 and 21 of the '045 patent recite specific amino acid sequences found in Antibody G1, but Teva disregards these sequences in asserting infringement under the doctrine of equivalents. Further, as discussed below, the claims are broad in multiple other aspects and share many of the same deficiencies as other asserted claims.

terms of their structure, but rather in terms of their function—in particular, their ability to bind to the CGRP ligand," resulting in claims of "extremely broad scope." *Teva*, 8 F.4th at 1362-63.

There are a staggering number of candidate antibodies potentially within the scope of Teva's functionally defined genus. ███████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████ SOF 75, 77. But nothing in the claim limits mutations to the CDRs, so this artificially constricts the potential number of antibodies covered by Teva's claims. As Teva's antibody expert in the related IPR proceedings explained, there are $20^{220}$ different antibodies that could potentially be made just by mutating an antibody's variable region region—"it's a big number." SOF 76-77. Even these numbers do not account for constant region mutations, antibody fragments, different antibody classes, or antibody fusions—all of which are encompassed by Teva's claims. SOF 77, 80-82, 225, 227; Dkt. 101 at 16.

One of Teva's antibody experts in this litigation now contends that the actual number of antibodies within the scope of the claims is a ████████████████████████████████
██████████████ SOF 78-79. But even assuming he is correct, this weighs against enablement, not for it. In *Idenix*, the patentee similarly argued that its method claims embraced use of just a "small" number of actually effective compounds among many potential candidates. 941 F.3d at 1162 (citation omitted). In affirming summary judgment for lack of enablement, the Federal Circuit explained that this disparity "weighs against enablement, not for it," because the patent leaves the POSA "searching for a needle in a haystack" to determine which of the "large number" of potential candidates falls into the "'small' group" that is therapeutically effective. *Id*. As discussed in

Sections V.B and V.E below, the same is true here, as extensive trial-and-error experimentation would be required to identify antibodies satisfying the functional requirements of the claims.

### 2. The Asserted Claims Broadly Encompass Treatment of Any and All Headache Disorders, by Any Effective Amount

Building on the vast antibody genus, the asserted claims broadly recite the functional result of using such antibodies for "treating headache." The specification lists categories encompassing at least *151 disparate headache disorders* by copying, essentially verbatim, numerous categories from the ICHD guidelines. SOF 185-187. As of 2005-2006, very few of these headache disorders were even linked to CGRP. *Supra* § II.A.

The asserted claims also broadly encompass administering *any* dose that works, for *each* antibody and *each* headache disorder. SOF 228-231, 225. But instead of identifying an operative dose, the asserted claims instead recite the desired function of being an "effective amount," i.e., a yet-to-be-determined amount "sufficient" to achieve beneficial results. Dkt. 101 at 31; SOF 188-189. Read in light of the specification, the claims potentially encompass more than a 30,000-fold daily dose range for *each* potentially useful antibody and headache disorder. SOF 190-192.

The asserted claims further encompass a wide variety of formulations and routes of administration. SOF 230. Although listed in Teva's specification, as of 2005-2006, many of these formulation types (e.g., tablets, pills, capsules, and liposomes) and routes of administration (e.g., transdermal, oral, and inhalation) had never been successfully used for any therapeutic antibody. SOF 176-184.

This vast overbreadth again weighs against enablement. In *Charleston Medical Therapeutics, Inc. v. AstraZeneca Pharmaceuticals LP*, the claims covered treating over 90 different disorders, across a 20,000-fold dose-range, administered via multiple administration routes. No. 2:13-cv-2078-RMG, 2016 WL 7030743, at *9-10 (D.S.C. Feb. 19, 2016). The court

calculated that for a single disorder and combination of just nine compounds, a POSA would be confronted with 489 quintillion different treatment options. *Id*. The court granted summary judgment for lack of enablement, holding that "[y]ears of trial-and-error experimentation would be required before one could even determine if the [claimed] compounds were useful in treating this myriad of diseases, much less actually using it to treat each of these diseases in particular individuals." *Id.* at *11. Here, Teva's claims similarly encompass a potentially limitless number of antibodies of varying amino acid sequence, more than 150 different headache disorders, a more than 30,000-fold dose range, and a variety of routes of administration, including some that have not successfully been used to deliver any therapeutic antibody therapy to this day.

