## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| TEVA PHARMACEUTICALS INTERNATIONAL GMBH and TEVA PHARMACEUTICALS USA, INC.,<br><br>       Plaintiffs,<br><br>  v.<br><br>ELI LILLY AND COMPANY,<br>       Defendant. | Civil Action No.<br>1:18-cv-12029-ADB<br><br> |

## PLAINTIFFS TEVA PHARMACEUTICALS INTERNATIONAL GMBH AND TEVA PHARMACEUTICALS USA, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR <u>PARTIAL SUMMARY JUDGMENT REGARDING JUDICIAL ESTOPPEL</u>

████████████████████████

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1

II.     BACKGROUND ............................................................................................. 3

    A.    The patents-in-suit claim methods of using anti-CGRP antagonist antibodies to treat headache. .................................................................... 3

    B.    Lilly petitions the Board for *inter partes* review of Teva's patents...................... 4

    C.    The Board found the challenged claims in Teva's Composition of Matter patents unpatentable, adopting Lilly's positions that anti-CGRP antagonist antibodies were well-known in the art at the time of the invention, as were methods for humanizing and screening them. ....................................................... 5

    D.    Lilly's arguments in this case conflict with Lilly's arguments in the IPRs. .......... 8

III.    LEGAL STANDARD.................................................................................... 9

    A.    Judicial estoppel prevents a party from taking inconsistent positions across two proceedings based on the exigencies of the moment. .................................... 9

    B.    Judicial estoppel may be decided at summary judgment..................................... 11

IV.     LILLY IS JUDICIALLY ESTOPPED FROM TAKING POSITIONS IN THIS CASE THAT DIRECTLY CONFLICT ARGUMENTS IT SUCCESSFULLY MADE IN THE IPRS. ................................................................................... 12

    A.    Lilly's written description and enablement defenses depend on it abandoning IPR arguments about the skill and knowledge of a POSA.............. 13

    B.    Lilly takes three positions in this case that directly conflict with positions it took before the Board............................................................................ 16

    C.    The Board relied on Lilly's prior positions in granting relief............................ 18

    D.    Lilly benefitted from the Board's acceptance of its positions and permitting Lilly to change positions would give it an unfair advantage in this case. .......... 19

V.      CONCLUSION.............................................................................................. 20

████████████████████████████

# **TABLE OF AUTHORITIES**

**Page(s)**

## Cases

*Adamson v. Walgreens Co.*,
  750 F.3d 73 (1st Cir. 2014) ...................................................................11

*Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*,
  374 F.3d 23 (1st Cir. 2004) ......................................................1, 2, 10, 19

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) (en banc) ...............................................14

*Biogen Int'l GmbH v. Mylan Pharms. Inc.*,
  2020 WL 3317105 (N.D. W. Va. June 18, 2020) ....................................11

*Cephalon, Inc. v. Watson Pharms., Inc.*,
  707 F.3d 1330 (Fed. Cir. 2020) ...............................................................15

*Chiron Corp. v. Genentech, Inc.*,
  363 F.3d 1247 (Fed. Cir. 2004) ...............................................................15

*Delanda v. County of Fresno Dept. of Probation*,
  2012 WL 253190 (E.D. Cal. 2012) ..........................................................12

*Egenera, Inc. v. Cisco Sys., Inc.*,
  972 F.3d 1367 (Fed. Cir. 2020) ...............................................................11

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
  2020 WL 1540364 (PTAB Mar. 31, 2020) ................................................5

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
  2020 WL 806932 (PTAB Feb. 18, 2020) ........................................5, 6, 19

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
  2020 WL 808240 (PTAB Feb. 18, 2020) .............................................5, 19

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
  8 F. 4th 1331 (Fed. Cir. 2021) ...................................................................5

*Guay v. Burack*,
  677 F.3d 10 (1st Cir. 2012) ......................................................................10

*InterGen N.V. v. Grina*,
  344 F.3d 134 (1st Cir. 2003) ......................................................................9

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
   688 F.3d 1342 (Fed. Cir. 2012)..............................................................................4, 13

*Lampi Corp. v. Am. Power Prds., Inc.*,
   228 F.3d 1365 (Fed. Cir. 2000).......................................................................................9

*New Hampshire v. Maine*,
   532 U.S. 742 (2001)................................................................................................1, 10

*Pattie v. AT&T*,
   2012 WL 1070031 (W.D. Pa. 29, 2012) ......................................................................12

*Portela-Gonzalez v. Sec'y of the Navy*,
   109 F.3d 74 (1st Cir. 1997).............................................................................................11

*PPG Indus., Inc. v. Guardian Indus. Corp.*,
   75 F.3d 1558 (Fed. Cir. 1996).......................................................................................15

*S3 Inc. v. NVIDIA Corp.*,
   259 F.3d 1364 (Fed. Cir. 2001).......................................................................................14

*In re Semcrude, L.P.*,
   2012 WL 694505 (D. Del. Mar. 1, 2012) ....................................................................12

*Sexual Minorities Uganda v. Lively*,
   899 F.3d 24 (1st Cir. 2018)............................................................................................10

*Thore v. Howe*,
   466 F.3d 173 (1st Cir. 2006)..........................................................................................12

*United States v. Tailwind Sports Corp.*,
   234 F. Supp. 3d 180 (D.D.C. 2017) ..............................................................................12

*Wagner v. Prof'l Eng'rs in Cal. Gov't*,
   354 F.3d 1036 (9th Cir. 2004) ......................................................................................10

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988).................................................................................14, 15

*Wang Labs., Inc. v. Applied Computer Scis., Inc.*,
   958 F.2d 355 (Fed. Cir. 1992).......................................................................................10

*Wyeth & Cordis Corp. v. Abbott Labs.*,
   720 F.3d 1380 (Fed. Cir. 2013)......................................................................................14

**Statutes**

35 U.S.C. § 103.......................................................................................................................4