### B.    A POSA Had No Prior Experience with the Claimed Antibodies in This New Field and the Art Was Unpredictable (*Wands* Factors 2, 4, and 5)

As of 2005-2006, a POSA[3] would have had ***no experience*** with the claimed methods or anything resembling the claimed methods: (i) no antibody, regardless of target, had been used to treat any headache disorder; (ii) no anti-CGRP antagonist antibody, regardless of type, had been administered to any human; and (iii) no human or humanized anti-CGRP antagonist antibody was known in the art, let alone used for any therapeutic purpose. *Supra* § II.B.2. As Teva represented, its patents cover the "***first-ever*** use of humanized antibodies to treat . . . migraine." SOF 11, 6.

Starting from this blank canvas, a POSA in 2005-2006 hoping to practice the claimed methods would have faced extensive obstacles and layers of unpredictability, necessitating repeated trial-and-error experimentation. Generating suitable murine antibodies via immunization of a live animal was a highly variable process, requiring extensive screening to identify the subset

---

[3] There is no genuine dispute regarding the level of ordinary skill in the art as of the asserted patents' November 14, 2005, and November 2, 2006, filing dates. The parties' experts each adopted a similar standard, including a Ph.D. with experience in antibody engineering and pharmacology, or an M.D. with a specialty in neurology. SOF 223-224.

of hybridomas producing murine monoclonal antibodies with desired properties. SOF 93-97. Antibody humanization also required iterative experimentation specific to each antibody, with no guarantee of success. *Supra* § II.B.2. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ SOF 127-129. Because these processes were unpredictable, they required brute force, trial-and-error experimentation, often lasting many months for each humanized antibody. *Supra* § II.B.2; *infra* § IV.D.

Making and identifying anti-CGRP "antagonist" antibodies would have been particularly unpredictable as of 2005-2006. Only a small number of ***murine*** anti-CGRP antibodies had been reported in the prior art, they'd been characterized in a limited number of *in vitro* and animal assays, and their amino acid sequences were unknown. SOF 319-329. Because the prior art contained no structural information, other anti-CGRP "antagonist" antibodies could only be identified through trial-and-error testing. *Supra* § II.B.2; SOF 328-329, 102, 93-97. This required a POSA to conduct multiple different screening assays under a variety of conditions, which could produce inconsistent, experiment- and condition-dependent results. SOF 98-100, 365, 93-97; D.I. 79 at 8 (Teva acknowledging that "different assays used to evaluate different characteristics of complex biological systems in different species produce different results").)

Testing the hypothesis that a humanized antibody might treat headache required further empirical pre-clinical and clinical testing to identify doses and dosing regimens to test, to evaluate safety and tolerability, and to ultimately assess efficacy (SOF 350, 353-368) without any certainty as to the outcome. SOF 98-99, 366 ██████████████████████████████

██████████████████████████████████████████████████

████████████████████████, 369-370 █████████████████████████



.) For example, █████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ SOF 330-334. Further, in the IPRs, the PTAB found that there was uncertainty, unpredictability, and skepticism about whether anti-CGRP antibodies would be effective. SOF 9, 12. This unpredictability was borne out in reality when Teva's clinical trials for both cluster headache and post-traumatic headache failed for Antibody G1. *Supra* § II.D; SOF 335 ██████████████

████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ )

Many aspects of making and using human and humanized anti-CGRP antagonist antibodies for treatment of headache were thus unpredictable, necessitating time-consuming, trial-and-error testing to obtain claimed-but-not-disclosed antibodies. *MorphoSys*, 358 F. Supp. 3d at 373-74.

### C. The Specification Amounts to an Invitation for Further Research and Contains Insufficient Working Examples (*Wands* Factors 6 and 7)

The specification's minimal disclosure is incompatible with the vast scope of Teva's asserted claims. It discloses **no** human antibodies. *Supra* § II.C.1. It discloses ***just one*** humanized anti-CGRP antagonist antibody, Antibody G1, which has a unique amino acid sequence and particular functional properties, such as binding strongly (with picomolar affinity) to the C-terminal end of CGRP. *Id.*; SOF 145-146, 148, 159-161. Antagonism of CGRP was not tested with any of the Antibody G1 variants. *Supra* § II.C.1. No antibody disclosed in the specification binds the N-terminal end or mid-region of CGRP. *Id.*

The specification provides little guidance on how to generate suitable antibodies aside from engaging in empirical, trial-and-error experimentation. *Supra* § II.C.1. The specification does not

identify any amino acid sequence that is shared by other claimed antibodies and confer the claimed function of binding to and antagonizing CGRP. *Supra* § II.C.1; SOF 102. At most, the specification discloses only "general" techniques to make and screen for suitable antibodies, amounting to an invitation to the POSA to make human and humanized anti-CGRP antagonist antibodies from scratch. *Supra* § II.C.1; SOF 171-175.