███████████████████████████

35 U.S.C. § 112 .......................................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 56 ...............................................................................................11, 12

Local Rule 56.1 .........................................................................................................11

## I.    INTRODUCTION

The doctrine of judicial estoppel safeguards the integrity of judicial proceedings by preventing a party from "changing positions according to the exigencies of the moment" and taking a position in one action that is inconsistent with a position the same party has taken in a prior action, where the party convinced the prior adjudicator to accept its earlier position.  *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) (citation omitted); *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004).  This is precisely what Lilly is seeking to do in this patent infringement suit.  In *inter partes review* ("IPR") proceedings before the Patent Trial and Appeal Board ("Board"), Lilly argued that six of Teva's patents claiming humanized anti-CGRP antagonist antibodies ("Composition of Matter patents") were unpatentable.  The Board agreed with Lilly.  Lilly now asks this Court to invalidate three related Teva patents by taking positions in this case that contradict the positions it took in the IPRs—positions the Board accepted in finding the Composition of Matter patents unpatentable.  This is precisely the kind of flip-flopping that judicial estoppel is designed to prevent.

At issue in this lawsuit are Teva's three patents claiming methods of treating headache using the same humanized anti-CGRP antagonist antibodies that were at issue in the IPRs ("Method of Treatment patents").  Having failed to convince the Board that the Method of Treatment patents are obvious, Lilly alleges that the claims are invalid for failing to satisfy the written description and enablement requirements of 35 U.S.C. § 112.  Lilly's arguments under § 112, predictably, conflict with the arguments Lilly made in the IPRs.  In the IPRs, Lilly was trying to convince the Board that the humanized anti-CGRP antagonist antibodies claimed in the Composition of Matter patents were obvious to a person of ordinary skill in the art ("POSA").  Here, Lilly is trying to convince the Court that the same antibodies, when used for the treatment of migraine, were so obscure and unpredictable that the disclosure of the antibodies in Teva's

1

Method of Treatment patent specifications is not sufficient for a POSA (i) to have recognized the inventors "possessed" the invention from the specification (written description) or (ii) to have practiced the invention from the specification without undue experimentation (enablement).

In particular, Lilly's district court experts advance three positions essential to Lilly's § 112 case that directly conflict with positions Lilly persuaded the Board to adopt in the IPRs. *First*, Lilly's experts opine that anti-CGRP antagonist antibodies were not well known in the art at the time of Teva's invention and that the process for preparing them was not routine. In the IPRs, Lilly took the opposite position, arguing that anti-CGRP antagonist antibodies and the process for preparing them were well known in the art, and the Board found as much. *Second*, Lilly's experts assert that the process of screening for antibodies that actually block (or "antagonize") the biological function of CGRP was lengthy and complicated, whereas in the IPRs, Lilly argued that screening was straightforward and well-understood, and the Board found as much. *Third*, Lilly's experts now claim that the process of humanizing anti-CGRP antagonist antibodies was unpredictable and time-consuming. In the IPRs, Lilly argued that humanizing antibodies was "routine," and the Board found as much. As explained below, these three issues of fact—namely, (i) what a POSA would understand about anti-CGRP antagonist antibodies and the process for preparing them, (ii) the techniques available to that POSA to screen anti-CGRP antibodies for antagonistic activity, and (iii) the techniques available to that POSA to humanize anti-CGRP antagonist antibodies—lie at the foundation of both of Lilly's § 112 defenses. Lilly has "adopted one position, secured a favorable decision, and then taken a contradictory position in search of legal advantage"; therefore, this Court should hold that Lilly is judicially estopped from taking their contradictory positions here. *Alternative Sys. Concepts*, 374 F.3d at 33 (citation omitted).

## II.     BACKGROUND

### A.     The patents-in-suit claim methods of using anti-CGRP antagonist antibodies to treat headache.

The patents in this case are U.S. Patents 8,586,045, 9,884,907, and 9,884,908.  Plaintiffs'
Statement of Undisputed Material Facts ("SUMF") ¶ 1.  They are directed to methods of treating
headache, including migraine, using humanized antagonist antibodies that target calcitonin gene-
related peptide ("CGRP").  CGRP is a 37-amino acid peptide that binds to CGRP receptors in the
body.  Prior to the inventions disclosed and claimed in the patents, the recognition of CGRP's
possible role in migraine led to the development and testing of small molecule compounds that
block the CGRP *receptor*, thereby inhibiting CGRP's activity in the central nervous system.  The
Method of Treatment patents, by contrast, are directed to methods of treating headache using
humanized antibodies that antagonize CGRP *itself*, not its receptors.

Patents are written for and intended to be interpreted by persons of ordinary skill in the art
("POSA").  In the scientific and technical field of therapeutic antibodies, the parties agree that the
POSA possesses impressive qualifications:  "(1) a Ph.D. in a relevant field, such as immunology,
biochemistry, or pharmacology, with several years of post-doctoral experience in antibody
engineering, pharmacokinetics, and pharmacodynamics, or (2) an M.D. with a residency or
specialty in neurology, and several years of experience studying CGRP or treating patients with a
CGRP-related disease, such as migraine headaches."  *Id.* ¶ 2.  The first component of the POSA's
qualifications concerning the knowledge and skill required to make, identify, and optimize
therapeutic antibodies, which generally is referred to as antibody engineering, is integral to this
motion.[1]  As explained below, Lilly's district court invalidity arguments hinge on a POSA having

---

[1] The second component of the POSA's qualifications relate to the use of those antibodies in a
clinical setting—*i.e.*, to treat patients suffering from headache disorders, such as migraine.

trouble grasping the technology here, because the engineering and screening of humanized anti-CGRP antagonist antibodies was "highly unpredictable," "laborious and fraught with unpredictability," and "highly variable, and uncontrollable." *Id.* ¶¶ 24, 25, 56, 58, 60.  As also explained below, this premise directly conflicts with positions Lilly took in related IPRs.