The specification also provides little guidance on how to use these antibodies to treat migraine or other headache disorders. Reading the specification, the POSA would be left with minimal information on formulating and delivering the antibody and no information on actual treatment of any headache disorder. *Supra* § II.C.1. Instead, the specification merely lists a variety of disparate administration routes (e.g., transdermal) and types of formulations (e.g., capsules) that could be explored, many of which had never been used for antibody drugs, and recites laundry lists of headache disorders, the vast majority of which had no known connection to CGRP. *Id.*

As Teva stated to the Patent Office during prosecution of a later-filed patent application directed to dosing anti-CGRP antagonist antibodies, the guidance on dosing provided in its specification is "***scant and mostly irrelevant.***" SOF 260-262. It invites a future POSA to experimentally determine an "effective amount" of antibody that could be used for treatment. SOF 188-195, 336. The specification emphasizes, and the parties' experts agree, that determining an effective dose for each individual antibody will require "empirical" experimentation, particularly as the claims encompass antibodies with varying amino acid sequences, varying classes and formats, different CGRP binding epitopes, different effector functions, and varying binding properties and potencies. *Supra* §§ II.C.1-2; SOF 367-368.

Even if it were routine to determine an effective dose for each engineered humanized or human antibody encompassed by the claims, which it would not be, this would be an enormous

undertaking. SOF 372-383. The specification identifies numerous factors that will influence the "appropriate" dosage for *each* antibody, including (1) the type and severity of headache, (2) administration for preventive or therapeutic purposes, (3) a patient's previous therapies, (4) a patient's clinical history and response to the antibody, and (5) the discretion of the attending physician. SOF 188-189. Yet, the specification, which focuses on basic research, broadly instructs hunting across a 30,000-fold dosing range (3 µg/kg to 100 mg/kg) to find an effective dose, untethered from any particular antibody or headache disorder. SOF 190-192. Further, as the sole antibody pharmacology expert in the case explained (SOF 337-342), the specification's purportedly "exemplary dosing regimen," which is untethered to any headache disorder, would be unsuitable for treating many different headache types across the wide variety of antibodies, routes of administration, or formulations, particularly given the absence of clinical data or other relevant pharmacokinetic/pharmacodynamic (PK/PD) information in the specification.[4] SOF 192, 343-347, 360-364, 151-152. Even if such an "exemplary dosing regimen" turns out to be effective for treating one headache disorder, it may not be effective for treating other, disparate headache disorders, as demonstrated by Teva's failed clinical trial for episodic cluster headache, which evaluated a dose of fremanezumab used to treat migraine. *Supra* § II.D; SOF 348-349, 345, 264-274; *compare* SOF 318 (Ajovy 675 mg quarterly dose for migraine), *with* SOF 265-266 (675 mg quarterly unsuccessfully tested for episodic cluster headache).

The specification's Examples are similarly deficient. A POSA reading the specification would find no example of administering any antibody to any human, much less in an effective amount to treat migraine or any other headache disorder. *Supra* § II.C.1. Teva's self-proclaimed

---

[4] Pharmacokinetics relates to the movement of a drug through the body, while pharmacodynamics relates to the body's biological response to the drug. SOF 338.

CGRP biology expert nevertheless alleges that Example 7, which evaluated Antibody G1 in a closed cranial window assay in rats, is a "working example" because it is purportedly predictive of migraine efficacy. SOF 352. Notably, he does not allege that this rat assay is predictive for the many other headache disorders encompassed by the claims. SOF 150. But even assuming for purposes of this motion that Dr. Hill is correct (he is not), a single working embodiment, testing a single antibody in a rat model, is legally insufficient to enable the full scope of the claims or preclude summary judgment. *See*, *e.g.*, *Baxalta*, 2022 WL 420479, at *2 (holding eleven working examples insufficient where there were millions of candidate antibodies within the claimed genus, the field of antibodies was "inherently unpredictable," the only way to practice the teachings of the patent was by trial and error, and no examples of certain classes of claimed antibodies existed).

Teva's specification at best discloses "little more than respectable guesses" as to the likelihood that any particular antibody would work to treat any particular headache disorder, relying on others to conduct future trial-and-error experimentation to determine whether the claimed methods would work, and if so, how to make them work. *See Rasmusson*, 413 F.3d at 1325. This "is not consistent with the statutory requirement that the inventor enable an invention rather than merely proposing an unproved hypothesis." *Id*.