      **B.**      **Lilly petitions the Board for *inter partes* review of Teva's patents.**

In addition to the three Method of Treatment patents, this case also initially included six "Composition of Matter" patents, which claim anti-CGRP antagonist antibodies themselves. SUMF ¶ 1.  In 2018, Lilly petitioned for *inter partes* review of all nine patents.  *Id.* ¶ 3.  Although the claims differ (method of treatment vs. composition of matter), the patents are related.  They all share the same specification, claim priority to the same original application, and have the same priority date.  *Id.* ¶ 1.

Lilly argued that the challenged claims were invalid because they were obvious in view of the art existing at the time of the invention ("prior art").  *See* 35 U.S.C. § 103.  To prove that the claims were obvious, Lilly was required to prove that (i) all the elements of the asserted claims were disclosed or suggested by the prior art, (ii) a POSA would have been motivated to combine those elements to achieve the claimed invention, and (iii) a POSA would have had a reasonable expectation of success in doing so.  *See, e.g.*, *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012).

The central issue in the Composition of Matter IPRs was whether a POSA would have been motivated to combine prior art references that disclosed non-human CGRP antagonist antibodies with other prior art references that discussed humanized antibodies generally, with a reasonable expectation of successfully making a humanized antibody that antagonized the biological function of CGRP.  The IPR record was enormous.  Lilly submitted multiple declarations from multiple expert witnesses, over three hundred exhibits, and hundreds of pages of attorney argument.  As

explained below, Lilly argued that in 2005, at the time of Teva's inventions, non-human anti-CGRP antagonist antibodies were "well-known," the techniques available to a POSA to recognize an antibody as an "antagonist" were "routinely used" and "conventional," and the process of turning a non-human antibody into a "humanized" antibody involved "the routine application of conventional humanization processes." *See* SUMF ¶¶ 6 – 14, 26 – 36, 44 – 49.

        C.      **The Board found the challenged claims in Teva's Composition of Matter patents unpatentable, adopting Lilly's positions that anti-CGRP antagonist antibodies were well-known in the art at the time of the invention, as were methods for humanizing and screening them.**

The Board held, in two separate but similar decisions, that the challenged claims in Teva's six Composition of Matter patents were unpatentable as obvious. *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 2020 WL 806932 (PTAB Feb. 18, 2020); *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 2020 WL 808240 (PTAB Feb. 18, 2020).[2]  The Board's two decisions contain extensive factual findings and contain more than 300 pages of analysis.[3]  *See, e.g.*, Ex. 8.  Although many aspects of the decisions cannot be squared with Lilly's § 112 defenses in this case, Teva focuses here on the three pillars of Lilly's IPR case that directly conflict with its § 112 district court defense.

*First*, the Board held that by 2005, antibodies that antagonize CGRP were "well known in the art," SUMF ¶ 18, and that the methods of preparing them were "routine," *id.* ¶ 19.  In so holding, the Board adopted the position Lilly advocated in briefing that anti-CGRP antagonist antibodies were "well-known and readily prepared" by 2005.  *Id.* ¶¶ 15 – 17.  In particular, Lilly argued that one of its primary prior art references, Tan 1995, "describes murine anti-CGRP

---

[2] SUMF ¶ 4.  The Board held that Lilly had not shown that the challenged claims in the Method of Treatment patents at issue in this case were unpatentable, and the Federal Circuit affirmed.  *See Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F. 4th 1331 (Fed. Cir. 2021); *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 2020 WL 1540364 (PTAB Mar. 31, 2020).

[3] After the Board found claims in the Composition of Matter patents unpatentable in the IPRs, and after the IPR decisions were affirmed by the Federal Circuit, Teva dropped these six Composition of Matter patents from this case.  ECF No. 164 at 3–4.

antagonist antibodies, including a full-length antibody, that blocked the effects of CGRP" and "establishes that an anti-CGRP antibody with the claimed properties could be readily prepared by known, established, and conventional techniques." *Id.* ¶ 10. Lilly's argument was not limited to Tan; as the Board recognized, Lilly argued that "the prior art was replete with exemplary disclosures of anti-CGRP antagonist antibodies." *Id.* ¶ 16 (citing Lilly's exhibits).[4] Lilly argued that a POSA "would have expected that a similar antibody [to that discussed in Tan] could be prepared using routine and conventional antibody preparation methods." SUMF ¶ 12.

*Second*, the Board "adopt[ed] as findings of fact" Lilly's assertion that it was "well established" by 2005, including by prior art reference Doods, that one could determine whether an antibody inhibits the CGRP pathway by a screening process that involved measuring "cAMP activation in SK-N-MC cells." *Id.* ¶ 37. As Lilly explained, "CGRP was well known to stimulate production of cAMP, a chemical involved in muscle relaxation and dilation of blood vessels (i.e., vasodilation)." *Id.* ¶ 27. By 2005, the use of assays to measure cAMP inhibition in cells "had become a common way to measure antagonist activity." *Id.* Indeed, Lilly emphasized that this was a "conventional" method for identifying antibodies as antagonists that would be "readily available" to a POSA. *See id.* ("measuring inhibition of cAMP activation is a conventional means of evaluating whether an anti-CGRP antagonist antibody is, in fact, an anti-CGRP antagonist.").[5]

---

[4] *See also* SUMF ¶ 7 ("murine monoclonal anti-CGRP antagonist antibod[ies] . . . and techniques for making them, were extensively described in the prior art"); *id.* ¶ 17 ("by 2005, several publications had described anti-CGRP antagonist antibodies" and "well-established" methods of making them"); *id.* ¶ 8 ("The '614 patent acknowledges the routine nature of generating anti-CGRP antagonist antibodies" and that there are "*established and conventional* techniques for antibody stimulation and production" (emphasis in original)); *Eli Lilly*, 2020 WL 806932, at *24–26 (describing references that disclose anti-CGRP antagonist antibodies).