### D. An Excessive Quantity of Experimentation Was Needed to Make and Use the Full Scope of the Claimed Methods (*Wands* Factor 8)

***The Claimed Antibodies -*** Making the full scope of antibodies used for the claimed methods would have required excessive time and effort. To make a single humanized antibody, a POSA would have first needed to make new murine monoclonal antibodies from scratch, which involved immunizing animals, identifying animals that produce antibodies against CGRP, making hybridomas, and testing for CGRP binding and antagonism. This would have taken at least "many weeks or months." SOF 105-107. After finding suitable murine monoclonal antibodies, a POSA

would have been required to individually humanize each antibody, the process of which would have taken at least "several months" with a conservative cost of "half a million dollars." [5] SOF 121-126; *supra* § II.B.2. Further, it often requires multiple rounds of re-engineering to make a humanized antibody suitable for therapeutic uses, e.g., by improving stability and solubility. SOF 130, 138-141, 283-285, 114-117, 99-100.

Before and after humanization, a POSA would need to test each antibody candidate for *in vivo* antagonism in animals. SOF 131-132, 94-98; *see* D.I. 79 at 9 (Teva stating that "antibodies that show only antagonistic activity *in vitro* but no activity *in vivo*" are not "covered by those claims").) ████████████████████████████████████████████████ ██████████████████████ SOF 133-134.

All of these estimates are conservative. For example, Lilly's development of galcanezumab ██████████████████████████████████████████████ *Supra* § II.E; SOF 125-126, 283-287. These estimates also ignore the challenges inherent to the process, ████████████ ████████████████████████████████████████████████ ██████████████████████ *Supra* § II.D.

Even if the experimentation needed to make one humanized anti-CGRP antagonist antibody is assumed to be routine in 2005-2006, the experimentation required to make *the full scope* of antibodies encompassed by the claimed methods was anything but. SOF 87-88, 93. That universe of antibody candidates is potentially limitless, ████████████████████████ ████████████████████████████████████████████████ ████████ SOF 75-77. As Teva's expert Dr. Hale explained in his work, ████████████████

---

[5] Some claims also encompass fully human antibodies, for which the specification discloses no examples. Illustrating the nascency of the field, the named inventors did not possess the technology to make a fully human antibody as of 2005-2006. *Supra* §§ II.B.2, IV.B.

█████████████████████████████████████████████████████ SOF 80-82.

Similarly, Teva expert Dr. Hill ████████████████████████████████████████

██████████████████████████████████████ SOF 393. The quantity of

requisite experimentation was excessive.

*The Claimed Methods* - In addition to making and screening a tremendous number of

antibodies, practicing the full scope of the claimed methods further required successfully treating

migraine and other headache disorders, as encompassed by the constructions of "effective amount"

and "treating." Dkt. 101 at 30-31; SOF 228-231. Testing in humans was thus essential. SOF 248,

350-351.

Prior to human testing, however, a POSA would need to conduct a variety of studies in

animals. At a minimum, to determine potential doses to test in humans, a POSA would need to

conduct studies, specific for each antibody, using non-human primates. SOF 355-364 ██████

███████████████████████████████████████████████████████████

████████████ SOF 343-344. Because dose extrapolation from non-human primates to humans

is unpredictable, a POSA would then need to conduct dose-ranging studies in humans. SOF 99-

100, 363-364, 188-192, 382 ("I'd start with a low dose and build up."). All of these dose-ranging

studies would need to be conducted on an individual antibody-by-antibody, headache-by-

headache, and administration route-by-administration route basis. SOF 188-192, 336, 367-383,

375 (Teva expert Dr. Blumenfeld: ████████████████████████████.

Clinical testing would then need to be carried out in patients. SOF 248, 365-366, 369-370

(Teva's expert Dr. Hill in his work explaining that █████████████████████████

████████████████████████, 371 (Teva's expert Dr. Hale in his work █████

███████████████████████████. The need to test antibodies on a headache-

by-headache basis further multiplied the amount of experimentation needed, as the claims encompass treating many headache disorders with no known link to CGRP. *Supra* § IV.A.2. Even for those disorders linked to CGRP, and even using a highly optimized antibody such as Antibody G1, failure was still a likely outcome. ████████████████████████████████████

████████████████████████████████ *Supra* § II.D.