[5] Lilly argued that another assay—referred to as a "radioligand binding assay"—was also a "conventional" method, "used routinely in the prior art," for identifying antibodies as anti-CGRP antagonists. SUMF ¶¶ 28, 29; *accord id.* ¶ 33. Lilly argued that a POSA "would have confirmed

███████████████████████████

*Third*, the Board found that the step of humanizing anti-CGRP antagonist antibodies would have been routine by 2005, and that a POSA could humanize an anti-CGRP antagonist antibody without reducing its ability to bind to its target CGRP.  *See id.* ¶¶ 50 – 54 (adopting Lilly's argument that by 2005 "conventional humanization techniques were routinely used," and holding that it would have been "routine" in 2005 to humanize an antibody that binds to CGRP).  Here, again, the Board credited the position Lilly had advocated in its briefing.  Lilly argued that "humanization was a well-established and routine procedure by 2005."  SUMF ¶ 44.  Lilly explained that "a prominent method [of humanization] was to . . . graft[] CDRs from a non-human antibody into a human antibody scaffold," a technique that was "first introduced nearly twenty years before Teva's earliest filing date, and was thereafter refined by the work of Queen and others."  *Id.* ¶ 52; *see also id.* ¶ 45 (Queen "describes routine and conventional humanization technologies that have been recognized as the 'gold standard' years before 2005" (citation omitted)).  Using "Queen's routine humanization processes," Lilly argued, "a POSA would have readily been able to" humanize an antibody "while maintaining or even improving the binding specificity and affinity for human CGRP."  *id.* ¶ 46; *accord id.* ¶ 47 ("Queen discloses well-established prior art techniques to generate humanized antibodies for therapeutic use that maintained the original binding attributes of the donor non-human antibodies.").

The Federal Circuit affirmed the Board's decision, holding that substantial evidence supported the Board's holding that a POSA would have had a motivation to combine the prior art references—including Tan, Queen, and Doods—to achieve the claimed humanized anti-CGRP antibodies, and a reasonable expectation of success in doing so.  *Id.* ¶ 5.

---

the ability of a humanized anti-CGRP antagonist antibody to inhibit human αCGRP from binding to its receptor using a radioligand binding assay in SK-N-MC cells" as disclosed in "Doods and other prior art references."  *Id.* ¶ 28.

**D.      Lilly's arguments in this case conflict with Lilly's arguments in the IPRs.**

Lilly has made clear that it intends to assert positions in this case that squarely contradict the positions Lilly took in the IPRs.

*First*, Lilly is arguing in this case that non-human anti-CGRP antagonist antibodies were not "well-known" in the art as of 2005, and that the process for preparing such antibodies was far from routine.  Lilly's expert, Dr. Charles, opines there are "few reported murine anti-CGRP antibodies" in the "literature as a whole," and that the few antibodies had "unpredictable properties and functions, with some *enhancing* CGRP's activity rather than antagonizing it."  SUMF ¶ 20.  "Variation and unpredictab[ility] in properties and function among anti-CGRP antibodies," he states, "was thus the general rule as of 2005-2006."  *Id.* ¶ 21; *accord id.* ¶ 20 ("And the few reported murine anti-CGRP antibodies had unpredictable properties, with some enhancing CGRP activity rather than antagonizing it (and some having no effect on CGRP)").  Another of Lilly's experts, Dr. McDonnell, criticizes the prior art for similar reasons.  He states that a POSA reviewing the prior art literature would have recognized the "unpredictable relationship between anti-CGRP antibodies and their functional properties," *id.* ¶ 23, and would have further understood that "the art of antibody engineering . . . was highly unpredictable."  *Id.* ¶ 25; *accord id.* ¶ 59 (referring to the "labor intensive" nature of  "techniques for making a monoclonal murine antibody").

*Second*, Lilly argues in this case that screening for antibodies that inhibit CGRP activity was not routine at all, but complicated and time-consuming.  Dr. McDonnell rests his invalidity opinion on his belief that the patent specifications "fail to provide adequate guidance on how to screen for humanized anti-CGRP antagonist antibodies that would be efficacious in treating a human disease."  *Id.* ¶ 41.  He states that screening was "extensive" and burdensome, requiring that "each variant" be tested, and was a "lengthy trial-and-error process."  *Id.* ¶ 42.  Dr. Charles

similarly emphasizes the complicated and lengthy nature of the process, stating that "conducting cAMP and *in vivo* animal assays to adequately characterize a single compound requires significant work and time for setting up the experimentation, selecting and evaluating appropriate controls, testing the compound of interest itself, and appropriately evaluating the results," a process that would take "at least four months." *Id.* ¶ 43.

*Third,* Lilly is taking the position in this case that the patents' specification does not provide enough detail about "humanized anti-CGRP antagonist antibodies," and that in 2005 humanization was a complicated, unpredictable process. Dr. McDonnell states that "the state of the prior art" with respect to humanization was "nascent" in 2005, and that a POSA would have had "no actual experience" with humanizing antibodies. *Id.* ¶ 56. He asserts that humanization was a "highly unpredictable" "trial and error exercise" that required much "experimentation" and had "no guarantee of success at the end." *Id.* Dr. Charles similarly states that "antibody humanization was an empirical, unpredictable, time-consuming, and expensive process, taking anywhere from four months to a full year, requiring multiple full-time employees, and costing about $500,000 for each humanized antibody." *Id.* ¶ 55. Dr. McDonnell also states that humanizing antibodies "typically reduced or eliminated the ability of the antibody to bind to its target" CGRP, and that researchers were unable to fix this issue without creating other issues. *Id.* ¶ 57.

## III.   LEGAL STANDARD

### A.   Judicial estoppel prevents a party from taking inconsistent positions across two proceedings based on the exigencies of the moment.