        Teva's expert Dr. Hale explained that ████████████████████████████████

████████████████████████████████████████████ SOF 123. In aggregate, practicing the full scope of the asserted claims would have required investigating extraordinarily large numbers of selections of various antibodies, headache disorders, and administration routes— all with little help from the prior art or the specification. SOF 176-192, 345-347, 367-383. As explained below, this constitutes undue experimentation.

### E.   Undue Experimentation Would Have Been Required to Practice the Full Scope of the Claimed Methods

        Controlling authority establishes that Teva's claims are not enabled as a matter of law because a POSA could not practice their ***full scope*** without undue experimentation.

        In *Wyeth*, the Federal Circuit considered claims directed to methods of treating restenosis (re-narrowing of an artery) by administering an "effective amount" of a genus of compounds. 720 F.3d at 1382-83 (citation omitted). The specification disclosed a single species within the scope of the genus. *Id*. at 1384. Although assays for testing anti-restenotic activity were disclosed (including *in vivo* testing in rats), the specification was silent on how to structurally modify compounds to produce the recited functional effects, and even minor alterations to the compound could impact activity. *Id*. at 1384-85. In affirming summary judgment for lack of enablement, the Federal Circuit concluded that "putting the challenges of synthesis aside," and accepting as true that screening was

"routine," "having to synthesize and screen each of at least tens of thousands of candidate compounds constitute[d] undue experimentation." *Id*. at 1384-86.

In *Idenix*, the Federal Circuit similarly affirmed a judgment of non-enablement as a matter of law. 941 F.3d at 1162-63. There, the claims were directed to methods of treating HCV infection with a genus containing at least "many, many thousands" of compounds. *Id*. at 1157 (citation omitted). To assess whether any candidate compound had activity against HCV, it needed to be individually made and tested. *Id*. at 1159. The Federal Circuit held as follows: even if (i) making an individual compound possessing the claimed function was assumed to be "routine," *id*. at 1159-60; and (ii) the ultimate number of compounds covered by the claims might end up being "small," *id*. at 1161-62, "[t]he immense breadth of screening required to determine which [compounds] are effective . . . can only be described as undue experimentation," *id*. at 1162-63.

Moreover, functional ***antibody*** claims very similar to Teva's have routinely been held to lack enablement as a matter of law. In *Amgen*, the Federal Circuit held that claims directed to monoclonal antibodies that bound certain amino acid residues on a protein called PCSK9 lacked enablement. 987 F.3d at 1083, 1088. The claimed genus of antibodies was "defined, not by structure, but by meeting functional limitations" of binding and blocking PCSK9.[6] *Id*. at 1087. As the Federal Circuit explained, "[t]he functional limitations here are broad, the disclosed examples and guidance are narrow," and the unpredictability of the art necessitated "trial and error [experimentation], by making changes to the disclosed antibodies and then screening those antibodies for the desired binding and blocking properties." *Id*. at 1087-88 (citation omitted). Undue experimentation was therefore required to practice the full scope of the claims. *Id*. at 1088.

---

[6] The Federal Circuit cited *Amgen* in its discussion of Teva's related antibody claims, explaining that "functional claim language can lead to broad claims, especially when there are no structural limitations to clearly define the scope." *Teva*, 8 F.4th at 1362 (citing *Amgen*, 987 F.3d at 1087).

In *Baxalta*, the court granted summary judgment for lack of enablement to claims directed to antibodies that target a blood coagulation factor called Factor IX. 2022 WL 420479, at *2-3, *22 (Dyk, J., sitting by designation). The claims encompassed "millions of different structural formats, binding epitopes, binding affinities, and mechanisms of action," but the specification disclosed limited numbers of examples. *Id*. at *9-10 (citation omitted). Moreover, without trial-and-error testing, it was not possible to predict which antibodies would satisfy the claim limitations. *Id*. at *10-11. The court explained, "where, as here, there are a large number of potential candidates, few working examples disclosed in the patent, and no guidance in the specification as to how to practice the full scope of the invention except to use trial and error to narrow down the potential candidates to those satisfying the claims' functional limitations—the asserted claims are not enabled." *Id*. at *14.