"[T]he doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier

phase of the same proceeding." *InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003).[6]   The purpose of the doctrine is to "safeguard the integrity of the courts by preventing parties from improperly manipulating the machinery of the judicial system," *Alternative Sys. Concepts*, 374 F.3d at 33, and "changing positions according to the exigencies of the moment," *New Hampshire*, 532 U.S. at 750.   The doctrine applies broadly to all kinds of positions a party may take, including an "expression of intention, a statement of fact, or a legal assertion." *Wagner v. Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1044 (9th Cir. 2004).

For judicial estoppel to apply, two conditions must be satisfied.   First, "the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive." *Alternative Sys. Concepts*, 374 F.3d at 33.   Second, "the responsible party must have succeeded in persuading a court to accept its prior position." *Id.*   The court need not have *explicitly* accepted the position; the issue "may sometimes be decided implicitly, as when the resolution of that issue comprises, either logically or practically, an essential part of the ordering court's decision." *Sexual Minorities Uganda v. Lively*, 899 F.3d 24, 33 (1st Cir. 2018).   Courts also consider whether the party asserting the inconsistent position benefitted from the court's acceptance of that position and "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 743.   These final two considerations are not necessary for judicial estoppel to attach, but a showing of an unfair advantage is "a powerful factor in favor of applying the doctrine." *Guay v. Burack*, 677 F.3d 10, 16–17 (1st Cir. 2012).

---

[6] Because the issue of judicial estoppel is a "non-patent procedural issue," the law of the First Circuit applies. *Lampi Corp. v. Am. Power Prds., Inc.*, 228 F.3d 1365, 1377 (Fed. Cir. 2000); *see also Wang Labs., Inc. v. Applied Computer Scis., Inc.*, 958 F.2d 355, 358 (Fed. Cir. 1992) (applying First Circuit law to issue of judicial estoppel).

Judicial estoppel is not limited to Article III proceedings; it also applies where a party takes a position in a judicial proceeding that is inconsistent with a position that party took before an administrative tribunal, including in an IPR proceeding before the Board.  The First Circuit has applied the doctrine of judicial estoppel to bar a party from taking a position inconsistent with the position she took in a prior navy disciplinary proceeding, *see Portela-Gonzalez v. Sec'y of the Navy*, 109 F.3d 74, 77-78 (1st Cir. 1997) ("Equitable doctrines of estoppel apply in administrative and judicial fora."), the Federal Circuit has applied the doctrine to bar a party from taking a position inconsistent with the position it took before the Patent and Trademark Office, *see Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1380 (Fed. Cir. 2020) ("[W]e agree that judicial estoppel can occur in an administrative tribunal."), and courts have applied the doctrine to bar a party from taking a position in conflict with that which it took in an IPR, *see, e.g.*, *Biogen Int'l GmbH v. Mylan Pharms. Inc.*, 2020 WL 3317105, at *8 n.15 (N.D. W. Va. June 18, 2020).

**B.**      **Judicial estoppel may be decided at summary judgment.**

The court is permitted to grant summary judgment on a "part of a claim or defense" if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Pursuant to Local Rule 56.1, Teva submits with this motion a concise statement of the material facts of record establishing that (i) Lilly is advancing positions in this case that directly conflict with arguments made in the IPRs, (ii) Lilly persuaded the Board to adopt Lilly's IPR arguments, and (iii) Lilly benefited from its IPR positions to Teva's disadvantage.  Rule 56(g) allows the Court to "enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case."  Fed. R. Civ. Proc. 56(g).  For the purposes of both rules, the same standard applies:  the court views the evidence in the light most favorable to the non-moving party and determines whether there is no genuine

dispute of material fact, such that judgment may be entered as a matter of law.  *See Adamson v. Walgreens Co.*, 750 F.3d 73, 76 (1st Cir. 2014).

Whether judicial estoppel applies is a proper question for decision at summary judgment. *See, e.g.*, *Thore v. Howe*, 466 F.3d 173, 178 (1st Cir. 2006).  Moreover, courts routinely issue rulings at summary judgment on discrete issues of fact and law in complicated cases like this to narrow issues for trial.  *See, e.g.*, *United States v. Tailwind Sports Corp.*, 234 F. Supp. 3d 180, 191 (D.D.C. 2017) ("[S]ummary judgment can be entered on narrow, factual issues.").[7]  This is precisely what Teva requests that the Court do here.  Teva asks the Court to hold as a matter of law that Lilly is judicially estopped from taking positions in this case that contradict positions it took in the IPRs and that the Board credited in holding for Lilly.  Teva asks this Court to deem the facts advanced by Lilly in the IPRs established in this case pursuant to Rule 56.

## IV.   LILLY IS JUDICIALLY ESTOPPED FROM TAKING POSITIONS IN THIS CASE THAT DIRECTLY CONFLICT ARGUMENTS IT SUCCESSFULLY MADE IN THE IPRS.

All the requirements for judicial estoppel are satisfied here.  First, Lilly advances three positions in this case that directly conflict with positions it took in the Composition of Matter IPRs. Second, the Board accepted and relied on Lilly's prior positions in holding in the IPRs that Lilly had shown that the challenged claims in the Composition of Matter patents were unpatentable. Third, Lilly obtained an advantage by asserting its prior position before the Board; Lilly

---

[7] *See also Pattie v. AT&T*, 2012 WL 1070031, at *5–9 (W.D. Pa. 29, 2012) (granting partial summary judgment in part on an element-by-element basis); *Delanda v. County of Fresno Dept. of Probation*, 2012 WL 253190, at *6 (E.D. Cal. 2012) (granting partial summary judgment on part of claim); *In re Semcrude, L.P.,* 2012 WL 694505, at *2–3 (D. Del. Mar. 1, 2012) ("Since the amendments [to Rule 56] . . . the argument that summary judgment is not proper for a portion of a single claim has lost its pluck."); Fed. R. Civ. P. 56(a), advisory committee's note to 2010 amendment ("The subdivision caption adopts the common phrase 'partial summary judgment' to describe disposition of less than the whole action, whether or not the order grants all the relief requested by the motion.").