In *MorphoSys*, the court similarly granted summary judgment of non-enablement. 358 F. Supp. 3d at 375 (Stark, J.). There, the claims were directed to human antibodies that bound to a protein called CD38 and use of these antibodies to treat hematological cancer. The claims encompassed a "very large" number of unique antibodies. *Id*. at 369. Although the patents provided four working examples, the specification "d[id] not teach a POSA how to predict from an antibody's sequence whether it will bind to CD38," and thus trial-and-error experimentation was required. *Id*. at 371-72. While the patentee contended that "any experimentation required to practice the invention would be 'routine,'" the court held that "this contention – even accepted as true at this stage [–] does not get to the relevant question: whether the ***full scope*** of the claims, which [are] quite broad, is enabled." *Id*. (emphasis in original) (citations omitted). In view of its application of the *Wands* factors, the court concluded they were not. *Id*.

The same conclusion is compelled here. Like these cases, Teva's asserted claims are functional: they claim use of antibodies by what they do, rather than what they are. *Supra* § IV.A. Like these cases, the potential number of candidates within the scope of Teva's claims is exceedingly large ███████████████████████████████ and the number of working examples in Teva's specification vanishingly small—with, for example, no headache disorder actually treated, no human antibody disclosed, no disclosure of any N-terminal end or mid-region binding antibody, and no disclosed correlation between any amino acid sequence and therapeutic blocking of CGRP function. *Supra* §§ IV.A, IV.C. Like these cases, Teva's specification here fails to provide meaningful structural information, correlation between structure and function, or otherwise alleviate the excessive empirical experimentation required to actually make the broad alleged invention it has claimed. *Supra* § IV.C. Like these cases, the unpredictable nature of the art mandated extensive trial-and-error experimentation to narrow down the very large number of candidate molecules to those satisfying the claims' functional limitations. *Supra* § IV.B. Indeed, making, screening, humanizing, and testing one antibody candidate for efficacy in just one headache disorder, such as migraine, which Teva never did until after others had done so, would have taken years of effort at significant cost. *Supra* §§ II.E, IV.D.

In view of these undisputed facts, undue experimentation would be required to practice the full scope of Teva's asserted claims. They should therefore be held invalid on summary judgment for lack of enablement.

### F.    None of Teva's Asserted Claims Are Enabled

The asserted independent claims (claim 17 of the '045 patent; claim 1 of the '907 and '908 patents) are each broadly directed to treating any "headache" disorder using any "effective amount," using antibodies lacking any amino acid sequence limitation or other structural characteristics that could have been used to distinguish antibodies that bind to and antagonize

CGRP from those that do not. *Supra* § II.C.2. These multi-dimensionally overbroad claims are invalid for the reasons discussed herein.

While the asserted dependent claims each limit the claims in one dimension, they remain exceedingly broad in many others, SOF 207-208, 233-235, 398-411:

- Claims directed to treating subsets of headache disorders fail to restrict the vast genus of claimed antibodies, the wide range of effective amounts, and potential routes of administration ('045 claims 19 and 24; '907 claims 5 and 6; '908 claims 5 and 6).

- Claims that include a binding affinity limitation fail to restrict the vast genus of claimed antibodies (except to add yet another functional requirement), the numerous listed headache disorders, the wide range of effective amounts, and potential routes of administration ('045 claim 20; all claims in the '908 patent).

- Claims that recite certain administration routes fail to restrict the vast genus of claimed antibodies, the numerous listed headache disorders, and the wide range of effective amounts ('045 claim 27, '907 claim 4, '908 claim 4).

- Claims that provide partial amino acid sequences corresponding to those in Antibody G1 ('045 claims 18 and 21) fail to restrict the numerous listed headache disorders, the wide range of effective amounts, and potential routes of administration.

- Claims that recite antibody type, class, subclass, or CDR source fail to meaningfully restrict the vast genus of claimed antibodies, the numerous listed headache disorders, the wide range of effective amounts, and potential routes of administration ('045 claim 30, '907 claims 15 and 17, '908 claims 15 and 17).

Because the scope of each asserted claim remains exceedingly broad, the specification provides minimal guidance, and the field was nascent and art was unpredictable, a POSA would need to engage in undue, trial-and-error experimentation. No claim is enabled.

## V.     Lilly Is Also Entitled to Summary Judgment as a Matter of Law Because Teva's Experts Applied the Wrong Legal Standard

Teva's experts did not address the amount of experimentation required to practice the ***full scope*** of the claims. Instead, they presented opinions premised on incorrect legal theories. But when an expert's opinion "is based on an erroneous legal standard, [it] cannot defeat summary judgment." *Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 134-35 (D. Mass.

2003); *see MorphoSys*, 358 F. Supp. 3d at 372 (granting summary judgment because contention that experimentation would be routine "does not get to the relevant question: whether the ***full scope*** of the claims" is enabled (emphasis in original)).