invalidated all challenged claims in the Composition of Matter patents.  Fourth, Lilly would obtain

an unfair advantage and Teva would be unfairly disadvantaged were Lilly permitted to assert

conflicting positions in this case.  Teva has already expended resources responding to the positions

Lilly's experts took in the IPRs, and now Lilly has hired a different antibody-engineering expert

to say the opposite, forcing Teva to respond accordingly.[8]  There are no genuine disputes of

material fact, and the only fair outcome is to hold Lilly to its prior positions.[9]

> **A.    Lilly's written description and enablement defenses depend on it abandoning IPR arguments about the skill and knowledge of a POSA.**

In the IPRs, Lilly successfully argued that claims to the anti-CGRP antagonist antibodies

themselves were obvious because antibody engineering techniques were "well-known," "routine,"

and "conventional."  Here, Lilly argues that those very same techniques are so "unpredictable"

and "labor intensive" that they amount to "undue experimentation" and should have been described

in painstaking detail in the patent specifications.  In taking these two positions, Lilly puts itself in

a bind, making arguments of fact that directly conflict with one another.

Lilly's about-face is not surprising.  For the purposes of its IPR obviousness arguments,

Lilly needed to establish that the prior art was so thorough and clear that a POSA would have had

no trouble finding all the elements of the claimed invention in the prior art and putting them

together to successfully achieve the claimed invention.  *See Kinetic Concepts*, 688 F.3d at 1360.

To show lack of written description or enablement, however, Lilly has the opposite incentive.

---

[8] Lilly's antibody engineering expert in the IPRs was Alain P. Vasserot.  In this proceeding, Lilly's antibody engineering expert is James M. McDonnell.

[9] Lilly may well argue that Teva is changing positions, too.  The crucial difference, however, is that Teva *lost* in the Composition of Matter IPRs and Teva did not persuade the Board on any issue relating to antibody engineering in the Method of Treatment IPRs.  Therefore, Lilly cannot show that the prior adjudicator accepted Teva's prior positions here.

While the written description and enablement inquiries focus on the patent's specification,[10] the prior art is critical, because the level of disclosure required in the specification depends on the baseline knowledge and skill of a POSA at the time of the invention. The less that is known and the more obscure the prior art, the more the patent must disclose.

Starting with written description, the question is whether the specification "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). The Federal Circuit has identified several factors that should be used to assess the adequacy of the specification, including: "[1] the existing knowledge in the particular field, [2] the extent and content of the prior art, [3] the maturity of the science or technology, and [4] the predictability of the aspect at issue." *Id.* A POSA's knowledge and the state of the art at the time are considered in determining whether the specification adequately describes the invention, because "[t]he law is clear that patent documents need not include subject matter that is known in the field of the invention and is in the prior art, for patents are written for persons experienced in the field of the invention." *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1371 (Fed. Cir. 2001). Lilly's positions in the IPRs bear directly on these four written description factors.

Similarly, determining whether an invention is enabled requires a court to look beyond the specification. The question is whether a POSA, viewing the specification and *with knowledge of the art at the time*, would have been able to practice the invention without "undue experimentation." *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013).

---

[10] Section 112 requires that "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112(a).

Courts consider eight factors—the "*Wands* factors"—in determining whether an invention is enabled, and those factors include the background art.  The factors are: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) *the state of the prior art*, (6) *the relative skill of those in the art*, (7) *the predictability or unpredictability of the art*, and (8) the breadth of the claims."  *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988) (emphases added). Importantly, whether an invention requires undue experimentation is not a quantitative test; a "considerable amount of experimentation is permissible, if it is merely routine," *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1564 (Fed. Cir. 1996) (citation omitted), or involves the "repetition of known or commonly used techniques," *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1336–40 (Fed. Cir. 2020); *accord Wands*, 858 F.2d at 736–37 ("Enablement is not precluded by the necessity for some experimentation such as routine screening.").  Similarly, the specification "need not enable information within the knowledge of a [POSA]."  In fact, "a patentee preferably ***omits*** from the disclosure any routine technology that is well known at the time of application."  *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1254 (Fed. Cir. 2004) (emphasis added).  A central question in this case with respect to enablement is whether the antibody engineering techniques at issue here would be considered "routine" or "commonly used" (as Lilly argued in the IPRs) or "undue experimentation" (as Lilly argues in this case).

In short, where, as here, Lilly is arguing that claims are invalid for lack of written description and enablement, Lilly has every incentive to make the prior art seem opaque and complicated.  This incentive is directly contrary to Lilly's chosen strategy in the IPRs.

**B.     Lilly takes three positions in this case that directly conflict with positions it took before the Board.**

Lilly's experts in this case have offered opinions that three aspects of the process of making the claimed humanized anti-CGRP antagonist antibodies—preparing non-humanized antibodies, screening them for anti-CGRP activity, and humanizing them—were far from routine, such that they were required to be extensively described in the specification for the purpose of both written description and enablement.  In trying to make the prior art seem as opaque as possible, however, Lilly goes too far.  These arguments directly conflict with positions Lilly took in the IPRs, where it successfully argued that these same three steps were "well-known," "established," "standard," and "conventional," such that they would have been "routine" for a POSA at the time.

a.  *Anti-CGRP antibodies and methods of making them:*  In the IPRs, Lilly argued that non-human (i.e., murine) anti-CGRP antibodies were well-known in the art, and that methods for preparing them were routine.  Here, Lilly argues that there were few reported non-humanized antibodies that inhibited CGRP, and that methods of preparing them were not routine.