*First*, Teva's experts assert that a POSA would not need to undertake iterative efforts because a POSA "only needs ***one*** functional . . . antibody." SOF 384 (██████████████ ██████████████████████████████████████████████), SOF 385 (███ ████████████████████████████████████████████████████████ ██████████), *see* SOF 386 (███████████████████████████████ ███████████████████████████████.) Similarly, they state that one would only attempt to identify "***an*** 'effective amount'" or use "***a simple*** formulation," ignoring that the claims encompass any and all effective amounts and many formulations. SOF 387-389. Teva's positions are incorrectly directed to making and using one embodiment of the claims—not practicing the ***full scope*** of the claims, as the law requires. *See Idenix*, 941 F.3d at 1154, 1162 (enablement "considers the scope of the claim as written, not just the subset of the claim that a POSA might practice").

*Second*, Teva's experts assert that individual experiments required along the pathway to develop treatment methods were "routine." SOF 390-392. None, however, opine that it would have been routine to make, screen, humanize, and test antibodies across the ***full scope*** of the claims, as required. *Idenix*, 941 F.3d at 1154. Instead, they confirm it was not. SOF 393 (█████████████ ████████████████████████████████████████████████████████ ; SOF 394 (███████████████████████████████ ); SOF 80-82 (Dr. Hale writing in his own work: "it is completely impractical to manufacture and test all of them"). The Federal Circuit has

placed reasonable limits on the amount of experimentation—even if routine—that the law will tolerate, and Teva's minimal disclosure and vast functional claims violate that standard. *E.g.*, *Idenix*, 941 F.3d at 1163 ("[n]otwithstanding the fact that screening an individual compound for effectiveness was considered 'routine,' we concluded as a matter of law in *Wyeth* that the claim was not enabled" because it would be necessary to make and screen tens of thousands of candidate compounds for use in the claimed treatment methods).

*Third*, Teva's experts contend that the specification need not describe the full genus of humanized and/or human antibodies recited for use in the claimed methods because the invention is purportedly directed to treatment methods, not the antibodies themselves. SOF 395-397. But one cannot practice the claimed methods without such antibodies. *See Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 926 (Fed. Cir. 2004) ("Without such a compound, it is impossible to practice the claimed method of treatment." (citation omitted)). Here, ***no*** human or humanized anti-CGRP antagonist antibodies were available from the prior art, and the specification discloses ***one*** such antibody. *Supra* §§ IV.B-C. The Federal Circuit has expressly rejected Teva's argument and affirmed summary judgment for method of treatment claims where even ***some*** suitable compounds were previously known because the functionally defined claims, like Teva's here, encompassed use of an ***entire genus*** of compounds. *Wyeth*, 720 F.3d at 1385.

Teva's legally incorrect positions fail to raise a genuine issue of material fact, and summary judgment should be granted. *Straumann*, 278 F. Supp. 2d at 134-35.

## VI.    Conclusion

Lilly respectfully requests that the Court grant summary judgment of invalidity as to all asserted claims for lack of enablement.

Dated:  March 28, 2022

/s/Andrea L. Martin
Andrea L. Martin (BBO 666117)
BURNS & LEVINSON LLP
125 High Street
Boston, MA 02110-1624
(617) 345-3000
amartin@burnslev.com

William B. Raich
Danielle A. Duszczyszyn
Denise Main
Pier D. DeRoo
Matthew Luneack
Yoonjin Lee
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
William.Raich@finnegan.com
Danielle.Duszczyszyn@finnegan.com
Denise.Main@finnegan.com
Pier.DeRoo@finnegan.com
Matthew.Luneack@finnegan.com
Yoonjin.Lee@finnegan.com

Charles E. Lipsey
Ryan O'Quinn
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
1875 Explorer Street
Suite 800
Reston, VA 20190-6023
Charles.Lipsey@finnegan.com
Oquinnr@finnegan.com

Emily R. Gabranski (BBO 694417)
Marta Garcia Daneshvar
Lulu Wang (BBO 704042)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
2 Seaport Lane
Boston, MA 02210-2001
Emily.Gabranski@finnegan.com
Marta.Garcia@finnegan.com
Lulu.Wang@finnegan.com

*Attorneys for Defendant*
*Eli Lilly and Company*

## <u>CERTIFICATE OF SERVICE</u>

I, Andrea Martin, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 28, 2022.  The unredacted version of this document will be served on all outside counsel of record via email.

*/s/Andrea L. Martin, Esq.*
Andrea L. Martin, Esq.