| Lilly's Position in the IPRs | Lilly's Position in this Case |
|---|---|
| "Anti-CGRP antagonist antibodies were ***well known*** in the art."  SUMF ¶ 6 (emphasis added) (citing "several publications" that "described anti-CGRP antagonist antibodies).<br><br>"[M]urine monoclonal anti-CGRP antagonist antibod[ies] that bind[] to human CGRP . . . . [have been] ***extensively described*** in the prior art."  *Id.* ¶ 7 (emphasis added).<br><br>"By 2005, ***several publications*** had described anti-CGRP antagonist antibodies."  *Id.* ¶ 8 (emphasis added). | There are "*few* reported murine anti-CGRP antibodies" in the "literature as a whole," and these antibodies have "***unpredictable*** properties and functions, with some enhancing CGRP's activity rather than antagonizing it."  SUMF ¶ 20 (emphasis added).<br><br>The prior art "contained ***minimal information*** about CGRP antibodies."  *Id.* ¶ 22 (emphasis added). |
| "Anti-CGRP antagonist antibodies could be created by ***known, established, and standard technique***s."  *Id.* ¶ 9 (emphasis added).<br><br>"[T]echniques for making "murine monoclonal anti-CGRP antagonist antibod[ies] that bind[] to human CGRP" "have been ***extensively described*** in the prior art."  *Id.* ¶ 11 (emphasis added).<br><br>"A POSA thus would have expected that a similar antibody [i.e., other anti-CGRP antagonist antibodies] could be | The process of making murine anti-CGRP antibodies was "***highly variable, and uncontrollable***," "***labor intensive***," and "***not a straightforward task*** as of 2005 and 2006."  *Id.* ¶ 24 (emphasis added).<br><br>"As of 2005 and 2006, the art of antibody engineering . . . was highly unpredictable."  *Id.* ¶ 25. |

████████████████████████

| Lilly's Position in the IPRs | Lilly's Position in this Case |
|---|---|
| prepared using ***routine and conventional*** antibody preparation methods." *Id.* ¶ 12 (emphasis added). | |

       b. *Screening for antibodies that antagonize CGRP:*  In the IPRs, Lilly argued that it was well established by 2005 that a POSA could determine whether a humanized anti-CGRP antibody worked as intended by measuring cAMP activation in SK-N-MC cells, and that such a screening process was conventional at the time.  Here, by contrast, Lilly's district court experts opine that screening antibodies for those that antagonize CGRP activity was not routine at all, but a lengthy and variable process for which there was little guidance in 2005.

| Lilly's Position in the IPRs | Lilly's Position in this Case |
|---|---|
| A POSA "would have confirmed the ability of a humanized anti-CGRP antagonist antibody to inhibit human αCGRP from binding to its receptor using a radioligand binding assay in SK-N-MC cells," as disclosed in "Doods and other prior art references."  SUMF ¶ 28 | The patents in suit "***fail to provide adequate guidance*** on how to screen for humanized anti-CGRP antagonist antibodies that would be efficacious in treating human disease." SUMF ¶ 41 (emphasis added). |
| "Teva's own disclosures established that the use of the radioligand binding in SK-N-MC cells is a ***routine and conventional assay***." *Id.* ¶ 29 (emphasis added). | Screening for antibodies that perform as required was "extensive" and burdensome, requiring that "each variant" be tested using a "***lengthy trial-and-error process***." *Id.* ¶ 42 (emphasis added). |
| "A POSA would . . . have expected to generate a humanized anti-CGRP antagonist antibody with similar properties that could be evaluated by the ***well-known and routine*** radioligand assay in SK-N-MC cells." *Id.* ¶ 30 (emphasis added). | "[C]onducting cAMP and *in vivo* animal assays to adequately characterize a single compound requires ***significant work and time*** for setting up the experimentation, selecting and evaluating appropriate controls, testing the compound of interest itself, and appropriately evaluating the results . . . . Overall, conducting such assays for even a single compound would take ***at least four months***." *Id.* ¶ 43 (emphasis added). |
| "[M]easuring inhibition of cAMP activation is a ***conventional*** means of evaluating whether an anti-CGRP antagonist antibody is, in fact, an anti-CGRP antagonist." *Id.* ¶ 27 (emphasis added). | |
| "SK-N-MC cells were a commercially available assay medium that a POSA would have had ***readily available*** for measuring inhibition of cAMP activation," as "evidenced by Doods." *Id.* ¶ 31 (emphasis added). | |
| The method of using SK-N-MC cells to screen was "***conventional***" and "***used routinely*** in the prior art." *Id.* ¶ 32 (emphasis added). | |
| "[R]adioligand binding assays in SK-N-MC cells were ***routinely*** used for measuring the ability of a CGRP antagonist from binding of [sic] human CGRP with its receptor." *Id.* ¶ 33 (emphasis added). | |

c.  *Humanization:*   In the IPRs, Lilly argued that humanizing a non-human anti-CGRP

antagonist antibody would have been routine in 2005, and that a POSA could have expected to

humanize an antibody without sacrificing the antibody's ability to bind to CGRP.   Here, by

contrast, Lilly's experts take the position that humanizing an antibody was a complicated process

that typically hurt the ability of an antibody to bind to CGRP.

| Lilly's Position in the IPRs | Lilly's Position in this Case |
|---|---|
| "[H]umanization was a ***well-established and routine*** procedure by 2005."  SUMF ¶ 44 (emphasis added).<br><br>Queen "describes ***routine and conventional*** humanization technologies that have been recognized as the 'gold standard' years before 2005."  *Id.* ¶ 45 (emphasis added) (citation omitted). | "[A]ntibody humanization was an ***empirical, unpredictable, time-consuming, and expensive process***, taking anywhere from four months to a full year, requiring multiple full-time employees, and costing about $500,000 for each humanized antibody."  SUMF ¶ 55 (emphasis added).<br><br>Humanization was "highly ***unpredictable***," a "***trial and error exercise***," required much "***experimentation***," and had "no guarantee of success at the end.  *Id.* ¶¶ 56, 58 (emphasis added).<br><br>"[M]ethods for humanization known in 2005–2006 were both laborious and fraught with unpredictability."  *Id.* ¶ 60 |
| Using "Queen's ***routine*** humanization processes," a POSA "would have readily been able to" humanize an antibody "***while maintaining or even improving the binding specificity*** and affinity for human CGRP."  *Id.* ¶ 46 (emphasis added).<br><br>"Queen discloses ***well-established*** prior art techniques to generate humanized antibodies for therapeutic use that ***maintained the original binding attributes*** of the donor non-human antibodies."  *Id.* ¶ 47 (emphasis added). | Humanizing antibodies "***typically reduced or eliminated the ability of the antibody to bind*** to its target" CGRP.  *Id.* ¶ 57 (emphasis added). |