# APPENDIX A

Appendix A: Asserted Claims of the Patents-in-Suit

**Asserted Claims of U.S. Patent No. 8,586,045 ("the '045 patent")**

17. A method for reducing incidence of or treating headache in a human, comprising administering to the human an effective amount of an anti-CGRP antagonist antibody, wherein said anti-CGRP antagonist antibody is a human monoclonal antibody or a humanized monoclonal antibody

18. The method according to claim 17, wherein the anti-CGRP antagonist antibody is:
   (a) an antibody having a CDR H1 as set forth in SEQ ID NO: 3; a CDR H2 as set forth in SEQ ID NO: 4; a CDR H3 as set forth in SEQ ID NO: 5; a CDR L1 as set forth in SEQ ID NO: 6; a CDR L2 as set forth in SEQ ID NO: 7; and a CDR L3 as set forth in SEQ ID NO: 8; or
   (b) a variant of an antibody according to (a) as shown in Table 6.

19. The method according to claim 17, where said headache is a migraine with or without aura, hemiplegic migraine, cluster headache, migrainous neuralgia, chronic headache, or tension headache.

20. The method according to claim 17, wherein the anti-CGRP antagonist antibody has a binding affinity ($K_D$) to human α-CGRP of 50 nM or less as measured by surface plasmon resonance at 37° C.

21. The method according to claim 17, wherein the anti-CGRP antagonist antibody comprises a $V_H$ domain comprising SEQ ID NO: 1 and a $V_L$ domain comprising SEQ ID NO: 2.

24. The method of claim 17, wherein said headache is a migraine.

27. The method of claim 17, wherein route of administration of said anti-CGRP antagonist antibody is selected from the group consisting of systemically, intravenously, subcutaneously, intramuscularly, and transdermally.

30. The method of claim 17, wherein said anti-CGRP antagonist antibody is a humanized monoclonal antibody.

**Asserted claims of U.S. Patent No. 9,884,907 ("the '907 patent")**

1. A method for treating headache in an individual, comprising:
   administering to the individual an effective amount of a humanized monoclonal anti-Calcitonin Gene-Related Peptide (CGRP) antagonist antibody, comprising:
   two human IgG heavy chains, each heavy chain comprising three complementarity determining regions (CDRs) and four framework regions, wherein portions of the two heavy chains together form an Fc region; and
   two light chains, each light chain comprising three CDRs and four framework regions;
   wherein the CDRs impart to the antibody specific binding to a CGRP consisting of amino acid residues 1 to 37 of SEQ ID NO:15 or SEQ ID NO:43.

4. The method of claim 1, wherein the antibody is administered intravenously or subcutaneously.

5. The method of claim 1, wherein the headache is a migraine with or without aura, hemiplegic migraine, cluster headache, migrainous neuralgia, chronic headache, or tension headache.

6. The method of claim 1, wherein the headache is a migraine.

15. The method of claim 1, wherein constant regions of the IgG heavy chains are IgG4 constant regions.

17. The method of claim 15, wherein the CDRs of the humanized monoclonal antibody are derived from mouse, rat, or rabbit CDRs.

**Asserted claims of U.S. Patent No. 9,884,908 ("the '908 patent")**

1. A method for treating headache in an individual, comprising:
   administering to the individual an effective amount of a humanized monoclonal anti-Calcitonin Gene-Related Peptide (CGRP) antagonist antibody, comprising:
   two human IgG heavy chains, each heavy chain comprising three complementarity determining regions (CDRs) and four framework regions, wherein portions of the two heavy chains together form an Fc region; and
   two light chains, each light chain comprising three CDRs and four framework regions;
   wherein the CDRs impart to the antibody specific binding to a CGRP consisting of amino acid residues 1 to 37 of SEQ ID NO:15 or SEQ ID NO: 43, and wherein the antibody binds to the CGRP with a binding affinity ($K_D$) of about 10 nM or less as measured by surface plasmon resonance at 37° C.

4. The method of claim 1, wherein the antibody is administered intravenously or subcutaneously.

5. The method of claim 1, wherein the headache is a migraine with or without aura, hemiplegic migraine, cluster headache, migrainous neuralgia, chronic headache, or tension headache.

6. The method of claim 1, wherein the headache is a migraine.

15. The method of claim 1, wherein constant regions of the IgG heavy chains are IgG4 constant regions.

17. The method of claim 15, wherein the CDRs of the humanized monoclonal antibody are derived from mouse, rat, or rabbit CDRs.