**C.      The Board relied on Lilly's prior positions in granting relief.**

The second requirement for application of judicial estoppel is also satisfied here:  the Board

relied on Lilly's positions in holding that Lilly met its burden of showing that the asserted claims

were obvious.   The Board held that, by 2005, non-human antibodies that antagonize CGRP were

"well known in the art," and that preparing such antibodies would have been "routine."   SUMF

¶¶ 18, 19.   The Board also "adopt[ed] as findings of fact" Lilly's assertion that it was "well

established" by 2005 that one could test whether an anti-CGRP antibody antagonizes the CGRP

pathway by a screening process involving measuring "cAMP activation in SK-N-MC cells."   *Id.*

¶¶ 39-40.  Finally, the Board held that the humanizing anti-CGRP antibodies would also have been "routine" in 2005, and that "prior art taught how to humanize an antibody without loss of affinity or function"—*i.e.*, without losing the antibody's ability to inhibit CGRP.  *Id.* ¶¶ 52 – 54.

>   **D.  Lilly benefitted from the Board's acceptance of its positions and permitting Lilly to change positions would give it an unfair advantage in this case.**

For the reasons given above, the two requirements for judicial estoppel are satisfied here. No more is required.  However, the two additional factors that the First Circuit has identified as relevant also support application of judicial estoppel here.  *See* p. 11, *supra*.

*First*, Lilly unquestionably benefitted from the Board's acceptance of its prior inconsistent positions in the IPRs.  SUMF ¶¶ 61 – 62.  The Board's acceptance of Lilly's positions led it to conclude that Lilly had shown that a POSA would have had a reasonable expectation of success in achieving the claimed invention of a humanized anti-CGRP antagonist antibody, a crucial part of the obviousness inquiry.  *See Eli Lilly*, 2020 WL 806932, at *41-43; *Eli Lilly*, 2020 WL 808240, at *45-47.  This conclusion, along with the Board's other findings, led the Board to its decision that the challenged claims were obvious, which gave Lilly the advantage of marketing a competing product without risk of liability for infringement of Teva's Composition of Matter patents.  The fact that Lilly benefitted from the positions it took in the IPRs favors holding that Lilly is estopped from taking conflicting positions in this case.  *See Alternative Sys. Concepts*, 374 F.3d at 33.

*Second*, Lilly's flip-flopping is nothing short of unfair.  Lilly supported its positions in the patent office with hundreds of pages of expert testimony, exhibits, and attorney argument, requiring Teva to respond in kind with its own experts, exhibits, and argument.  Now, having succeeded in challenging Teva's Composition of Matter patents but having failed in challenging Teva's Method of Treatment patents, Lilly has turned around and hired *different experts* to advance the exact opposite positions to a lay jury in this case.  Teva now is forced to rebut the *opposite*

arguments and factual positions to those it opposed in the IPRs.  By contrast, there is nothing unfair about imposing judicial estoppel in this case.  Lilly can advance its § 112 defenses, but it must do so within the constraints it created in the IPR proceedings.

## V.    CONCLUSION

The Court should hold that Lilly is judicially estopped from taking positions in this case that directly conflict with positions it took in the IPRs and which the Board accepted in granting Lilly's petitions.  Specifically, Teva requests that the Court hold that the following facts are established for purposes of this case:

1.  Anti-CGRP antagonist antibodies were well-known in the art as of 2005.

2.  By 2005, a POSA would have considered the techniques for generating anti-CGRP antagonist antibodies to be "routine" and "conventional."

3.   By 2005, the techniques for preparing humanized antibodies from non-human antibodies were well-established and conventional to a POSA.

4.  By 2005, conventional humanization techniques that were routinely used preserved the affinity and specificity of the donor antibody.

5.  By 2005, assays that measured antagonism, such as cAMP activation assays and radioligand binding assays, were conventional and routine means of evaluating whether an anti-CGRP antibody was in fact able to antagonize CGRP.

Dated:  March 28, 2022

Respectfully Submitted,

*/s/ Elaine Herrmann Blais*
Douglas J. Kline (BBO# 556680)
Elaine Herrmann Blais (BBO# 656142)
Robert Frederickson III (BBO# 670111)
Joshua S. Weinger (BBO# 690814)
Alexandra Lu (BBO# 691114)
Eric T. Romeo (BBO# 691591)
Kathleen A. McGuinness (BBO# 693760)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: (617) 570-1000
Fax: (617) 523-1231
dkline@goodwinlaw.com
eblais@goodwinlaw.com
rfrederickson@goodwinlaw.com
jweinger@goodwinlaw.com
alu@goodwinlaw.com
eromeo@goodwinlaw.com
kmcguinness@goodwinlaw.com

I. Neel Chatterjee (*pro hac vice*)
GOODWIN PROCTER LLP
601 Marshall St.
Redwood City, CA 94063
Tel.: (650) 752-3100
Fax: (650) 853-1038
nchatterjee@goodwinlaw.com

Natasha E. Daughtrey (*pro hac vice*)
GOODWIN PROCTER LLP
601 S. Figueroa St.
Los Angeles, CA 90017
Tel.: (213) 426-2500
Fax: (213) 623-1673
ndaughtrey@goodwinlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Elaine Hermann Blais, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants on July 27, 2022.

*/s/ Elaine Herrmann Blais*
Elaine Herrmann Blais (BBO# 656142)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: (617) 570-1000
Fax: (617) 523-1231
eblais@goodwinlaw.com